ACCEPTED
05-18-00647-CV
FIFTH COURT OF APPEALS
DALLAS, TEXAS
6/4/2018 3:01 PM
LISA MATZ
CLERK

**Part 5 of 5**

No. 05-18-00647-CV

In the Court of Appeals
Fifth District of Texas at Dallas

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
6/4/2018 3:01:03 PM
LISA MATZ
Clerk

**In re JOHN CALCE**
*Relator*

# RECORD FOR PETITION FOR WRIT OF MANDAMUS

Relator John Calce submits this record of trial court proceedings in support of his petition for writ of mandamus.

## Index of Documents

| # | Date | Description | Record Pages |
|---|------|-------------|--------------|
| 1 | 6/26/16 | Plaintiff's Original Petition | 001-023 |
| 2 | 7/31/17 | John Calce's Original Counterclaim Against Centurion Logistics LLC and Centurion Pecos Terminal LLC | 024-172 |
| 3 | 11/22/17 | John Calce's First Amended Counterclaim Against Centurion Logistics LLC and Centurion Pecos Terminal LLC | 173-321 |
| 4 | 11/22/17 | John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC | 322-393 |

| 5 | 11/27/17 | John Calce's Supplemental Evidence in Support of Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC | 394-405 |
|---|---|---|---|
| 6 | 12/8/17 | Plaintiff's Response to John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC | 406-858 |
| 7 | 12/12/17 | John Calce's Reply Brief in Support of Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC | 859-865 |
| 8 | 12/15/17 | Notice of Trial Setting | 866 |
| 9 | 5/2/18 | Plaintiffs' Second Amended Petition | 867-903 |
| 10 | 5/21/18 | Order Denying John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Againt Centurion Logistics LLC | 904-905 |

# <u>Declaration of Chase J. Potter</u>

STATE OF TEXAS          §
COUNTY OF DALLAS       §

My name is Chase J. Potter. My date of birth is May 12, 1986. My address is 901 Main Street, Suite 6000, Dallas, Texas 75202. I hereby declare under penalty of perjury as follows:

1. I am over eighteen years of age and am fully competent to make this declaration. I am an attorney licensed by the Supreme Court of Texas and am counsel for Relator John Calce in this case.

2. The factual statements contained within this instrument are within my personal knowledge and are true and correct.

3. The copies of pleadings, motions, and other documents included in this Record for Petition for Writ of Mandamus are true and correct copies of these documents as filed in the trial court.

Executed in Dallas County, Texas, on June 4, 2018.

*/s/ Chase J. Potter*
Chase J. Potter, Declarant

## 6.3 SEVERABILITY; USURY SAVINGS

If any provision in this Note is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Note will remain in full force and effect. Any provision of this Note held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

It is the intention of the Maker and the Payee to conform strictly with applicable usury laws. Accordingly, if the transactions contemplated hereby would be usurious under applicable law then, in that event, notwithstanding anything to the contrary in any agreement entered into in connection with or as security for this Note, it is agreed as follows: (a) the aggregate of all consideration which constitutes interest under applicable law that is taken, reserved, contracted for, charged or received under this Note or under any of the other aforesaid agreements or otherwise in connection with this Note shall under no circumstances exceed the maximum amount permissible under such laws, and any excess shall be credited on this Note by the Payee (or if this Note shall have been paid in full, refunded to the Maker); (b) if determination of the rate of interest for determining whether the loans hereunder are usurious shall be made by amortizing, prorating, allocating and spreading, in equal parts during the full stated term of such loans (including any renewals of the term hereof) all interest at any time contracted for, charged or received from the Maker in connection with such loans, and any excess shall be canceled, credited or refunded as set forth in clause (a) above; and (c) in the event that maturity of this Note is accelerated by reason of an election by the Payee resulting from any Event of Default or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest may never include more than the maximum permissible amount, and excess interest, if any, provided for in this Note or otherwise shall be canceled automatically as of the date of such acceleration or prepayment and, if theretofore prepaid, shall be credited on this Note (or if this Note shall have been paid in full, refunded to the Company). Unless changed in accordance with law, the applicable rate ceiling under Texas law shall be the indicated (weekly) rate ceiling from time to time in effect as provided in Texas Revised Civil Statutes Annotated, Finance Code, Chapter 303, as amended.

## 6.4 GOVERNING LAW; PARTIES IN INTEREST

This Note will be governed by and construed under the laws of the State of Texas without regard to conflicts-of-laws principles that would require the application of any other law. In the event of a dispute involving this Note or any other instruments executed in connection herewith, the undersigned irrevocably agrees that the exclusive venue for such dispute shall lie in any court of competent jurisdiction in Dallas County, Texas. As used herein, the term "Payee" shall be deemed to include its successors, legal representatives and assigns, whether by voluntary action or by operation of law. This Note shall not be assigned or transferred by Payee without the express prior written consent of Maker, other than by operation of law. Subject to the preceding sentence, this Note will be binding in all respects and inure to the benefit of Maker and Payee and their successors and assigns, whether by voluntary action of the parties, by operation of law or otherwise and all persons claiming by through or under them.

## 6.5 ENTIRE AGREEMENT

THIS NOTE CONTAINS THE FINAL, ENTIRE AGREEMENT BETWEEN THE PARTIES HERETO RELATING TO THE SUBJECT MATTER HEREOF AND ALL PRIOR AGREEMENTS WHETHER WRITTEN OR ORAL RELATED HERETO WHICH ARE NOT CONTAINED HEREIN ARE SUPERSEDED AND TERMINATED HEREBY, AND THIS NOTE MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES HERETO.

IN WITNESS WHEREOF, Maker, intending to be legally bound hereby has executed and delivered this Promissory Note as of the date first stated above.

Centurion Pecos Terminal, LLC

By: John V. Calce, its President

4

MR.707

Exhibit "T"

MR.708

# Centurion Terminals breaks ground at port

**Staff Report | Posted: Saturday, September 12, 2015 9:38 pm**

The Port of Brownsville will have a new tenant following the recent groundbreaking for Centurion Terminals.

Officials said the Centurion Brownsville Terminal is expected to generate more than 500 jobs while under construction and then create 35 permanent jobs once fully operational in the third quarter of fiscal year 2016.

A groundbreaking was held Thursday in Brownsville .

Centurion Terminals, LLC is a premier provider of crude transportation, storage and processing. With its strategically located crude terminals in the Permian Basin and along the Gulf Coast at the Port of Brownsville , Centurion is able to offer a full crude logistics solution, a press release on the new terminal stated.

"Centurion Terminals is excited to be a part of the growth that is going on in the Port of Brownsville and appreciates the community's efforts to make the Port of Brownsville such a business friendly environment," said John Calce , Centurion's president.



## Centurion Terminal

Ken Douglas, Centurion Executive Vice President, Finance; Ralph Cowen, Port Chairman; Peter Schmarr, Centurion Executive Vice President, Operations; John Calce, Centurion President; Port Commissioner John Wood attend the ground breaking of the new Centurion processing and storage facility at Port of Brownsville Friday, Sept. 11, 2015.

"With our investment in the Centurion Brownsville Terminal we seek to not only create local employment opportunities but also to utilize Brownsville 's unique position to access worldwide markets for America 's crude."

A more complete version of this story is available on www.myBrownsvilleHerald.com.

MR.709



# Centurion Terminals breaks ground on processing and storage facility at Port of Brownsville



John Faulk, Frontera Media

BROWNSVILLE, Texas - The Port of Brownsville welcomed its new tenant, Centurion Terminals (www.CenturionTerminals.com), at the company's groundbreaking Thursday, Sept. 10, 2015. The Centurion Brownsville Terminal is expected to generate more than 500 jobs while under construction and create 35 permanent jobs when fully operational in the 3rd quarter of 2016.

Centurion Terminals, LLC is a premier provider of crude transportation, storage and processing. With its strategically located crude terminals in the Permian Basin and along the Gulf Coast at the Port of Brownsville, Centurion is able to offer a full crude logistics solution.

The Centurion Brownsville Terminal, currently under construction, will have 1.5+ million barrels of storage capacity with room for expansion. Features include state-of-the-art facilities, automated material handling, liquid cargo dock, three track rail spur and 10 truck LACT skids. Additionally, an initial two processing towers will allow Centurion to process condensate at a rate of up to 50,000 barrels per day to produce products that could be used in the local market or exported.

John Calce, Centurion's President, remarked, "Centurion Terminals is excited to be a part of the growth that is going on in the Port of Brownsville and appreciates the community's efforts to make the Port of Brownsville such a business friendly environment. With our investment in the Centurion Brownsville Terminal we seek to not only create local employment opportunities but also to utilize Brownsville's unique position to access worldwide markets for America's crude."

The Port of Brownsville is the only deep-water seaport directly on the U.S./Mexico border and the largest land-owning public port authority in the nation with 40,000 acres of land. In 2014, the Port of Brownsville moved 7.6 million metric tons of steel, aluminum, lumber, minerals, gasoline, diesel and windmill components internationally. Port activity adds $926.7 million to the regional economy, and more than $2 billion to the state's economy. More than $134 million in state and local sales tax also is generated through Port business. The Port is also responsible for the creation of 11,230 direct and indirect jobs on the regional level, and 21,590 jobs statewide.

MR.710

# Exhibit "U"

# EXTENSION OF REAL ESTATE NOTE AND LIEN

RECORDATION REQUESTED BY:
Texas Capital Bank, National Association
Premier Office, Commercial Banking
8910 N. Central Expressway, Suite 150
Dallas, TX 75206

WHEN RECORDED MAIL TO:
Texas Capital Bank, National Association
Attn : Loan Operations
2350 Lakeside Blvd, Suite 800
Richardson, TX 75082

SEND TAX NOTICES TO:
Centurion Pecos Terminal LLC
17950 Preston Road, Ste. 1080
Dallas, TX 75252

99 - 72313 / 748699

SPACE ABOVE THIS LINE IS FOR RECORDER'S USE ONLY

THIS EXTENSION OF REAL ESTATE NOTE AND LIEN dated September 16, 2015, is made and executed among Centurion Pecos Terminal LLC, 17950 Preston Road, Ste. 1080, Dallas, TX 75252 ("Grantor"); BALLENGEE INTERESTS, LLC ("Borrower"); and Texas Capital Bank, National Association ("Lender").

NOTE. Borrower has executed the following described Promissory Note payable to the order of Lender (the "Indebtedness"):

Original Promissory Note secured by Deed of Trust in the amount of $1,500,000.00 dated September 16, 2014.

LIEN. To secure the Indebtedness, Grantor has previously conveyed in trust for the benefit of Lender, certain Real Property pursuant to a Deed of Trust dated September 16, 2014 delivered to Lender's trustee, creating a lien upon the Real Property in favor of Lender (hereinafter referred to as the "Lien") and recorded in the real property records of Reeves County, State of Texas as follows:

Filed as instrument number 14-09181 in the Official Public Records of Reeves County, Texas on September 30, 2014.

REAL PROPERTY DESCRIPTION. The Lien covers the following described real property located in Reeves County, State of Texas:

See Exhibit "A", which is attached to this Extension Agreement and made a part of this Extension Agreement as if fully set forth herein.

The Real Property or its address is commonly known as Tract of land located in Section 76, Block 4, H&GN Railroad Company Survey, Pecos, TX.

EXTENSION OR MODIFICATION. Borrower, Grantor and Lender hereby extend or otherwise modify the Note and the Lien as follows:

Effective September 16, 2015, the maturity date is hereby extended to September 16, 2016

CONTINUING VALIDITY. Except as expressly modified in this Extension Agreement, the terms of the original Lien and Note shall remain unchanged and in full force and effect until the Indebtedness has been paid. Consent by Lender to this Extension Agreement does not waive Lender's right to require strict performance of the Lien and Note as changed in this Extension Agreement or obligate Lender to make any future modifications. Nothing in this Extension Agreement shall constitute a satisfaction of the Lien and Note or other credit agreement secured by the Lien. It is the intention of Lender to retain as liable all parties to the Lien and all parties, makers and endorsers to the Note, including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, shall not be released by virtue of this Extension Agreement. If any person who signed the original Lien or Note does not sign this Extension Agreement, then all persons signing below acknowledge that this Extension Agreement is given conditionally, based on the representation to Lender that the non-signing person consents to the changes and provisions of this Extension Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension or modification, but also to all such subsequent extensions and modifications.

LATE CHARGE. If payment remains unpaid after 15 days or more from the date such payment is due, Bank may charge a late charge equal to 5% of the delinquent payment , subject to the General Provisions of the original documents.

EACH PARTY TO THIS AGREEMENT ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS EXTENSION OF REAL ESTATE NOTE AND LIEN, AND EACH AGREES TO ITS TERMS.

GRANTOR:

CENTURION PECOS TERMINAL LLC

By: _____
John V. Calce, Manager of Centurion Pecos Terminal LLC

BORROWER:

BALLENGEE INTERESTS, LLC

By: _____
James H. Ballengee, Manager of BALLENGEE INTERESTS, LLC

BALLENGEE00002069
MR 712

LENDER:

TEXAS CAPITAL BANK, NATIONAL ASSOCIATION

X _____
Kevin F. Smith, Senior Vice President

---

## LIMITED LIABILITY COMPANY ACKNOWLEDGMENT

STATE OF __Texas__ )
                    ) SS
COUNTY OF __Dallas__ )

MICHELLE ROGERS
Notary Public, State of Texas
My Commission Expires
October 03, 2017

This instrument was acknowledged before me on __October 12__, 20__15__ by John V. Calce, Manager of Centurion Pecos Terminal LLC, a member on behalf of Centurion Pecos Terminal LLC, a limited liability company.

__Michelle Rogers__
Notary Public, State of Texas

---

## LIMITED LIABILITY COMPANY ACKNOWLEDGMENT

STATE OF __Texas__ )
                    ) SS
COUNTY OF __Dallas__ )

MICHELLE ROGERS
Notary Public, State of Texas
My Commission Expires
October 03, 2017

This instrument was acknowledged before me on __October 12__, 20__15__ by James H. Ballengee, Manager of BALLENGEE INTERESTS, LLC, a member on behalf of BALLENGEE INTERESTS, LLC, a limited liability company.

__Michelle Rogers__
Notary Public, State of Texas

---

## LENDER ACKNOWLEDGMENT

STATE OF __Texas__ )
                   ) SS
COUNTY OF __TX__ )

This instrument was acknowledged before me this __14th__ day of __October__, 20__15__ by Kevin F. Smith as Senior Vice President of Texas Capital Bank, National Association.

SANDRA T JOHNSON
My Commission Expires
September 22, 2018

__Sandra Johnson__
Notary Public, State of Texas

LaserPro, Ver. 15.2.0.024 Copr. D+H USA Corporation 1997, 2015. All Rights Reserved. - TX C:\CFNLPL\G27.FC TR-17190

V O L  1 2 0 9

P G  0 0 9 0

BEING A TRACT OF LAND LOCATED IN SECTION 76, BLOCK 4, H&GN SURVEY, REEVES COUNTY, TEXAS, AND BEING A PART OF A CALLED 496.76 GRID (496.87 SURFACE) ACRE TRACT OF LAND AS DESCRIBED IN A DEED RECORDED IN VOLUME 905, PAGE 155, OFFICIAL PUBLIC RECORDS, REEVES COUNTY, TEXAS (O.P.R.R.C.T.), AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A 5/8" IRON ROD SET WITH CAP STAMPED "TRANS TEXAS SURVEYING" FOR THE NORTHWEST CORNER OF SAID SECTION 76, THE SOUTHWEST CORNER OF SAID SECTION 75, THE NORTHEAST CORNER OF SECTION 77 AND THE SOUTHEAST CORNER OF SECTION 78, SAID 5/8" IRON ROD SET ALSO BEING IN THE INTERSECTION OF COUNTY ROAD NO. 408 AND COUNTY ROAD NO. 404;

THENCE N 58°03'46" E, WITH THE COMMON LINE OF SAID SECTION 76 AND SECTION 75, A DISTANCE OF 2639.85 FEET TO A POINT IN THE EAST LINE OF SAID 496.76 ACRE TRACT FROM WHICH A 1/2" IRON ROD FOUND WITH CAP STAMPED "5358 TRUJILLO" BEARS S 58°03'46" W, A DISTANCE OF 0.63 FEET, ALSO FROM WHICH A 1/2" IRON ROD FOUND AT THE NORTHEAST CORNER OF SAID SECTION 76, BLOCK 4, BEARS N 58°03'46" E, A DISTANCE OF 2639.85 FEET;

THENCE S 32°08'23" E, WITH THE EAST LINE OF SAID 496.76 ACRE TRACT, A DISTANCE OF 3187.68 FEET TO A 5/8" IRON ROD SET WITH CAP STAMPED "TRANS TEXAS SURVEYING" FOR THE SOUTHEAST CORNER OF SAID 496.76 ACRE TRACT BEING 100' NORTH OF THE CENTERLINE OF THE TEXAS & PACIFIC RAILROAD;

THENCE S 69°42'22" W, WITH THE SOUTH LINE OF SAID 496.76 ACRE TRACT AND 100' NORTH OF AND PARALLEL WITH THE CENTERLINE OF SAID TEXAS & PACIFIC RAILROAD, A DISTANCE OF 2697.40 FEET TO A POINT IN SAID COUNTY ROAD NO. 408, THE WEST LINE OF SAID SECTION 76 AND THE EAST LINE OF SECTION 77, BLOCK 4, FROM WHICH A 60D NAIL FOUND BEARS S 69°42'22" W, A DISTANCE OF 0.37 FEET, ALSO FROM WHICH A 1/2" IRON ROD FOUND FOR THE SOUTHWEST CORNER OF SAID SECTION 76, BLOCK 4, BEARS S 32°08'13" E, A DISTANCE OF 2657.42 FEET;

THENCE N 32°08'13" W, WITH THE WEST LINE OF SAID 496.76 ACRE TRACT AND WITH THE COMMON LINE OF SAID SECTION 76 AND SAID SECTION 77, A DISTANCE OF 2643.29 FEET TO THE PLACE OF BEGINNING AND CONTAINING 176.659 ACRES OF LAND. THIS DESCRIPTION IS BASED ON THE LAND TITLE SURVEY AND PLAT MADE BY ROBERT L. YOUNG, REGISTERED PROFESSIONAL LAND SURVEYOR NO. 5400 ON JUNE 20, 2014. ALL BEARINGS RECITED HEREIN ARE CORRELATED TO THE TEXAS STATE PLANE COORDINATE SYSTEM, CENTRAL ZONE (4203), NAD83 (NA2011). SEE THE ACCOMPANYING SURVEY MAP ATTACHED HERETO AND MADE A PART HEREOF.

VOL 12099

PG 00901

Inst No. 15-10258
DIANNE O. FLOREZ
COUNTY CLERK
2015 Oct 30 at 03:23 PM
REEVES COUNTY TEXAS
By: BA _Brittany Ulila_ , DEPUTY

BALLENGEE00002069.03

MR 714

Exhibit "V"

MR.715



May 27, 2016

**Centurion Terminals LLC**
**440 Louisiana Street, Suite 723**
**Houston, TX 77002**

Centurion Pecos Terminal, LLC
Attn: John Calce, President
15851 Dallas Parkway, Suite 650
Addison, TX 75001

Dear Mr. Calce:

Please accept this letter as formal notice that (1) Centurion Terminals, LLC no longer wishes to pursue a land lease or construct a crude oil terminal at the Centurion Pecos Terminal, LLC property in Reeves County, Texas and (2) because of recent actions taken by individuals purporting to represent Centurion Pecos Terminal, LLC with the Union Pacific Railroad, Centurion Pecos Terminal, LLC is now in default under section 2.1 (d) of the Promissory Note dated November 15, 2015 between Centurion Terminals, LLC and Centurion Pecos Terminal, LLC. As such, we hereby demand immediate payment of $237,975.10, representing outstanding principle and interest to Centurion Terminals, LLC from Centurion Pecos Terminal, LLC per the Promissory Note dated November 15, 2015.

Regards,

Thomas Ramsey
Chief Executive Officer
Centurion Terminals, LLC

CALCE00549

MR.716

Exhibit "W"

MR.717

**Centurion Pecos Terminal, LLC**
**17950 Preston Road, Suite 1080**
**Dallas, Texas 75252**

May 23, 2016

<u>VIA USPS PRIORITY MAIL AND EMAIL (leehullman@up.com; swmartch@up.com;</u>
<u>akbrown@up.com; tlanderson@up.com;bsmoore@up.com)</u>

Union Pacific Railroad Company
 Attn: Lee J. Hullman
15150 Blanco Road, Suite 2323
San Antonio, Texas 78232

Union Pacific Railroad Company
Attn: Aaron Brown
1212 Corporate Drive, Suite 300
Irving, Texas 75038

Union Pacific Railroad Company
Attn: Steven W. Martchenke
101 S. Watson Road
Arlington, Texas 76010

Union Pacific Railroad Company
Attn: Tammy L. Anderson
1400 Douglas Street, STOP 1350
Omaha, Nebraska 68179

Union Pacific Railroad Company
Attn: Brad Moore
1400 Douglas Street, STOP 1210
Omaha, Nebraska 68179

Union Pacific Railroad Company
Attn: Senior Vice President and General Counsel
1400 Douglas Street, STOP 1580
Omaha, Nebraska 68179

RE:     Memorandum of Understanding dated June 12, 2014 (the "MOU") and Letter
Agreement dated February 11, 2016 sent by Union Pacific Railroad Company ("UP") to
Centurion Logistics, LLC (the "Letter Agreement") for rail service located in Pecos,
Texas, File 2975-07 (the "Project")

Dear Messrs. and Madam,

I was recently made aware by a UP employee assisting on the Project that UP has been contacted by representatives of entities named Centurion Terminals, LLC and "Centurion Midstream" (collectively, the "Unaffiliated Entities") about the development of rail service located on the same real property that is the site of the Project (the "Property"). I am writing to inform you that Centurion Pecos Terminal, LLC, a manager-managed Texas limited liability company ("Owner") owns all of the Property, as evidenced by the two General Warranty Deeds attached to this letter. Centurion Logistics, LLC, a Texas limited liability company, is one of two managers of Owner, and has certain rights in connection with the management and development of the Project. The Unaffiliated Entities do not have and have never had, any right to use any portion of the Property. Further, the Unaffiliated Entities are not and have never been affiliated with Owner or Centurion Logistics, LLC, and neither Owner nor Centurion Logistics, LLC has granted the Unaffiliated Entities any authority whatsoever to act for or on behalf of Owner or Centurion Logistics, LLC for the Project.

On June 25, 2014, Tony Albanese, manager of Centurion Logistics, LLC, executed the MOU, a copy of which is attached hereto, which document describes the terms upon which UP agreed to move forward with the track authorization process and provide service to facilities proposed for the Property by Centurion Logistics, LLC. The Letter Agreement, a copy of which is attached hereto,

MR.718

confirms UP's acceptance of the proposal made for the Project by Centurion Logistics, LLC, and that, upon the company's payment of $15,000.00 to UP, UP would proceed to design the signal facilities necessary for the Project. Centurion Logistics, LLC will be submitting this payment together with an executed Letter Agreement to UP in the very near future. Please be further advised that the Unaffiliated Entities do not have and have never had any authority to act on behalf of Centurion Logistics, LLC for matters addressed in the MOU or the Letter Agreement and have not been assigned any rights otherwise under these agreements.

Centurion Logistics, LLC is not clear what authority the Unaffiliated Entities are claiming in contacting UP and attempting to manage and develop the Project. I respectfully request to be notified of any future communication UP receives from the Unaffiliated Entities and to be informed of any delay or interruption caused to the Project by the Unaffiliated Entities to date. Centurion Logistics, LLC and Owner are in contact with the Unaffiliated Entities and are working to resolve these current issues.

If you have any questions regarding this letter or matters concerning the Project, please contact me at your earliest convenience at 214-893-4267 or mmarrocco@viacenturion.com.

Respectfully,

Centurion Logistics, LLC,
a Texas limited liability company

By: *Marc Marrocco*

President and Manager

Enclosures:
General Warranty Deed for 300 acre Tract of Land filed of record in Reeves County, Texas August 25, 2015 as Instrument No. 15-07673

General Warranty Deed for 176 acre Tract of Land filed of record in Reeves County, Texas September 24, 2014 as Instrument No. 14-08864

Union Pacific Memorandum of Understanding dated June 12, 2014

Union Pacific Letter Agreement dated February 11, 2016

cc:     Tony Albanese, Manager of Centurion Logistics, LLC via email correspondence to talbanese@viacenturion.com

2

MR.719

14-08864
FILED FOR RECORD
REEVES COUNTY, TEXAS
Sep 24, 2014 at 10:09:00 AM

2

After recording return to:
Centurion Logistics, LLC
c/o Marc Marrocco
1875 Laws Street
Dallas, Texas 75202

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

## GENERAL WARRANTY DEED

| | | |
|---|---|---|
| STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF REEVES | § | |

THAT **MONTANE INDUSTRIES, LLC**, a Texas limited liability company ("*Grantor*"), for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration to the undersigned paid by Grantee (as hereinafter defined), the receipt and sufficiency of which is hereby acknowledged, has GRANTED, SOLD AND CONVEYED, and by these presents does hereby GRANT, SELL AND CONVEY, with general warranty covenants, unto **CENTURION PECOS TERMINAL LLC**, a Texas limited liability company ("*Grantee*"), whose mailing address is 17950 Preston Road, Suite 1080, Dallas, Texas 75252, all of that certain lot, tract or parcel of land lying and being situated in Reeves County, Texas, and being more particularly described on Exhibit A attached hereto and incorporated herein (the "*Property*"), together with all buildings, structures, paving, curbing, trees, plants, shrubs, and other building improvements and landscaping of every kind and nature presently situated on, in, or under, or hereafter erected or installed on the Property, together with all of Grantor's right, title and interest in all rights, tenements, hereditaments, easements, licenses, rights-of-way, privileges, and rights of ingress and egress applicable to the Property, and appurtenances pertaining thereto and strips and gores.

MR.720

This conveyance is made and accepted subject to all matters of recording against the Property. Ad valorem real property taxes for the current year have been prorated through the date of this instrument, with Grantor and Grantee each paying its pro rata share. Grantee assumes and promises to pay taxes for 2014 and subsequent years.

TO HAVE AND TO HOLD the Property, subject to the Permitted Exceptions, together with all and singular the rights and appurtenances thereto in anywise belonging unto said Grantee, its successors and assigns, forever, and Grantor does hereby bind itself, its successors and assigns to warrant and forever defend all and singular the Property, subject to all matters of record against the Property, unto said Grantee, its successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof.

[Signature page immediately follows.]

IN WITNESS WHEREOF, the Grantor has executed the within instrument as of September 19, 2014.

"GRANTOR":

**MONTANE INDUSTRIES, LLC**
a Texas limited liability company

By: TexSand Holdings, LLC
a Texas limited liability company,
its Manager

By: _____
Name: Farrell Arcenaux
Title: Manager

STATE OF TEXAS )
                        )  ss
COUNTY OF Dallas )

On this ___15___ day of ___September___, 2014 before me, the undersigned Notary Public in and for said State, personally appeared Farrell Arcenaux known or identified to me to be the Manager of TexSand Holdings, LLC, a Texas limited liability company, the Manager of MONTANE INDUSTRIES, LLC, a Texas limited liability company, that executed the instrument and acknowledged to me that he executed the same for and on behalf of said limited liability company and limited partnership.

_____
Notary Public
My Commission Expires on 7-16-2017

[NOTARY SEAL]

DANIEL ROESSNER TSAKONAS
MY COMMISSION EXPIRES
July 16, 2017

## Exhibit A

BEING a tract of land located in Section 76, Block 4, H&GN Survey, Reeves County, Texas, and being a part of a called 496.76 GRID (496.87 Surface) acre tract of land as described in a Deed recorded in Volume 905, Page 155, Official Public Records, Reeves County, Texas (O.P.R.R.C.T.), and being more particularly described as follows:

BEGINNING at a 5/8 inch iron rod set with cap stamped "TRANS TEXAS SURVEYING" for the Northwest corner of said Section 76, the Southwest corner of said Section 75, the Northeast corner of Section 77 and the Southeast corner of Section 78, said 5/8 inch iron rod set also being in the intersection of County Road No. 408 and County Road No. 404;

THENCE North 58 degrees 03 minutes 46 seconds East, with the common line of said Section 76 and Section 75, a distance of 2639.85 feet to a point in the East line of said 496.76 acre tract from which a 1/2 inch iron rod found with cap stamped "5358 TRUJILLO" bears South 58 degrees 03 minutes 46 seconds West, a distance of 0.63 feet, also from which a 1/2 inch iron rod found at the Northeast corner of said Section 76, Block 4, bears North 58 degrees 03 minutes 46 seconds East, a distance of 2639.85 feet;

THENCE South 32 degrees 08 minutes 23 seconds East, with the East line of said 496.76 acre tract, a distance of 3187.68 feet to a 5/8 inch iron rod set with cap stamped "TRANS TEXAS SURVEYING" for the Southeast corner of said 496.76 acre tract being 100 feet North of the centerline of the Texas & Pacific Railroad;

THENCE South 69 degrees 42 minutes 22 seconds West, with the South line of said 496.76 acre tract and 100 feet North of and parallel with the centerline of said Texas & Pacific Railroad, a distance of 2697.40 feet to a point in said County Road No. 408, the West line of said Section 76 and the East line of Section 77, Block 4, from which a 60D nail found bears South 69 degrees 42 minutes 22 seconds West, a distance of 0.37 feet, also from which a 1/2 inch iron rod found for the Southwest corner of said Section 76, Block 4, bears South 32 degrees 08 minutes 13 seconds East, a distance of 2657.42 feet;

THENCE North 32 degrees 08 minutes 13 seconds West, with the West line of said 496.76 acre tract and with the common line of said Section 76 and said Section 77, a distance of 2643.29 feet to the PLACE OF BEGINNING and CONTAINING 176.659 acres of land.

Inst No. 14-03854
DIANNE O FLOREZ
COUNTY CLERK
2014 Sep 24 at 10:09 AM
REEVES COUNTY TEXAS
DEPUTY

MR.723

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

## GENERAL WARRANTY DEED

THE STATE OF TEXAS §
§
COUNTY OF REEVES §

For a valuable consideration, the receipt of which is hereby acknowledged, ZANE KIEHNE, TANYA KIEHNE, and Z&T CATTLE COMPANY, LLC, a Texas limited liability company, (collectively, "Grantors") have granted, sold and conveyed and by these presents do grant, sell and convey unto CENTURION PECOS TERMINAL LLC, a Texas limited liability company, ("Grantee"), whose address is 17950 Preston Road, Suite 1080, Dallas Texas 75252, all of Grantors' right, title and interest in and to the property described in Exhibit A attached hereto and made a part hereof (the "Subject Lands"), together with all buildings, structures, and improvements of every kind and nature in, on, or under the Subject Lands; all of Grantors' rights, titles and interests in all rights, tenements, hereditaments, easements, licenses, privileges, rights of ingress and egress applicable to the Subject Lands, and appurtenances pertaining thereto; and all rights, titles and interests of Grantors in and to any roads, rights-of-way, strips, or gores of land adjoining the Subject Lands and abutting properties, save and except for the rights, easements and appurtenances reserved herein.

A.     There is reserved unto Grantors, and Grantors' heirs and assigns forever the following

1.      Oil, Gas and Other Minerals:  All oil, gas and other minerals in and under and that may be produced from the Subject Property, together with all present or future rights appurtenant or belonging to the oil, gas and other minerals, including, without limitation, all of Grantor's (i) rights of ingress egress and possession to explore for oil, gas and other minerals and to produce, treat, process, store, transport, market and remove all or any of them from the Subject Lands, subject to any limitations of Grantors to surface use of the Subject Lands as may be further described in this General Warranty Deed and Term Conveyance; (ii) rights under each valid and subsisting oil, gas and other mineral lease to which the oil, gas and other minerals are subject, including, but not limited to, all bonuses, delay rentals, royalties, shut-in and minimum royalties; (iii) rights to any and all sums payable by any lessee, operator, purchaser or seller of production, governmental agency, tribunal or other party with respect to oil, gas and/or other minerals production attributable to any of the oil, gas and other minerals, including without limitation all revenues, payments, accounts, suspended funds, refunds and interest on overdue payments; (iv) rights, claims and causes of action with respect to the sums described in item (iii).

GENERAL WARRANTY DEED - Kiehne Z&T Cattle Company, LLC and Centurion Pecos Terminal, LLC          1

MR.724

including without limitation claims for the underpayment of royalties; and, (v) any other claims, demands, suits, causes of action, obligations, damages, proceeds, settlements and distributions of whatsoever kind or character, known or unknown, relating or attributable to the oil, gas and other minerals.

This General Warranty Deed is made and accepted subject to that certain Oil and Gas Lease and Surface Use, Damage Schedule and Right of Way Agreement (collectively hereinafter referred to as the "Lease") dated October 23, 2014 by and between Zane Kiehne and Tanya Kiehne, collectively as Lessor, and KEW Drilling, as Lessee, a memorandum of which Lease was recorded in Volume 1125, Page 564, of the Official Public Records of Reeves County, Texas, as amended by that certain Amendment to the Lease dated January 26, 2015 (the "Lease Amendment"), a memorandum of which Lease Amendment was recorded on February 20, 2015 in Volume 1146, Page 306, of the Official Public Records of Reeves County, Texas.

Subject to the terms and conditions set forth in the Lease and Lease Amendment, Grantors and Grantors' heirs, successors and assigns, for a term of five (5) consecutive years from the date of this General Warranty Deed and hereby grant, sell and convey to Grantee all rights of ingress and egress that the Grantors may possess or own, if any, to enter upon or use the surface of the Subject Lands for the purposes contemplated by Section A(1)(i) of this General Warranty Deed or any other purpose incident thereto. Nothing herein shall be construed to prevent Grantors or Grantors' heirs, successors or assigns from exploring for, developing and/or producing oil, gas and other minerals by pooling or by directional drilling under the Subject Lands from well sites located on property outside of the Subject Lands. Upon the expiration of five (5) years, Grantors shall resume ownership of rights of ingress and egress to the Subject Lands herein conveyed to Grantee, and all of such rights shall revert to Grantors.

2. Commercial Water Rights and Water Rights Appurtenant to the Surface Estate: All of the commercial water and water rights appurtenant to the surface estate of the Subject Lands, including, without limitation, water running or lying in streams or rivers, water contained in near surface aquifers, and water in lakes, sloughs, ponds or playa lakes (collectively, "Commercial Water Rights").

3. Water Line Easement: An easement on, over, under and across the Subject Lands for the construction, installation, repair, maintenance, replacement and removal, including ingress and egress to one (1) underground water line, which shall be located on that portion of the Subject Lands depicted on Exhibit B attached hereto and made a part hereof, for the sole purpose of transporting water between the Grantors' property adjacent to the Subject Lands and shown on Exhibit B. The specifications of the water line, including without limitation the location, size, width and depth, and points of access

MR.725

including without limitation the location, size, width and depth, and points of access (collectively, the "Water Line Specs"), shall be and remain in compliance with all applicable federal and state laws, ordinances, rules and standards of any governmental agency, including without limitation the Natural Resource Conservation Service practice standards (NRCS) or similar standards as may be required by the United States Department of Agriculture (USDA), and which Water Line Specs, and any future replacement of the water line and future specs, must be approved by Grantee prior to the construction and installation thereof, which approval shall not be unreasonably withheld by Grantee. Grantee shall have the right to relocate the Water Line Easement, as may be necessary, prior to installation of the water line by Grantors, and Grantors shall have the duty to maintain, perform repairs to, keep clean and at all times safeguard those portions of the Subject Lands surrounding the Water Line Easement.

Grantors shall be obligated, at all times during the ownership and exercise of its Commercial Water Rights and use of the water line and the Water Line Easement on the Subject Lands, to use, maintain, repair and operate the water line in compliance with any and all applicable federal and state laws, statutes, ordinances, codes, regulations, rules and requirements applicable thereto, and the water being transported thereby, including obtaining any and all permits as may be necessary and required, and to comply with any rules developed, adopted and promulgated by any ground water conservation district established in or applicable to Reeves County, Texas.

4. Electric Power Line Easement: Grantors hereby reserve an exclusive Power Line Easement over, on and across that certain portion of the Subject Lands, the current general location of which is depicted on Exhibit C attached hereto and made a part hereof, for purposes of access to and use of the overhead power line also shown on Exhibit C which runs vertically along the west boundary of that certain tract of land identified on Exhibit C as Tract B. Grantee shall have the unrestricted right to relocate the Power Line Easement at any time and from time to time so long as Grantee provides reasonable notice to Grantors of the new location, relocation of the easement does not unreasonably interfere with Grantors' ability to access and use the overhead power line, and Grantee pays for all reasonable costs incurred by Grantors, if any, resulting from Grantee's relocation of the Power Line Easement. Grantors shall have the duty to maintain, perform repairs to, keep clean and at all times safeguard those portions of the Subject Lands surrounding the Power Line Easement.

B. Grantee's interest is subject expressly to all zoning laws, ordinances, covenants, conditions, restrictions, rights-of-way, easements and rights now existing under any oil and gas leases and all royalties, overriding royalties and other burdens presently of record covering and affecting the interests herein conveyed, including, without limitation, the easements, restrictions, and rights-of-way described on the survey in Exhibit C, and Grantee's interest shall also be subject to the following rights and restrictions:

1. Grantee Rights, Grantors' Restrictions: Grantee and Grantee's heirs, assigns, successors, partners, tenants and tenant employees, and other users, operators and commercial occupants on the Subject Lands (collectively, "Grantee Parties") shall have

MR.726

and business operations conducted on the Subject Lands free and clear of any claim of Grantors or their successors and assigns pursuant to Grantors' Commercial Water Rights. Grantors, in exercising their Commercial Water Rights, shall not prohibit, unreasonably restrict or adversely or materially affect, Grantee or Grantee Parties' ability to consume, use, access, drill wells for, and construct facilities to distribute water on the Subject Lands for the purposes authorized herein.

2.      Grantee and Grantee Parties' Restrictions: Grantee and Grantee Parties shall be prohibited from constructing any water depot(s) on the Subject Lands for the purpose of engaging in the private sale of water. Grantee and Grantee Parties shall be prohibited from engaging in the sale of water from Grantee and/or Grantee Parties to any persons or entities outside of the Subject Lands and from transporting water off the Subject Lands for the purpose of selling it. Grantee and Grantee Parties shall be prohibited from competing with Grantors and their successors and assigns in any manner for the private sale of water. Grantee and Grantee Parties shall have no commercial water rights in the Subject Lands.

This conveyance is made and accepted subject to all matters of record for the Subject Lands. Grantors, for the consideration recited above and subject to the prior liens and the reservations from and exceptions to conveyance and warranty, grant, sell, and convey the Subject Lands to the Grantee, together with all and singular the rights and appurtenances thereto in any wise belonging, to have and to hold to the Grantee, and its successors and assigns forever. Grantors bind Grantors and Grantors' successors and assigns to warrant and forever defend all and singular the Subject Lands to Grantee and Grantee's successors and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof.

[Remainder of page intentionally left blank. Signature page to follow.]

MR.727

EXECUTED this _17th_ day of August, 2015, to be effective as of the _17th_ day of August, 2015.

**GRANTORS:**

_[signature]_
Zane Kiehne

_[signature]_
Tanya Kiehne

**Z&T CATTLE COMPANY, LLC**
a Texas limited liability company

By: _[signature]_
Zane Kiehne, Manager

VOL 1190 PG 0774

MR.728

EXECUTED this _____ day of August, 2015, to be effective as of the _____ day of August, 2015.

**GRANTORS:**

_____
Zane Kiehne

_____
Tanya Kiehne

**Z&T CATTLE COMPANY, LLC**
a Texas limited liability company

By: _____
      Zane Kiehne, Manager

**GRANTEE:**

CENTURION PECOS TERMINAL LLC
a Texas limited liability company

By: Centurion Logistics, LLC,
a Texas limited liability company,
its Manager

By: _____

Name: Marc Marrocco

Title: Manager

MR.729

STATE OF TEXAS §
      REEVES §
COUNTY OF ~~MIDLAND~~ §

    This foregoing instrument was acknowledged before me this __17__ day of August, 2015 by Zane Kiehne, individually, and on behalf of Z&T Cattle Company, as its Manager.

Notary Seal:



_Kathy Kelton_
Notary Public, the State of Texas

STATE OF TEXAS §
      REEVES §
COUNTY OF ~~MIDLAND~~ §

    This foregoing instrument was acknowledged before me this __17__ day of August, 2015 by Tanya Kiehne.

Notary Seal:



_Kathy Kelton_
Notary Public, the State of Texas

STATE OF TEXAS §
      §
COUNTY OF DALLAS §

    This foregoing instrument was acknowledged before me this __19th__ day of August, 2015 by Marc Moracco on behalf of Centurion Pecos Terminal, LLC, a Texas limited liability company, as its Manager.

Notary Seal:



_Anne Gross_
Notary Public, the State of Texas

MR.730

VOL 1190 PG 0777

## EXHIBIT A

to

### General Warranty Deed

(From Zane Kiehne, Tanya Kiehne and Z &T Cattle Company, LLC to Centurion Pecos Terminal, LLC)

### PROPERTY DESCRIPTION
### 299.325 ACRES

BEING A TRACT OF LAND LOCATED IN SECTIONS 73 AND 76, BLOCK 4, H&GN RAILROAD COMPANY SURVEY, REEVES COUNTY, TEXAS, AND BEING COMPOSED OF THE FOLLOWING: A PART OF A CALLED 84.2 ACRE TRACT OF LAND AS DESCRIBED IN A DEED RECORDED IN VOLUME 860, PAGE 82, OFFICIAL PUBLIC RECORDS, REEVES COUNTY, TEXAS (O.P.R.R.C.T.); A PART OF THE NORTHWEST QUARTER OF SAID SECTION 73 AS DESCRIBED IN A DEED RECORDED IN VOLUME 825, PAGE 784 OF SAID O.P.R.R.C.T.; AND ALL OF A CALLED 109.58 ACRE TRACT OF LAND AS DESCRIBED IN A DEED RECORDED IN VOLUME 1080, PAGE 17 OF SAID O.P.R.R.C.T., AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A 5/8" IRON ROD FOUND WITH CAP STAMPED "TRANS TEXAS SURVEYING" IN THE NORTH LINE OF THE T&P RAILROAD COMPANY RIGHT-OF-WAY AT THE SOUTHWEST CORNER OF THE SAID 109.58 ACRE TRACT AND THE SOUTHEAST CORNER OF THAT 176.659 ACRE TRACT OF LAND AS DESCRIBED IN A DEED RECORDED IN INST. No. 14-03664 OF SAID O.P.R.R.C.T. FOR THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE N 32°08'23" W, WITH THE WEST LINE OF THE SAID 109.58 ACRE TRACT AND THE EAST LINE OF THE SAID 176.659 ACRE TRACT, A DISTANCE OF 1537.04 FEET TO A POINT FOR THE NORTHWEST CORNER OF THE SAID 109.58 ACRE TRACT AND THE SOUTHWEST CORNER OF THAT 100.00 ACRE TRACT OF LAND DESCRIBED AS A SAVE AND EXCEPT TRACT IN A DEED RECORDED IN VOLUME 1006, PAGE 1 OF SAID O.P.R.R.C.T. FOR THE MOST SOUTHERLY NORTHWEST CORNER OF THE HEREIN DESCRIBED TRACT FROM WHICH A 1/2" IRON ROD FOUND WITH CAP STAMPED "TRUJILLO RPLS 5358" BEARS S 58°03'30" W A DISTANCE OF 0.91 FEET;

THENCE N 58°03'30" E, WITH THE NORTH LINE OF THE SAID 109.58 ACRE TRACT AND THE SOUTH OF THE SAID 100.00 ACRE TRACT, AT A DISTANCE OF 2639.42 FEET PASSING A 1/2" IRON ROD FOUND WITH CAP STAMPED "TRUJILLO RPLS 5358", IN ALL A TOTAL DISTANCE OF 2639.92 FEET TO A POINT IN THE COMMON LINE OF SAID SECTION 76 AND SAID SECTION 73 FOR THE NORTHEAST CORNER OF THE SAID 109.58 ACRE TRACT AND THE SOUTHEAST CORNER OF THE SAID 100.00 ACRE TRACT, BEING ALSO THE SOUTHWEST CORNER OF A 20.000 ACRE TRACT OF LAND THIS DATE SURVEYED;

THENCE CROSSING THE NORTHWEST QUARTER OF SAID SECTION 73 WITH THE SOUTH AND EAST LINE OF THE SAID 20.000 ACRE TRACT OF LAND THIS DATE SURVEYED, THE FOLLOWING BEARING AND DISTANCES:

N 58°03'30" E, A DISTANCE OF 527.87 FEET TO A 5/8" IRON ROD SET WITH CAP

---

EXHIBIT A to GENERAL WARRANTY DEED
Kiehne/Z&T Cattle Co., LLC and Centurion Pecos Terminal, LLC

MR.731

STAMPED "TRANS TEXAS SURVEYING" FOR THE SOUTHEAST CORNER OF THE SAID 20.000 ACRE TRACT AND AN INTERIOR CORNER OF THE HEREIN DESCRIBED TRACT;

N 32°08'32" W, A DISTANCE OF 1650.40 FEET TO A 5/8" IRON ROD SET WITH CAP STAMPED "TRANS TEXAS SURVEYING" IN THE COMMON LINE OF SAID SECTION 73 AND SECTION 74 OF SAID BLOCK 4, H&GN RAILROAD COMPANY SURVEY AND THE SOUTH LINE OF COUNTY ROAD NO. 404 FOR THE NORTHEAST CORNER OF THE SAID 20.000 ACRE TRACT AND THE MOST NORTHERLY NORTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

**THENCE** N 58°03'46" E, WITH THE COMMON LINE OF SAID SECTION 73 AND SAID SECTION 74 AND THE SOUTH LINE OF SAID COUNTY ROAD NO. 404, PASSING AT A DISTANCE OF 2034.62 FEET A 5/8" IRON ROD SET WITH CAP STAMPED "TRANS TEXAS SURVEYING" IN THE WEST RIGHT-OF-WAY LINE OF F.M. HIGHWAY NO. 2119, IN ALL A TOTAL DISTANCE OF 2117.21 FEET TO A POINT FOR THE NORTHEAST CORNER OF SAID NORTHWEST QUARTER AND THE NORTHWEST CORNER OF THE NORTHEAST QUARTER OF SAID SECTION 73 AND FOR THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT, FROM WHICH A 1/2" IRON ROD FOUND WITH CAP AT THE NORTHEAST CORNER OF SAID SECTION 73 BEARS N 58°03'46" E, A DISTANCE OF 2645.08 FEET;

**THENCE** S 32°08'42" E, WITH THE EAST LINE OF THE SAID NORTHWEST QUARTER AND THE WEST LINE OF THE SAID NORTHEAST QUARTER OF SAID SECTION 73, A DISTANCE OF 2645.36 FEET TO A POINT FOR THE FOR THE SOUTHEAST CORNER OF THE SAID NORTHWEST QUARTER AND THE SOUTHWEST CORNER OF THE SAID SOUTHEAST QUARTER OF SAID SECTION 73 AND BEING IN THE NORTH LINE OF THE SOUTH HALF OF SAID SECTION 73 AND THE NORTH LINE OF A CALLED 120 ACRE TRACT OF LAND DESCRIBED IN A DEED RECORDED IN VOLUME 122, PAGE 521, DEED RECORDS OF REEVES COUNTY, TEXAS FOR THE MOST NORTHERLY SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

**THENCE** S 58°01'36" W, WITH THE SOUTH LINE OF THE SAID NORTHWEST QUARTER AND THE NORTH LINE OF THE SAID 120 ACRE TRACT, A DISTANCE OF 13.20 FEET TO A POINT FOR THE NORTHEAST CORNER OF THE SAID 84.2 ACRE TRACT AND THE NORTHWEST CORNER OF THE SAID 120 ACRE TRACT FOR AN INTERIOR CORNER OF THE HEREIN DESCRIBED TRACT;

**THENCE** S 32°08'32" E, WITH THE EAST LINE OF THE SAID 84.2 ACRE TRACT AND THE WEST LINE OF THE SAID 120 ACRE TRACT A DISTANCE OF 1.61 FEET TO A POINT FOR THE NORTHEAST CORNER OF A 33.000 ACRE TRACT THIS DATE SURVEYED AND A SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

**THENCE** CROSSING THE SAID 84.2 ACRE TRACT WITH THE NORTH AND WEST LINE OF THE SAID 33.000 ACRE TRACT OF LAND THIS DATE SURVEYED, THE FOLLOWING BEARING AND DISTANCES:

S 58°03'32" W, AT A DISTANCE OF 61.35 FEET PASSING A 1/2" IRON ROD FOUND WITH CAP STAMPED "TRUJILLO RPLS 5358", AT A DISTANCE OF 61.51 FEET PASSING THE WEST RIGHT-OF-WAY LINE OF SAID F.M. HIGHWAY NO. 2119, IN ALL A TOTAL

VOL 01190 PG 0778

MR.732

DISTANCE OF 933.83 FEET TO A 5/8' IRON ROD SET FOR THE NORTHWEST CORNER OF THE SAID 33.000 ACRE TRACT AND AN INTERIOR CORNER OF THE HEREIN DESCRIBED TRACT;

S 31°43'00" E, A DISTANCE OF 1432.68 FEET TO A 5/8" IRON ROD SET IN THE NORTH LINE OF THE SAID T&P RAILROAD RIGHT-OF-WAY FOR THE SOUTHWEST CORNER OF THE SAID 33.000 ACRE TRACT AND THE MOST SOUTHERLY SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

**THENCE** S 69°42'07" W, WITH THE NORTH LINE OF THE SAID T&P RAILROAD COMPANY RIGHT-OF-WAY, A DISTANCE OF 4421.63 FEET TO THE **PLACE OF BEGINNING AND CONTAINING 299.325 ACRES OF LAND.** THIS DESCRIPTION IS BASED ON THE LAND TITLE SURVEY AND PLAT MADE BY ROBERT L. YOUNG, REGISTERED PROFESSIONAL LAND SURVEYOR NO. 5400 ON DECEMBER 15, 2014. ALL BEARINGS RECITED HEREIN ARE CORRELATED TO THE TEXAS STATE PLANE COORDINATE SYSTEM, CENTRAL ZONE (4203), NAD83 (NA2011). SEE THE ACCOMPANYING SURVEY MAP ATTACHED HERETO AND MADE A PART HEREOF.



VOL 1190 PG 0779

VOL 4490 PG 0780

# EXHIBIT B

to

**General Warranty Deed**

(From Zane Kiehne, Tanya Kiehne and Z &T Cattle Company, LLC to Centurion Pecos Terminal, LLC)

## WATER LINE EASEMENT

[Attached hereto]

EXHIBIT B to GENERAL WARRANTY DEED
Kiehne/Z&T Cattle Co., LLC and Centurion Pecos Terminal, LLC



- CONCEPTUAL -
FOR REVIEW/DISCUSSION

EXHIBIT B

SCALE IN FEET

400   0   400   800

CB 404

CB 403

SELLER-RETAINED
TRACT
134 ACRES

WATER LINE EASEMENT
15 WIDE

SELLER-RETAINED
TRACT
50 ACRES

INTERSTATE 20

WARNING !
FIBER OPTIC CABLE
ON RAILROAD R-O-W

VA RAIL
LOGISTICS, LLC

CENTURION LOGISTICS

PROPERTY EXHIBIT

MR.735

**EXHIBIT C**
to
**General Warranty Deed**
(From Zane Kiehne, Tanya Kiehne and Z &T Cattle Company, LLC to Centurion Pecos Terminal, LLC)

**POWER LINE EASEMENT**

[Attached hereto]

MR.736

# EXHIBIT C



General Warranty Deed - Page 10 of 10

MR.737

## UNION PACIFIC RAIL ACCESS
## MEMORANDUM OF UNDERSTANDING

Union Pacific Railroad Company ("UP") has reviewed Centurion Logistics ("Company") request for rail service in Pecos, TX as depicted on the conceptual plan dated 4/17/2014. UP is pleased to notify you that we are looking forward to working with you on developing new rail service to Centurion Logistics Pecos, TX location. Based on the conceptual plan and representations made to UP, UP agrees to move forward with its track authorization process subject to Company satisfying the conditions detailed below. This memorandum ("MOU") is being provided to Company to outline the infrastructure elements that UP requires to efficiently and safely provide rail service to Company's new facility (the "Facility") and to establish an understanding of UP's track authorization process. The criteria outlined below are consistent with Union Pacific's Guidelines for Rail Service and Union Pacific's Industry Track Standards, a link to which can be found at http://www.uprr.com/customers/attachments/industry_guidelines.pdf.

In addition to the requirements of Union Pacific's Guidelines for Rail Service and Union Pacific's Industry Track Standards, the following terms and conditions must be met prior to Company proceeding with its new construction:

- This MOU is based upon the commodities, traffic volumes, and methods of operation Company represented in its conceptual plan dated April 17th, 2014. To the extent any of those change, Union Pacific reserves the right to impose additional requirements on providing rail service to the Facility, which could include construction of additional track infrastructure.

- All railcars destined to the Facility must be received by Company upon arrival (i.e., spot on arrival). Railcars will not be held or stored in rail yards or other Union Pacific owned or controlled trackage.

- Company shall manage the inventory of inbound and outbound railcars at the Facility so as not to adversely affect Union Pacific operations, and shall cooperate with Union Pacific operational requirements regarding inventory management.

- Any third party use of tracks in the Facility, including request for new rail service, is subject to prior Union Pacific review and approval.

- Company will perform all intraplant switching at the Facility.

- Based on Company's conceptual plan dated April 17th, 2014, only unit train service is approved at the Facility.

- Company will ensure that all outbound railcars are coupled with air hoses laced.

- Company shall assemble each unit train on its track B (based on Company's conceptual plan dated April 17th, 2014), in its entirety and ready for departure.

- Interior switches must be lined for arrival of inbound train when a unit train arrival is expected.

MR.738

- The Facility must have sufficient capacity to chamber full unit trains, accommodate spot on arrival, and allow trains to clear the main line without the train crew stopping to line switches. Maximum unit train size to be determined by UP's Customer Service Profile (CSP) process.

- The Facility as reflected in Company's conceptual plan dated April 17th, 2014, will accommodate inbound and outbound operations coming from and going to the east of the facility. If Company desires train operations from origins west of the facility, Industry must bear all costs of installing a west facing connection with power switches and power derails.

Once Company has satisfied the aforementioned terms and conditions, the next steps in UP's track authorization process are as follows:

1. Company must prepare the Facility's Switch Location Plan (30% drawing) and submit to UP via the Engineering Document Exchange (web application) to initiate UP's design of the signal system associated with Company's project.
2. Company will work with its UP Marketing and Sales representative to prepare a Customer Service Plan, if applicable, and determine the rail service Company would receive and the corresponding rates. Additionally, the UP Marketing and Sales representative will coordinate with other UP departments to determine any other requirements necessary for UP to provide service to Customer.
3. Company must prepare the Facility's track design/construction drawings and submit them to UP via the Engineering Document Exchange (web application) for approval.
4. Company must execute an Industrial Track Agreement with UP.

UP shall only authorize construction of the industry track upon the execution of a Industrial Track Agreement.

UP shall keep confidential all design/construction drawings, plans and other materials related to the new or expanded Facility that Company gives UP during the track construction process.

Union Pacific's offer of conditional acceptance shall expire if Company does not execute and return this MOU to Shanker Chalekode at Union Pacific Company, 1212 Corporate Drive, Ste 300, Irving,TX 75038, within 90 days from the date of this MOU.

Once executed, this MOU shall terminate twelve (12) months after execution unless Company has requested an extension of the MOU. The extension must be requested in writing and approved by Union Pacific.

Company understands that Union Pacific will not authorize construction of the planned industry tracks until the entire track authorization process is complete. Company understands that at no time prior to authorization of track construction is UP agreeing to provide rail service at Facility. Further, Company understands that Union Pacific will not operate on industry owned tracks until UP has approved the Facility track design/construction drawings and Company has fully executed an Industrial Track Agreement with Union Pacific. Additionally, Company understands that all of UP's approvals and authorizations are based on Company's representation of particular volumes and commodities that will be shipped to and/or from the Facility. Any changes in volumes or commodities may change UP's requirements to provide service to the Facility. Consequently, if volumes or commodities change after rail service has begun,

UP may not be able to meet Company's expectation for increased or additional rail service without Company making modifications to the infrastructure or constructing additional infrastructure.

ACKNOWLEDGEMENT: I HAVE READ AND UNDERSTAND UP'S REQUIREMENTS FOR NEW SERVICE AS SET FORTH ABOVE:

Centurion Logistics

By: _____

Printed Name: _Antonio Albanese_

Title: _Principal_

Date: _6/25/14_

Union Pacific Railroad Company

By: _Bradley Moore_

Printed Name: _BRAD MOORE_

Title: **Assistant Vice President Industrial Products**

Date: _7/7/2014_

Centurion Logistics
Pecos, TX
6/12/2014

**UNION PACIFIC RAIL ACCESS**
**Track Construction Project Contacts**

Prepared for: Centurion Logistics
Track Construction Project Location: Pecos, TX 6/12/14

Marketing and Sales Representative
Shanker Chalekode
Business Director
1212 Corporate Dr, STE 300 Irving, TX 75038
402-871-9164
Fax: 402-997-4947
skchalek@up.com

Manager of Industry & Public Projects
Steven W. Martchenke
101 S Watson Rd, Arlington, TX 76010
817-353-7625
402-501-2616
swmartch@up.com

Regional Manager Industrial Development
Aaron Brown
Regional Industrial Development Manager
1212 Corporate Dr. Ste 300, Irving, TX 75038
469 262 7059
402 233 3453
akbrown@up.com

Track Agreement Contact
Tammy Anderson
Sr Mgr Industry Track Construction
1400 Douglas St Stop 1350, Omaha, NE 68179
402 544 2305
402 233 2187
tlanderson@up.com

February 11, 2016

**VIA EMAIL ONLY**
Centurion Logistics LLC
Marc Marrocco, Principal
8150 North Central Expressway, Suite 1435
Dallas, TX 75206-1815
mmarrocco@viacenturion.com

Re:    Request for New Rail Service Location on Union Pacific at Pecos, Texas - File 2975-07

Dear Mr. Marrocco:

As you are aware, Union Pacific has accepted your proposal to establish a new rail service location for Centurion Logistics at Pecos, Texas.  Your engineering consultant should now be preparing detailed construction drawings and an "Exhibit A" for our final review and approval.

Any track operated by Union Pacific must be covered by an Industry Track Agreement (ITA).  Included with this letter is a draft of Union Pacific's standard form ITA for your project, which includes terms for construction, maintenance and operation of the new tracks and our contract insurance requirements (Exhibit B).   Once Construction Drawings and an Exhibit A for your project have been approved and the design for Union Pacific's work is complete a final version of the ITA will be provided for signature.  Also at that time you will receive a Land Lease agreement to secure Union Pacific property for installation of a culvert (as identified on current concept prints).

Your proposal involves signalized switch(es), and we expect the cost for Union Pacific's signal work to exceed $1,000,000.  Before we can determine the final cost of our signal work, we need to design the signal facilities.  A $15,000 deposit from Centurion Logistics will allow the design process to begin.  You will receive credit for this deposit in the "Construction Cost; Payment" section of the ITA.

In the event Centurion Logistics decides not to proceed with track construction, or if the construction is delayed until 2017 or beyond, upon written notification to me concerning your decision to cancel or delay the project, we will refund your deposit less any expense incurred on your project up to the time of cancellation.

Please sign and return a copy of this Letter Agreement to me via email or fax.  This Agreement will be accepted by Union Pacific upon receipt of the indicated deposit.  If you require formal billing, you may consider this letter as a formal bill.

Payment can be made by wire transfer (preferred) or by check according to the following payment instructions:

To pay by wire transfer, provide the following information to your financial institution to ensure proper electronic transfer of funds:

| | |
|---|---|
| Bank: | Bank of America |
| ABA Routing: | 0260-0959-3 |
| Account No.: | 3752021457 |
| A/C Name: | Union Pacific Railroad Miscellaneous Receivables |
| OBI: | BS259-0040 for PID 88198, Folder 2975-07 |



MR.742

To pay by check, make your check payable to UNION PACIFIC RAILROAD COMPANY, include reference to **PID 88198, Folder 2975-07**, and forward to the following address:

**Union Pacific Railroad Company**
**12567 Collection Center Drive**
**Chicago, IL 60693**

Union Pacific's final signal design process, depending on the project's complexity, can take between 90 and 180 days. In order to avoid delays, please respond to this request within 30 days. Do not hesitate to contact me if you have any questions concerning this request or the draft ITA. I look forward to working with you.

Sincerely,

*Tammy Anderson*

TAMMY L. ANDERSON
Sr. Business Manager - Industrial Track Construction
Network & Industrial Development
Telephone (402) 544-2305    Fax (402) 233-2187
E-mail: tlanderson@up.com

**ACCEPTED ON BEHALF OF**
**CENTURION LOGISTICS LLC**

By_____
Title_____
Date Signed_____

MR.743

Exhibit "X"

MR.744



Contact

- Home
- Operations
- Management
- Brownsville
- Pecos
- News

Centurion Terminals is a premier provider of crude/condensate transportation, storage and processing. With its strategically located crude terminals in the Delaware Basin and along the Gulf Coast, and in conjunction with its crude marketing partnerships, Centurion is able to offer a full crude logistics solution.

The Company's terminal in Orla, TX is designed to serve as a header facility with initial operational storage capacity of 300,000 barrels with batching capabilities. The terminal will connect to Centurion's rail transload terminal in Pecos, Texas via a 24-inch condensate/crude pipeline.

Centurion's 500 acre Pecos Terminal is located approximately 5 miles west of Pecos, TX with road frontage on US Interstate 20 and track frontage on the Union Pacific Rail Road. At full operational capacity, the Pecos Terminal is designed to enable the daily movement of up to 2 outbound unit trains or approximately 160,000 barrels per day of crude/condensate by rail from the Delaware Basin to the Company's Gulf Coast storage and processing terminal.

The Brownsville Terminal, currently under construction, is designed to have 1.5+ million barrels of storage capacity (plus additional expansion space). Features include state-of-the-art facilities, automated material handling, liquid cargo dock, three track rail spur and 10 truck LACT skids. Initially, three processing towers will allow Centurion to process condensate at a rate of up to 50,000 barrels per day into products that can be used in the local market or exported.

17950 Preston Rd.
Suite 1080
Dallas, TX 75252

Picture

Web Hosting by FatCow

MR.745

INTERNET ARCHIVE
WayBachMachine    **5 captures**
                  2 Oct 2015 - 24 Feb 2016

http://www.centurionterminals.com:80/brownsville.html          Go

Contact

- Home
- Operations
- Management
- Brownsville
- Pecos
- News

Picture

Web Hosting by FatCow

INTERNET ARCHIVE
WayBackMachine

http://www.centurionterminals.com:80/pecos.html    Go

6 captures
3 Oct 2015 - 26 Feb 2016

Contact

- Home
- Operations
- Management
- Brownsville
- Pecos
- News

Picture

Web Hosting by FatCow



INTERNET ARCHIVE

**6 captures**
3 Oct 2015 - 26 Feb 2016

http://www.centurionterminals.com:80/news.html    [Go]

Contact

- Home
- Operations
- Management
- Brownsville
- Pecos
- News

# News

**October 28, 2015**

Centurion Names Chief Executive Officer

**October 12, 2015**

Centurion Secures Commitment from Anchor Shipper

**September 10, 2015**

Brownsville Terminal Groundbreaking

**August 24, 2015**

Pecos Acreage Acquisition

Web Hosting by FatCow

MR.748

INTERNET ARCHIVE
WayBackMachine

http://www.centurionterminals.com:80/operations.html    Go

7 captures
3 Oct 2015 - 31 Mar 2016

Contact

- Home
- Operations
- Management
- Brownsville
- Pecos
- News

Picture

Web Hosting by FatCow

MR.749



Contact

- Home
- Operations
- Management
- Brownsville
- Pecos
- News

# Executive Management

**Tom Ramsey**
**Chief Executive Officer**

Mr. Ramsey was formerly Head of North American Crude Oil Marketing and Midstream at Vitol, Inc., the world's largest independent oil trader with 2014 revenues of $270 billion. He has 24 years of energy and finance experience managing a wide range of businesses in crude oil, refined products, natural gas, NGLs and olefins and financial and physical commodity supply and trading. Previously, he served as Chief Operating Officer of Gavilon's energy segment where he led the development and growth of a startup midstream business that was later sold to NGL Energy Partners for almost $900 million. Mr. Ramsey has also led crude oil, natural gas liquids and olefins businesses at BP. He holds a B.S. in Finance from the University of Illinois and an M.B.A. from Northwestern University. He is also a Certified Public Accountant.

**John V. Calce**
**President**

Mr. Calce brings over a decade of experience in creating, funding and managing early and development stage companies. Mr. Calce has played a role in the successful founding, development and sale of more than seven different exploration and production and oilfield service companies in the Barnett Shale, Marcellus Shale and Bakken Shale plays. Mr. Calce has supervised or coordinated land transactions totaling more than 200,000 gross acres in the Williston, Appalachian and Permian Basins since 2010. Mr. Calce has assisted in the investment of more than $250 million of principal capital since 2005. He served as a Director of the Petro Capital/THL Energy Fund I, LP as well as a member of the Fund's LP advisory board. Mr. Calce is also a founder of Tritaurian Capital, Inc., a FINRA registered broker-dealer and heads the firm's oil and gas practice. He holds Series 6, 7, 24, 26, 63, 65, and 79 licenses. Mr. Calce is a graduate of Yale University.

**Peter Schmar**
**Executive Vice President, Operations**

Mr. Schmar heads project management, including permitting, engineering, construction and Port Authority negotiations at Centurion. Prior to Centurion, Mr. Schmar created and headed all oil trading for LMS in North Dakota where he successfully raised over $100 million in trade credit and bought and sold crude oil. He has served as director of crude oil supply for a terminal in Green River, Utah where he developed and managed producer relationships within a 250 mile radius. Mr. Schmar has also served as VP of Operations for a Gulf Coast crude terminal where he oversaw daily operations, company permitting, construction, USCG compliance and Homeland Security. Mr. Schmar began his career in Sales and Risk Management with Liberty Mutual where he served for over 25 years progressing into management over Oklahoma, Texas, Arkansas and Louisiana. Mr. Schmar graduated from Wichita State University with a bachelors in business management and psychology.

**Ken D. Douglas**
**Executive Vice President, Finance**

Mr. Douglas has over a decade of experience in investment banking and private equity, all within the energy sector. Mr.



INTERNET ARCHIVE

| http://www.centurionterminals.com:80/management.html | Go |

5 captures
3 Oct 2015 - 21 Feb 2016

involved in over a dozen principal investments, comprised of oilfield services and E&P companies. Prior to Centurion, he was principally focused on structuring and arranging venture capital and mezzanine financing for early and development stage oil and gas companies in the Bakken, Barnett, Permian, Eagle Ford, Haynesville, Montney, Horn River, Marcellus and Utica Shales. This includes the start-up and interim financing of numerous E&P and oilfield service companies, whose services include coiled tubing, fishing and rental tools, fluid pumping, drilling, specialty hauling, oilfield accommodations, snubbing and well servicing. He has served as a Director and Observor on numerous Board of Directors, earned Series 7, 24, 63 and 79 licenses and graduated cum laude with a B.B.A. in Financial Consulting and B.A. in Economics from Southern Methodist University.

**Brian Jeans**
**Executive Vice President, Midstream Development**
Mr. Jeans was most recently the North American Midstream Business Development Manager for BHP Billiton, a multi-billion dollar exploration & production company, where he was responsible for the creation and implementation of midstream asset strategies, business development opportunities, and A&D and market development. He was responsible for leading joint ventures, defining and executing midstream asset strategies, leading / supporting midstream A&D opportunities and identifying / capturing midstream business development opportunities in 3 key areas: the Eagle Ford, Permian & Fayetteville/Haynesville. Previously, he worked as midstream and pipeline business development specialist for Hess, British Petroleum, DCP Midstream and GDF Suez. He earned a bachelors in Business from Louisiana State University and a Masters of Science in Oil and Gas Enterprise Management from the University of Aberdeen.

Web Hosting by FatCow





Contact

- Home
- Operations
- Management
- Brownsville
- Pecos
- News

Centurion Terminals is a premier provider of crude/condensate transportation, storage and processing. With its strategically located crude terminals in the Delaware Basin and along the Gulf Coast, and in conjunction with its crude marketing partnerships, Centurion is able to offer a full crude logistics solution.

The Company's terminal in Orla, TX is designed to serve as a header facility with initial operational storage capacity of 300,000 barrels with batching capabilities. The terminal will connect to Centurion's rail transload terminal in Pecos, Texas via a 24-inch condensate/crude pipeline.

Centurion's 500 acre Pecos Terminal is located approximately 5 miles west of Pecos, TX with road frontage on US Interstate 20 and track frontage on the Union Pacific Rail Road. At full operational capacity, the Pecos Terminal is designed to enable the daily movement of up to 2 outbound unit trains or approximately 160,000 barrels per day of crude/condensate by rail from the Delaware Basin to the Company's Gulf Coast storage and processing terminal.

The Brownsville Terminal, currently under construction, is designed to have 1.5+ million barrels of storage capacity (plus additional expansion space). Features include state-of-the-art facilities, automated material handling, liquid cargo dock, three track rail spur and 10 truck LACT skids. Initially, three processing towers will allow Centurion to process condensate at a rate of up to 50,000 barrels per day into products that can be used in the local market or exported.

17950 Preston Rd.
Suite 1080
Dallas, TX 75252

Picture

Web Hosting by FatCow

MR.752

INTERNET ARCHIVE
**WayBackMachine**

5 captures
3 Oct 2015 - 21 Feb 2016

http://www.centurionterminals.com:80/management.html    | Go |

Contact

- Home
- Operations
- Management
- Brownsville
- Pecos
- News

# Executive Management

**Tom Ramsey**
**Chief Executive Officer**

Mr. Ramsey was formerly Head of North American Crude Oil Marketing and Midstream at Vitol, Inc., the world's largest independent oil trader with 2014 revenues of $270 billion. He has 24 years of energy and finance experience managing a wide range of businesses in crude oil, refined products, natural gas, NGLs and olefins and financial and physical commodity supply and trading. Previously, he served as Chief Operating Officer of Gavilon's energy segment where he led the development and growth of a startup midstream business that was later sold to NGL Energy Partners for almost $900 million. Mr. Ramsey has also led crude oil, natural gas liquids and olefins businesses at BP. He holds a B.S. in Finance from the University of Illinois and an M.B.A. from Northwestern University. He is also a Certified Public Accountant.

**John V. Calce**
**President**

Mr. Calce brings over a decade of experience in creating, funding and managing early and development stage companies. Mr. Calce has played a role in the successful founding, development and sale of more than seven different exploration and production and oilfield service companies in the Barnett Shale, Marcellus Shale and Bakken Shale plays. Mr. Calce has supervised or coordinated land transactions totaling more than 200,000 gross acres in the Williston, Appalachian and Permian Basins since 2010. Mr. Calce has assisted in the investment of more than $250 million of principal capital since 2005. He served as a Director of the Petro Capital/THL Energy Fund I, LP as well as a member of the Fund's LP advisory board. Mr. Calce is also a founder of Tritaurian Capital, Inc., a FINRA registered broker-dealer and heads the firm's oil and gas practice. He holds Series 6, 7, 24, 26, 63, 65, and 79 licenses. Mr. Calce is a graduate of Yale University.

**Peter Schmar**
**Executive Vice President, Operations**

Mr. Schmar heads project management, including permitting, engineering, construction and Port Authority negotiations at Centurion. Prior to Centurion, Mr. Schmar created and headed all oil trading for LMS in North Dakota where he successfully raised over $100 million in trade credit and bought and sold crude oil. He has served as director of crude oil supply for a terminal in Green River, Utah where he developed and managed producer relationships within a 250 mile radius. Mr. Schmar has also served as VP of Operations for a Gulf Coast crude terminal where he oversaw daily operations, company permitting, construction, USCG compliance and Homeland Security. Mr. Schmar began his career in Sales and Risk Management with Liberty Mutual where he served for over 25 years progressing into management over Oklahoma, Texas, Arkansas and Louisiana. Mr. Schmar graduated from Wichita State University with a bachelors in business management and psychology.

**Ken D. Douglas**
**Executive Vice President, Finance**

Mr. Douglas has over a decade of experience in investment banking and private equity, all within the energy sector. Mr.

MR.753



involved in over a dozen principal investments, comprised of oilfield services and E&P companies. Prior to Centurion, he was principally focused on structuring and arranging venture capital and mezzanine financing for early and development stage oil and gas companies in the Bakken, Barnett, Permian, Eagle Ford, Haynesville, Montney, Horn River, Marcellus and Utica Shales. This includes the start-up and interim financing of numerous E&P and oilfield service companies, whose services include coiled tubing, fishing and rental tools, fluid pumping, drilling, specialty hauling, oilfield accommodations, snubbing and well servicing. He has served as a Director and Observor on numerous Board of Directors, earned Series 7, 24, 63 and 79 licenses and graduated cum laude with a B.B.A. in Financial Consulting and B.A. in Economics from Southern Methodist University.

**Brian Jeans**
**Executive Vice President, Midstream Development**
Mr. Jeans was most recently the North American Midstream Business Development Manager for BHP Billiton, a multi-billion dollar exploration & production company, where he was responsible for the creation and implementation of midstream asset strategies, business development opportunities, and A&D and market development. He was responsible for leading joint ventures, defining and executing midstream asset strategies, leading / supporting midstream A&D opportunities and identifying / capturing midstream business development opportunities in 3 key areas: the Eagle Ford, Permian & Fayetteville/Haynesville. Previously, he worked as midstream and pipeline business development specialist for Hess, British Petroleum, DCP Midstream and GDF Suez. He earned a bachelors in Business from Louisiana State University and a Masters of Science in Oil and Gas Enterprise Management from the University of Aberdeen.

Web Hosting by FatCow

MR.754



INTERNET ARCHIVE

http://www.centurionterminals.com:80/    Go

7 captures
3 Oct 2015 - 2 Oct 2016



Contact

- Home
- Operations
- Management
- Brownsville
- Pecos
- News

Centurion Terminals is a premier provider of crude/condensate transportation, storage and processing. With its strategically located crude terminals in the Delaware Basin and along the Gulf Coast, and in conjunction with its crude marketing partnerships, Centurion is able to offer a full crude logistics solution.

The Company's terminal in Orla, TX is designed to serve as a header facility with initial operational storage capacity of 300,000 barrels with batching capabilities. The terminal will connect to Centurion's rail transload terminal in Pecos, Texas via a 24-inch condensate/crude pipeline.

Centurion's 500 acre Pecos Terminal is located approximately 5 miles west of Pecos, TX with road frontage on US Interstate 20 and track frontage on the Union Pacific Rail Road. At full operational capacity, the Pecos Terminal is designed to enable the daily movement of up to 2 outbound unit trains or approximately 160,000 barrels per day of crude/condensate by rail from the Delaware Basin to the Company's Gulf Coast storage and processing terminal.

The Brownsville Terminal, currently under construction, is designed to have 1.5+ million barrels of storage capacity (plus additional expansion space). Features include state-of-the-art facilities, automated material handling, liquid cargo dock, three track rail spur and 10 truck LACT skids. Initially, three processing towers will allow Centurion to process condensate at a rate of up to 50,000 barrels per day into products that can be used in the local market or exported.

17950 Preston Rd.      Picture
Suite 1080
Dallas, TX 75252

Web Hosting by FatCow

MR.755



Contact

- Home
- Operations
- Management
- Brownsville
- Pecos
- News

# Executive Management

### Tom Ramsey
**Chief Executive Officer**

Mr. Ramsey was formerly Head of North American Crude Oil Marketing and Midstream at Vitol, Inc., the world's largest independent oil trader with 2014 revenues of $270 billion. He has 24 years of energy and finance experience managing a wide range of businesses in crude oil, refined products, natural gas, NGLs and olefins and financial and physical commodity supply and trading. Previously, he served as Chief Operating Officer of Gavilon's energy segment where he led the development and growth of a startup midstream business that was later sold to NGL Energy Partners for almost $900 million. Mr. Ramsey has also led crude oil, natural gas liquids and olefins businesses at BP. He holds a B.S. in Finance from the University of Illinois and an M.B.A. from Northwestern University. He is also a Certified Public Accountant.

### John V. Calce
**President**

Mr. Calce brings over a decade of experience in creating, funding and managing early and development stage companies. Mr. Calce has played a role in the successful founding, development and sale of more than seven different exploration and production and oilfield service companies in the Barnett Shale, Marcellus Shale and Bakken Shale plays. Mr. Calce has supervised or coordinated land transactions totaling more than 200,000 gross acres in the Williston, Appalachian and Permian Basins since 2010. Mr. Calce has assisted in the investment of more than $250 million of principal capital since 2005. He served as a Director of the Petro Capital/THL Energy Fund I, LP as well as a member of the Fund's LP advisory board. Mr. Calce is also a founder of Tritaurian Capital, Inc., a FINRA registered broker-dealer and heads the firm's oil and gas practice. He holds Series 6, 7, 24, 26, 63, 65, and 79 licenses. Mr. Calce is a graduate of Yale University.

### Peter Schmar
**Executive Vice President, Operations**

Mr. Schmar heads project management, including permitting, engineering, construction and Port Authority negotiations at Centurion. Prior to Centurion, Mr. Schmar created and headed all oil trading for LMS in North Dakota where he successfully raised over $100 million in trade credit and bought and sold crude oil. He has served as director of crude oil supply for a terminal in Green River, Utah where he developed and managed producer relationships within a 250 mile radius. Mr. Schmar has also served as VP of Operations for a Gulf Coast crude terminal where he oversaw daily operations, company permitting, construction, USCG compliance and Homeland Security. Mr. Schmar began his career in Sales and Risk Management with Liberty Mutual where he served for over 25 years progressing into management over Oklahoma, Texas, Arkansas and Louisiana. Mr. Schmar graduated from Wichita State University with a bachelors in business management and psychology.

### Ken D. Douglas
**Executive Vice President, Finance**

Mr. Douglas has over a decade of experience in investment banking and private equity, all within the energy sector. Mr.

MR.756



involved in over a dozen principal investments, comprised of oilfield services and E&P companies. Prior to Centurion, he was principally focused on structuring and arranging venture capital and mezzanine financing for early and development stage oil and gas companies in the Bakken, Barnett, Permian, Eagle Ford, Haynesville, Montney, Horn River, Marcellus and Utica Shales. This includes the start-up and interim financing of numerous E&P and oilfield service companies, whose services include coiled tubing, fishing and rental tools, fluid pumping, drilling, specialty hauling, oilfield accommodations, snubbing and well servicing. He has served as a Director and Observor on numerous Board of Directors, earned Series 7, 24, 63 and 79 licenses and graduated cum laude with a B.B.A. in Financial Consulting and B.A. in Economics from Southern Methodist University.

**Brian Jeans**
**Executive Vice President, Midstream Development**
Mr. Jeans was most recently the North American Midstream Business Development Manager for BHP Billiton, a multi-billion dollar exploration & production company, where he was responsible for the creation and implementation of midstream asset strategies, business development opportunities, and A&D and market development. He was responsible for leading joint ventures, defining and executing midstream asset strategies, leading / supporting midstream A&D opportunities and identifying / capturing midstream business development opportunities in 3 key areas: the Eagle Ford, Permian & Fayetteville/Haynesville. Previously, he worked as midstream and pipeline business development specialist for Hess, British Petroleum, DCP Midstream and GDF Suez. He earned a bachelors in Business from Louisiana State University and a Masters of Science in Oil and Gas Enterprise Management from the University of Aberdeen.

Web Hosting by FatCow

MR.757

INTERNET ARCHIVE

WagBackMachine    7 captures
3 Oct 2015 - 2 Oct 2016

http://www.centurionterminals.com:80/    Go

Contact

- Home
- Operations
- Management
- Brownsville
- Pecos
- News

Centurion Terminals is a premier provider of crude/condensate transportation, storage and processing. With its strategically located crude terminals in the Delaware Basin and along the Gulf Coast, and in conjunction with its crude marketing partnerships, Centurion is able to offer a full crude logistics solution.

The Company's terminal in Orla, TX is designed to serve as a header facility with initial operational storage capacity of 300,000 barrels with batching capabilities. The terminal will connect to Centurion's rail transload terminal in Pecos, Texas via a 24-inch condensate/crude pipeline.

Centurion's 500 acre Pecos Terminal is located approximately 5 miles west of Pecos, TX with road frontage on US Interstate 20 and track frontage on the Union Pacific Rail Road. At full operational capacity, the Pecos Terminal is designed to enable the daily movement of up to 2 outbound unit trains or approximately 160,000 barrels per day of crude/condensate by rail from the Delaware Basin to the Company's Gulf Coast storage and processing terminal.

The Brownsville Terminal, currently under construction, is designed to have 1.5+ million barrels of storage capacity (plus additional expansion space). Features include state-of-the-art facilities, automated material handling, liquid cargo dock, three track rail spur and 10 truck LACT skids. Initially, three processing towers will allow Centurion to process condensate at a rate of up to 50,000 barrels per day into products that can be used in the local market or exported.

17950 Preston Rd.    Picture
Suite 1080
Dallas, TX 75252

Web Hosting by FatCow

MR.758



INTERNET ARCHIVE

**5 captures**
3 Oct 2015 - 21 Feb 2016

http://www.centurionterminals.com:80/management.html    Go

Contact

- Home
- Operations
- Management
- Brownsville
- Pecos
- News

# Executive Management

### Tom Ramsey
### Chief Executive Officer

Mr. Ramsey was formerly Head of North American Crude Oil Marketing and Midstream at Vitol, Inc., the world's largest independent oil trader with 2014 revenues of $270 billion. He has 24 years of energy and finance experience managing a wide range of businesses in crude oil, refined products, natural gas, NGLs and olefins and financial and physical commodity supply and trading. Previously, he served as Chief Operating Officer of Gavilon's energy segment where he led the development and growth of a startup midstream business that was later sold to NGL Energy Partners for almost $900 million. Mr. Ramsey has also led crude oil, natural gas liquids and olefins businesses at BP. He holds a B.S. in Finance from the University of Illinois and an M.B.A. from Northwestern University. He is also a Certified Public Accountant.

### John V. Calce
### President

Mr. Calce brings over a decade of experience in creating, funding and managing early and development stage companies. Mr. Calce has played a role in the successful founding, development and sale of more than seven different exploration and production and oilfield service companies in the Barnett Shale, Marcellus Shale and Bakken Shale plays. Mr. Calce has supervised or coordinated land transactions totaling more than 200,000 gross acres in the Williston, Appalachian and Permian Basins since 2010. Mr. Calce has assisted in the investment of more than $250 million of principal capital since 2005. He served as a Director of the Petro Capital/THL Energy Fund I, LP as well as a member of the Fund's LP advisory board. Mr. Calce is also a founder of Tritaurian Capital, Inc., a FINRA registered broker-dealer and heads the firm's oil and gas practice. He holds Series 6, 7, 24, 26, 63, 65, and 79 licenses. Mr. Calce is a graduate of Yale University.

### Peter Schmar
### Executive Vice President, Operations

Mr. Schmar heads project management, including permitting, engineering, construction and Port Authority negotiations at Centurion. Prior to Centurion, Mr. Schmar created and headed all oil trading for LMS in North Dakota where he successfully raised over $100 million in trade credit and bought and sold crude oil. He has served as director of crude oil supply for a terminal in Green River, Utah where he developed and managed producer relationships within a 250 mile radius. Mr. Schmar has also served as VP of Operations for a Gulf Coast crude terminal where he oversaw daily operations, company permitting, construction, USCG compliance and Homeland Security. Mr. Schmar began his career in Sales and Risk Management with Liberty Mutual where he served for over 25 years progressing into management over Oklahoma, Texas, Arkansas and Louisiana. Mr. Schmar graduated from Wichita State University with a bachelors in business management and psychology.

### Ken D. Douglas
### Executive Vice President, Finance

Mr. Douglas has over a decade of experience in investment banking and private equity, all within the energy sector. Mr.

MR.759



http://www.centurionterminals.com:80/management.html    Go

involved in over a dozen principal investments, comprised of oilfield services and E&P companies. Prior to Centurion, he was principally focused on structuring and arranging venture capital and mezzanine financing for early and development stage oil and gas companies in the Bakken, Barnett, Permian, Eagle Ford, Haynesville, Montney, Horn River, Marcellus and Utica Shales. This includes the start-up and interim financing of numerous E&P and oilfield service companies, whose services include coiled tubing, fishing and rental tools, fluid pumping, drilling, specialty hauling, oilfield accommodations, snubbing and well servicing. He has served as a Director and Observor on numerous Board of Directors, earned Series 7, 24, 63 and 79 licenses and graduated cum laude with a B.B.A. in Financial Consulting and B.A. in Economics from Southern Methodist University.

**Brian Jeans**
**Executive Vice President, Midstream Development**
Mr. Jeans was most recently the North American Midstream Business Development Manager for BHP Billiton, a multi-billion dollar exploration & production company, where he was responsible for the creation and implementation of midstream asset strategies, business development opportunities, and A&D and market development. He was responsible for leading joint ventures, defining and executing midstream asset strategies, leading / supporting midstream A&D opportunities and identifying / capturing midstream business development opportunities in 3 key areas: the Eagle Ford, Permian & Fayetteville/Haynesville. Previously, he worked as midstream and pipeline business development specialist for Hess, British Petroleum, DCP Midstream and GDF Suez. He earned a bachelors in Business from Louisiana State University and a Masters of Science in Oil and Gas Enterprise Management from the University of Aberdeen.

Web Hosting by FatCow

MR.760

Exhibit "Y"

MR.761

Return to: PSG
Republic Title of Texas, Inc.
2626 Howell Street, 10th Floor
Dallas TX 75204
$45.00

# Deed of Trust to Secure Assumption

**Notice of confidentiality rights: If you are a natural person, you may remove or strike any or all of the following information from any instrument that transfers an interest in real property before it is filed for record in the public records: your Social Security number or your driver's license number.**

## Basic Information

Date: __April 6__, 2016

Grantor: CENTURION PECOS TERMINAL LLC, a Texas limited liability company

Grantor's Mailing Address: 17950 Preston Road, Suite 1080, Dallas, Texas 75252

Trustee: David W. Tomek

Trustee's Mailing Address: 325 N. St. Paul Street, Suite 3300, Dallas, Texas 75201

Beneficiary: BALLENGEE INTERESTS, LLC, a Louisiana limited liability company

Beneficiary's Mailing Address: Two Turtle Creek, 3838 Oak Lawn Avenue, Suite 1150, Dallas, Texas 75219

Note Assumed

    Date: September 16, 2014

    Original principal amount: $1,500,000.00

    Borrower: Ballengee Interests, LLC

    Lender: Texas Capital Bank, National Association

    Secured by: Deed of Trust recorded as Instrument No. 14-09181 in the Real Property Records of Reeves County, Texas, as extended by Extension of Real Estate Note and Lien recorded as Instrument No. 15-10258 in the Real Property Records of Reeves County, Texas (as extended, the TCB Deed of Trust)

    Guarantor: James H. Ballengee

Property (including any improvements): See Exhibit A attached hereto.

Prior Lien: Other than the TCB Deed of Trust, none.

Other Exceptions to Conveyance and Warranty: All matters of record affecting the Property.

Consideration: For $10 and other good and valuable consideration, Grantor has assumed


EXHIBIT
6

payment of the Note Assumed pursuant to an assumption agreement of even date herewith.

### A. Granting Clause

For value received and to secure Grantor's assumption of the Note Assumed, Grantor conveys the Property to Trustee in trust. Grantor warrants and agrees to defend the title to the Property, subject to the Other Exceptions to Conveyance and Warranty. If Grantor performs all the covenants of the Note Assumed and if Beneficiary has not filed of record a notice of advancement (see paragraph C.3. below), a release of the TCB Deed of Trust will release this deed of trust to secure assumption.

### B. Grantor's Obligations

Grantor agrees to—

*B.1.* perform all the covenants of the Note Assumed; and

*B.2.* notify Beneficiary and Lender of any change of address.

### C. Beneficiary's Rights

*C.1.* Beneficiary may appoint in writing a substitute trustee, succeeding to all rights and responsibilities of Trustee.

*C.2.* If Grantor fails to perform any of Grantor's obligations under the Note Assumed, Beneficiary or Guarantor may perform those obligations, advance funds required, and then be reimbursed by Grantor on demand for any amounts so advanced, including attorney's fees, plus interest on those amounts from the dates of payment at the highest legal rate. The amount to be reimbursed will be secured by this deed of trust to secure assumption.

*C.3.* Beneficiary may file a sworn notice of such advancement in the office of the county clerk in the county in which the Property is located. The notice will detail the dates, amounts, and purposes of the amounts advanced to perform Grantor's obligations under the Note Assumed and will include the legal description of the Property.

*C.4.* If Grantor fails on demand to reimburse Beneficiary or Guarantor for the amounts advanced and such failure continues after Beneficiary gives Grantor notice of the failure and the time within which it must be cured, to the extent required by law or by written agreement, Beneficiary may—

    a. exercise Beneficiary's rights with respect to rent under the Texas Property Code as then in effect;

    b. direct Trustee to foreclose this lien, in which case Beneficiary or Beneficiary's agent will cause notice of the foreclosure sale to be given as provided by the Texas Property Code as then in effect; and

    c. purchase the Property at any foreclosure sale by offering the highest bid

2

VOL 12599 PG 03655

MR.763

and then have the bid credited to the amount owed to Beneficiary.

## D. Trustee's Rights and Duties

If directed by Beneficiary to foreclose this lien, Trustee will—

*D.1.* either personally or by agent give notice of the foreclosure sale as required by this deed of trust to secure assumption and the Texas Property Code as then in effect;

*D.2.* sell and convey all or part of the Property "AS IS" to the highest bidder for cash with a general warranty binding Grantor, subject to the Prior Lien and to the Other Exceptions to Conveyance and Warranty and without representation or warranty, express or implied, by Trustee;

*D.3.* from the proceeds of the sale, pay, in this order—

    a.    expenses of foreclosure, including a reasonable commission to Trustee;

    b.    to Beneficiary, the full amount advanced, attorney's fees, and other charges due and unpaid;

    c.    any amounts required by law to be paid before payment to Grantor; and

    d.    to Grantor, any balance; and

*D.4.* be indemnified, held harmless, and defended by Beneficiary against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this deed of trust to secure assumption, which includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity.

## E. General Provisions

*E.1.* If any of the Property is sold under this deed of trust to secure assumption, Grantor must immediately surrender possession to the purchaser. If Grantor does not, Grantor will be a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

*E.2.* Recitals in any trustee's deed conveying the Property will be presumed to be true.

*E.3.* Proceeding under this deed of trust to secure assumption, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

*E.4.* This lien will be superior to liens later created even if Beneficiary has made no advancements when later liens are created.

*E.5.* If any portion of the advancements cannot be lawfully secured by this deed of trust to secure assumption, payments will be applied first to discharge that portion.

3

MR.764

*E.6.*     A sale of the Property under this deed of trust to secure assumption—

    a.     is subject to Grantor's continuing obligation to make all payments owing on the Note Assumed; and

    b.     does not extinguish Trustee's right to conduct subsequent sales of the Property for future Grantor defaults under this deed of trust to secure assumption.

*E.7.*     Grantor collaterally assigns to Beneficiary all present and future rent from the Property and its proceeds. Grantor warrants the validity and enforceability of the assignment. Grantor will apply all rent to payment of the Note Assumed, but if the rent exceeds the amount due with respect to the Note Assumed, Grantor may retain the excess. If a default exists in payment of the Note Assumed or performance of this deed of trust to secure assumption, Beneficiary may exercise Beneficiary's rights with respect to rent under the Texas Property Code as then in effect. Beneficiary neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the Property. Beneficiary may exercise Beneficiary's rights and remedies under this paragraph without taking possession of the Property. Beneficiary will apply all rent collected under this paragraph as required by the Texas Property Code as then in effect. Beneficiary is not required to act under this paragraph, and acting under this paragraph does not waive any of Beneficiary's other rights or remedies.

*E.8.*     Interest on the debt secured by this deed of trust to secure assumption will not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess will be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides any conflicting provisions in this and all other instruments concerning the debt.

*E.9.*     Any action taken under this deed of trust to secure assumption will not extinguish the rights of Beneficiary or Guarantor to proceed against Grantor under the indemnity contained in the assumption agreement by which Borrower assumed the Note Assumed.

*E.10.*     The term *Beneficiary* includes any mortgage servicer for Beneficiary.

*E.11.*     When the context requires, singular nouns and pronouns include the plural.

*E.12.*     This deed of trust to secure assumption binds, benefits, and may be enforced by the successors in interest of all parties.

*E.13.*     Grantor waives and surrenders to Lender (a) Grantor's power to authorize anyone (other than Lender or Grantor) to pay ad valorem taxes on the Property and (b) Grantor's power to authorize a taxing entity to transfer its tax lien on the Property to anyone other than Lender. Grantor agrees and declares that any authorization from Grantor to another (other than Lender) to pay the taxes and transfer a tax lien on the Property is void.

4

VOL 1259 PG 0367

MR.765

GRANTOR:

CENTURION PECOS TERMINAL LLC,
a Texas limited liability company

By: _James Hock_

Name: _James Hock_

Title: _President_

ACKNOWLEDGEMENT

THE STATE OF TEXAS        §

COUNTY OF DALLAS         §

BEFORE ME, the undersigned authority, a Notary Public in and for the State of Texas, on this day personally appeared _Hock_ , _James_ of Centurion Pecos Terminal LLC, a Texas limited liability company, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that s/he executed the same for the purposes and consideration expressed therein and on behalf of such company.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 4th day of _April_ , 2016.

MARY KILPATRICK
Notary Public, State of Texas
My Commission Expires
July 14, 2019

_Mary Kilpatrick_
Notary Public State of Texas

_Mary Kilpatrick_
Typed or Printed Name of Notary

My Commission Expires:

7/14/19

VOL
12599

PG
03688

5

MR.766

## Exhibit A

BEING a tract of land located in Section 76, Block 4, H&GN Survey, Reeves County, Texas, and being a part of a called 496.76 GRID (496.87 Surface) acre tract of land as described in a Deed recorded in Volume 905, Page 155, Official Public Records, Reeves County, Texas (O.P.R.R.C.T.), and being more particularly described as follows:

BEGINNING at a 5/8 inch iron rod set with cap stamped "TRANS TEXAS SURVEYING" for the Northwest corner of said Section 76, the Southwest corner of said Section 75, the Northeast corner of Section 77 and the Southeast corner of Section 78, said 5/8 inch iron rod set also being in the intersection of County Road No. 408 and County Road No. 404;

THENCE North 58 degrees 03 minutes 46 seconds East, with the common line of said Section 76 and Section 75, a distance of 2639.85 feet to a point in the East line of said 496.76 acre tract from which a 1/2 inch iron rod found with cap stamped "5358 TRUJILLO" bears South 58 degrees 03 minutes 46 seconds West, a distance of 0.63 feet, also from which a 1/2 inch iron rod found at the Northeast corner of said Section 76, Block 4, bears North 58 degrees 03 minutes 46 seconds East, a distance of 2639.85 feet;

THENCE South 32 degrees 08 minutes 23 seconds East, with the East line of said 496.76 acre tract, a distance of 3187.68 feet to a 5/8 inch iron rod set with cap stamped "TRANS TEXAS SURVEYING" for the Southeast corner of said 496.76 acre tract being 100 feet North of the centerline of the Texas & Pacific Railroad;

THENCE South 69 degrees 42 minutes 22 seconds West, with the South line of said 496.76 acre tract and 100 feet North of and parallel with the centerline of said Texas & Pacific Railroad, a distance of 2697.40 feet to a point in said County Road No. 408, the West line of said Section 76 and the East line of Section 77, Block 4, from which a 60D nail found bears South 69 degrees 42 minutes 22 seconds West, a distance of 0.37 feet, also from which a 1/2 inch iron rod found for the Southwest corner of said Section 76, Block 4, bears South 32 degrees 08 minutes 13 seconds East, a distance of 2657.42 feet;

THENCE North 32 degrees 08 minutes 13 seconds West, with the West line of said 496.76 acre tract and with the common line of said Section 76 and said Section 77, a distance of 2643.29 feet to the PLACE OF BEGINNING and CONTAINING 176.659 acres of land.

V
O
L

1
2
5
9

P
G

0
3
6
9

Inst No. 16-04401
DIANNE O. FLOREZ
COUNTY CLERK
2016 Apr 11 at 04:39 PM
REEVES COUNTY TEXAS
By: BA

6

MR.767

<u>Exhibit "Z"</u>

MR.768

Return to: PSG
Republic Title of Texas, Inc.
2626 Howell Street, 10th Floor
Dallas TX 75204
$53.00

V
O
L

1
2
5
9

P
G

0
3
7
0

# Deed of Trust to Secure Assumption

**Notice of confidentiality rights: If you are a natural person, you may remove or strike any or all of the following information from any instrument that transfers an interest in real property before it is filed for record in the public records: your Social Security number or your driver's license number.**

## Basic Information

Date: __April 6__, 2016

Grantor: CENTURION PECOS TERMINAL LLC, a Texas limited liability company

Grantor's Mailing Address: 17950 Preston Road, Suite 1080, Dallas, Texas 75252

Trustee: David W. Tomek

Trustee's Mailing Address: 325 N. St. Paul Street, Suite 3300, Dallas, Texas 75201

Beneficiary: BALLENGEE INTERESTS, LLC, a Louisiana limited liability company

Beneficiary's Mailing Address: Two Turtle Creek, 3838 Oak Lawn Avenue, Suite 1150, Dallas, Texas 75219

Note Assumed

Date: August 17, 2015

Original principal amount: $1,500,000.00

Borrower: Ballengee Interests, LLC

Lender: Texas Capital Bank, National Association

Secured by: Deed of Trust recorded as Instrument No. 15-07672 in the Real Property Records of Reeves County, Texas (the TCB Deed of Trust)

Guarantor: James H. Ballengee

Property (including any improvements): See Exhibit A attached hereto.

Prior Lien: Other than the TCB Deed of Trust, none.

Other Exceptions to Conveyance and Warranty: All matters of record affecting the Property.

Consideration: For $10 and other good and valuable consideration, Grantor has assumed payment of the Note Assumed pursuant to an assumption agreement of even date herewith.



EXHIBIT
7

MR.769

## A.    Granting Clause

For value received and to secure Grantor's assumption of the Note Assumed, Grantor conveys the Property to Trustee in trust. Grantor warrants and agrees to defend the title to the Property, subject to the Other Exceptions to Conveyance and Warranty. If Grantor performs all the covenants of the Note Assumed and if Beneficiary has not filed of record a notice of advancement (see paragraph C.3. below), a release of the TCB Deed of Trust will release this deed of trust to secure assumption.

## B.    Grantor's Obligations

Grantor agrees to—

*B.1.*    perform all the covenants of the Note Assumed; and

*B.2.*    notify Beneficiary and Lender of any change of address.

## C.    Beneficiary's Rights

*C.1.*    Beneficiary may appoint in writing a substitute trustee, succeeding to all rights and responsibilities of Trustee.

*C.2.*    If Grantor fails to perform any of Grantor's obligations under the Note Assumed, Beneficiary or Guarantor may perform those obligations, advance funds required, and then be reimbursed by Grantor on demand for any amounts so advanced, including attorney's fees, plus interest on those amounts from the dates of payment at the highest legal rate. The amount to be reimbursed will be secured by this deed of trust to secure assumption.

*C.3.*    Beneficiary may file a sworn notice of such advancement in the office of the county clerk in the county in which the Property is located. The notice will detail the dates, amounts, and purposes of the amounts advanced to perform Grantor's obligations under the Note Assumed and will include the legal description of the Property.

*C.4.*    If Grantor fails on demand to reimburse Beneficiary or Guarantor for the amounts advanced and such failure continues after Beneficiary gives Grantor notice of the failure and the time within which it must be cured, to the extent required by law or by written agreement, Beneficiary may—

      a.    exercise Beneficiary's rights with respect to rent under the Texas Property Code as then in effect;

      b.    direct Trustee to foreclose this lien, in which case Beneficiary or Beneficiary's agent will cause notice of the foreclosure sale to be given as provided by the Texas Property Code as then in effect; and

      c.    purchase the Property at any foreclosure sale by offering the highest bid and then have the bid credited to the amount owed to Beneficiary.

2

MR.770

**D.    Trustee's Rights and Duties**

If directed by Beneficiary to foreclose this lien, Trustee will—

*D.1.*    either personally or by agent give notice of the foreclosure sale as required by this deed of trust to secure assumption and the Texas Property Code as then in effect;

*D.2.*    sell and convey all or part of the Property "AS IS" to the highest bidder for cash with a general warranty binding Grantor, subject to the Prior Lien and to the Other Exceptions to Conveyance and Warranty and without representation or warranty, express or implied, by Trustee;

*D.3.*    from the proceeds of the sale, pay, in this order—

    a.    expenses of foreclosure, including a reasonable commission to Trustee;

    b.    to Beneficiary, the full amount advanced, attorney's fees, and other charges due and unpaid;

    c.    any amounts required by law to be paid before payment to Grantor; and

    d.    to Grantor, any balance; and

*D.4.*    be indemnified, held harmless, and defended by Beneficiary against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this deed of trust to secure assumption, which includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity.

**E.    General Provisions**

*E.1.*    If any of the Property is sold under this deed of trust to secure assumption, Grantor must immediately surrender possession to the purchaser. If Grantor does not, Grantor will be a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

*E.2.*    Recitals in any trustee's deed conveying the Property will be presumed to be true.

*E.3.*    Proceeding under this deed of trust to secure assumption, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

*E.4.*    This lien will be superior to liens later created even if Beneficiary has made no advancements when later liens are created.

*E.5.*    If any portion of the advancements cannot be lawfully secured by this deed of trust to secure assumption, payments will be applied first to discharge that portion.

*E.6.*    A sale of the Property under this deed of trust to secure assumption—

3

VOL 1259 PG 0372

    a.     is subject to Grantor's continuing obligation to make all payments owing on the Note Assumed; and

    b.     does not extinguish Trustee's right to conduct subsequent sales of the Property for future Grantor defaults under this deed of trust to secure assumption.

*E.7.*    Grantor collaterally assigns to Beneficiary all present and future rent from the Property and its proceeds. Grantor warrants the validity and enforceability of the assignment. Grantor will apply all rent to payment of the Note Assumed, but if the rent exceeds the amount due with respect to the Note Assumed, Grantor may retain the excess. If a default exists in payment of the Note Assumed or performance of this deed of trust to secure assumption, Beneficiary may exercise Beneficiary's rights with respect to rent under the Texas Property Code as then in effect. Beneficiary neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the Property. Beneficiary may exercise Beneficiary's rights and remedies under this paragraph without taking possession of the Property. Beneficiary will apply all rent collected under this paragraph as required by the Texas Property Code as then in effect. Beneficiary is not required to act under this paragraph, and acting under this paragraph does not waive any of Beneficiary's other rights or remedies.

*E.8.*    Interest on the debt secured by this deed of trust to secure assumption will not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess will be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides any conflicting provisions in this and all other instruments concerning the debt.

*E.9.*    Any action taken under this deed of trust to secure assumption will not extinguish the rights of Beneficiary or Guarantor to proceed against Grantor under the indemnity contained in the assumption agreement by which Borrower assumed the Note Assumed.

*E.10.*    The term *Beneficiary* includes any mortgage servicer for Beneficiary.

*E.11.*    When the context requires, singular nouns and pronouns include the plural.

*E.12.*    This deed of trust to secure assumption binds, benefits, and may be enforced by the successors in interest of all parties.

*E.13.*    Grantor waives and surrenders to Lender (a) Grantor's power to authorize anyone (other than Lender or Grantor) to pay ad valorem taxes on the Property and (b) Grantor's power to authorize a taxing entity to transfer its tax lien on the Property to anyone other than Lender. Grantor agrees and declares that any authorization from Grantor to another (other than Lender) to pay the taxes and transfer a tax lien on the Property is void.

4

MR.772

VOL 1259 PG 0373

GRANTOR:

CENTURION PECOS TERMINAL LLC,
a Texas limited liability company

By: _Jan Hok_____

Name: _James Hock_____

Title: _President_____

                         ACKNOWLEDGEMENT

THE STATE OF TEXAS      §

COUNTY OF DALLAS        §

BEFORE ME, the undersigned authority, a Notary Public in and for the State of Texas, on this day personally appeared __Hock_____, __James_____ of Centurion Pecos Terminal LLC, a Texas limited liability company, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that s/he executed the same for the purposes and consideration expressed therein and on behalf of such company.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 4th day of _April_____, 2016.

**MARY KILPATRICK**
Notary Public, State of Texas
My Commission Expires
July 14, 2019

_Mary Kym_____
Notary Public State of Texas

My Commission Expires:

7/14/19

_Mary Kilpatrick_____
Typed or Printed Name of Notary

V
O
L

1
2
5
9

P
G

0
3
7
4

5

MR.773

BEING A TRACT OF LAND LOCATED IN SECTIONS 73 AND 76, BLOCK 4, H&GN RAILROAD COMPANY SURVEY, REEVES COUNTY, TEXAS, AND BEING COMPOSED OF THE FOLLOWING: A PART OF A CALLED 84.2 ACRE TRACT OF LAND AS DESCRIBED IN A DEED RECORDED IN VOLUME 860, PAGE 82, OFFICIAL PUBLIC RECORDS, REEVES COUNTY, TEXAS (O.P.R.R.C.T.); A PART OF THE NORTHWEST QUARTER OF SAID SECTION 73 AS DESCRIBED IN A DEED RECORDED IN VOLUME 825, PAGE 784 OF SAID O.P.R.R.C.T.; AND ALL OF A CALLED 109.58 ACRE TRACT OF LAND AS DESCRIBED IN A DEED RECORDED IN VOLUME 1080, PAGE 17 OF SAID O.P.R.R.C.T., AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A 5/8" IRON ROD FOUND WITH CAP STAMPED "TRANS TEXAS SURVEYING" IN THE NORTH LINE OF THE T&P RAILROAD COMPANY RIGHT-OF-WAY AT THE SOUTHWEST CORNER OF THE SAID 109.58 ACRE TRACT AND THE SOUTHEAST CORNER OF THAT 176.659 ACRE TRACT OF LAND AS DESCRIBED IN A DEED RECORDED IN INST. No. 14-03664 OF SAID O.P.R.R.C.T. FOR THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE N 32°08'23" W, WITH THE WEST LINE OF THE SAID 109.58 ACRE TRACT AND THE EAST LINE OF THE SAID 176.659 ACRE TRACT, A DISTANCE OF 1537.04 FEET TO A POINT FOR THE NORTHWEST CORNER OF THE SAID 109.58 ACRE TRACT AND THE SOUTHWEST CORNER OF THAT 100.00 ACRE TRACT OF LAND DESCRIBED AS A SAVE AND EXCEPT TRACT IN A DEED RECORDED IN VOLUME 1006, PAGE 1 OF SAID O.P.R.R.C.T. FOR THE MOST SOUTHERLY NORTHWEST CORNER OF THE HEREIN DESCRIBED TRACT FROM WHICH A 1/2" IRON ROD FOUND WITH CAP STAMPED "TRUJILLO RPLS 5358" BEARS S 58°03'30" W A DISTANCE OF 0.91 FEET;

THENCE N 58°03'30" E, WITH THE NORTH LINE OF THE SAID 109.58 ACRE TRACT AND THE SOUTH OF THE SAID 100.00 ACRE TRACT, AT A DISTANCE OF 2639.42 FEET PASSING A 1/2" IRON ROD FOUND WITH CAP STAMPED "TRUJILLO RPLS 5358", IN ALL A TOTAL DISTANCE OF 2639.92 FEET TO A POINT IN THE COMMON LINE OF SAID SECTION 76 AND SAID SECTION 73 FOR THE NORTHEAST CORNER OF THE SAID 109.58 ACRE TRACT AND THE SOUTHEAST CORNER OF THE SAID 100.00 ACRE TRACT, BEING ALSO THE SOUTHWEST CORNER OF A 20.000 ACRE TRACT OF LAND THIS DATE SURVEYED;

THENCE CROSSING THE NORTHWEST QUARTER OF SAID SECTION 73 WITH THE SOUTH AND EAST LINE OF THE SAID 20.000 ACRE TRACT OF LAND THIS DATE SURVEYED, THE FOLLOWING BEARING AND DISTANCES:

N 58°03'30" E, A DISTANCE OF 527.87 FEET TO A 5/8" IRON ROD SET WITH CAP STAMPED "TRANS TEXAS SURVEYING" FOR THE SOUTHEAST CORNER OF THE SAID 20.000 ACRE TRACT AND AN INTERIOR CORNER OF THE HEREIN DESCRIBED TRACT;

V O L 1 2 5 9 9 P G 0 3 7 5

6

N 32°08'32" W, A DISTANCE OF 1650.40 FEET TO A 5/8" IRON ROD SET WITH CAP STAMPED "TRANS TEXAS SURVEYING" IN THE COMMON LINE OF SAID SECTION 73 AND SECTION 74 OF SAID BLOCK 4, H&GN RAILROAD COMPANY SURVEY AND THE SOUTH LINE OF COUNTY ROAD NO. 404 FOR THE NORTHEAST CORNER OF THE SAID 20.000 ACRE TRACT AND THE MOST NORTHERLY NORTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE N 58°03'46" E, WITH THE COMMON LINE OF SAID SECTION 73 AND SAID SECTION 74 AND THE SOUTH LINE OF SAID COUNTY ROAD NO. 404, PASSING AT A DISTANCE OF 2034.62 FEET A 5/8" IRON ROD SET WITH CAP STAMPED "TRANS TEXAS SURVEYING" IN THE WEST RIGHT-OF-WAY LINE OF F.M. HIGHWAY NO. 2119, IN ALL A TOTAL DISTANCE OF 2117.21 FEET TO A POINT FOR THE NORTHEAST CORNER OF SAID NORTHWEST QUARTER AND THE NORTHWEST CORNER OF THE NORTHEAST QUARTER OF SAID SECTION 73 AND FOR THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT, FROM WHICH A 1/2" IRON ROD FOUND WITH CAP AT THE NORTHEAST CORNER OF SAID SECTION 73 BEARS N 58°03'46" E, A DISTANCE OF 2645.08 FEET;

THENCE S 32°08'42" E, WITH THE EAST LINE OF THE SAID NORTHWEST QUARTER AND THE WEST LINE OF THE SAID NORTHEAST QUARTER OF SAID SECTION 73, A DISTANCE OF 2645.36 FEET TO A POINT FOR THE FOR THE SOUTHEAST CORNER OF THE SAID NORTHWEST QUARTER AND THE SOUTHWEST CORNER OF THE SAID SOUTHEAST QUARTER OF SAID SECTION 73 AND BEING IN THE NORTH LINE OF THE SOUTH HALF OF SAID SECTION 73 AND THE NORTH LINE OF A CALLED 120 ACRE TRACT OF LAND DESCRIBED IN A DEED RECORDED IN VOLUME 122, PAGE 521, DEED RECORDS OF REEVES COUNTY, TEXAS FOR THE MOST NORTHERLY SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE S 58°01'36" W, WITH THE SOUTH LINE OF THE SAID NORTHWEST QUARTER AND THE NORTH LINE OF THE SAID 120 ACRE TRACT, A DISTANCE OF 13.20 FEET TO A POINT FOR THE NORTHEAST CORNER OF THE SAID 84.2 ACRE TRACT AND THE NORTHWEST CORNER OF THE SAID 120 ACRE TRACT FOR AN INTERIOR CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE S 32°08'42" E, WITH THE EAST LINE OF THE SAID 84.2 ACRE TRACT AND THE WEST LINE OF THE SAID 120 ACRE TRACT A DISTANCE OF 1.61 FEET TO A POINT FOR THE NORTHEAST CORNER OF A 33.000 ACRE TRACT THIS DATE SURVEYED AND A SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE CROSSING THE SAID 84.2 ACRE TRACT WITH THE NORTH AND WEST LINE OF THE SAID 33.000 ACRE TRACT OF LAND THIS DATE SURVEYED, THE FOLLOWING BEARING AND DISTANCES:

S 58°03'32" W, AT A DISTANCE OF 61.35 FEET PASSING A 1/2" IRON ROD FOUND WITH CAP STAMPED "TRUJILLO RPLS 5358", AT A DISTANCE OF 61.51 FEET PASSING THE WEST RIGHT-OF-WAY LINE OF SAID F.M. HIGHWAY NO. 2119, IN ALL

VOL 1259 PG 0376

7

MR.775

A TOTAL DISTANCE OF 933.83 FEET TO A 5/8' IRON ROD SET FOR THE NORTHWEST CORNER OF THE SAID 33.000 ACRE TRACT AND AN INTERIOR CORNER OF THE HEREIN DESCRIBED TRACT;

S 31°43'00" E, A DISTANCE OF 1432.68 FEET TO A 5/8" IRON ROD SET IN THE NORTH LINE OF THE SAID T&P RAILROAD RIGHT-OF-WAY FOR THE SOUTHWEST CORNER OF THE SAID 33.000 ACRE TRACT AND THE MOST SOUTHERLY SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE S 69°42'07" W, WITH THE NORTH LINE OF THE SAID T&P RAILROAD COMPANY RIGHT-OF-WAY, A DISTANCE OF 4421.63 FEET TO THE PLACE OF BEGINNING AND CONTAINING 299.325 ACRES OF LAND.

VOL

1
2
5
9

PG

0
3
7
7

Inst No. 16-04402
DIANNE O. FLOREZ
COUNTY CLERK
2016 Apr 11 at 04:30 PM
REEVES COUNTY TEXAS
By: BA                    DEPUTY

8

MR.776

Exhibit "AA"

MR.777

## ASSUMPTION AGREEMENT

This ASSUMPTION AGREEMENT ("Agreement") is made as of **April 6**, 2016 (the "Effective Date") by and among TEXAS CAPITAL BANK, NATIONAL ASSOCIATION, a national banking association ("Lender"), BALLENGEE INTERESTS, LLC, a Louisiana limited liability company ("Original Borrower"), and CENTURION PECOS TERMINAL LLC, a Texas limited liability company ("New Borrower").

### RECITALS

A. On September 16, 2014, Lender made a loan ("Loan") to Original Borrower, in the amount of $1,500,000.00) ("Loan Amount");

B. Lender and Original Borrower executed a Business Loan Agreement ("Loan Agreement") dated September 16, 2014 pertaining to the Loan;

C. Original Borrower executed and delivered to Lender a Promissory Note (the "Note") dated September 16, 2014, payable to the order of Lender in the amount of and evidencing the Loan;

D. New Borrower executed and delivered a Deed of Trust dated of even date with the Note to John Hudgens, as trustee, for the benefit of the Lender, recorded as Instrument No. 14-09181 in the Real Property Records of Reeves County, Texas (as same may have been heretofore amended or extended, the "Deed of Trust") covering the land described in Exhibit "A" attached hereto and incorporated in this Agreement for all purposes, together with all improvements, appurtenances, other properties (whether real or personal), rights and interests described in and encumbered by the Deed of Trust ("Mortgaged Property"), to secure the payment of the Note and performance by Original Borrower of the other obligations set forth in the Note and the Loan Agreement; and

E. Original Borrower caused James Ballengee ("Guarantor") to execute and deliver to Lender a Commercial Guaranty (the "Guaranty") of even date with the Note;

F. New Borrower wishes to assume all of Original Borrower's obligations, responsibilities, duties, liabilities and costs under the Note and the Loan Agreement.

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Lender, New Borrower and Original Borrower agree as follows:

1. **Assumption and Indemnity by New Borrower; No Release of Original Borrower or Guarantor.** New Borrower assumes and agrees to pay to Lender when due all sums now due and owing or which hereafter become due and owing under the Note and the Loan Agreement and agrees to perform all of Original Borrower's obligations under and be bound by all of the provisions of the Note and the Loan Agreement as if New Borrower was the original obligor thereunder (the "Assumption"). New Borrower will indemnify Original Borrower or Guarantor,

ASSUMPTION AGREEMENT – Page 1



EXHIBIT

2

as the case may be, for and against any amounts required by Lender to be paid by Original Borrower or Guarantor, as the case may be, under the Note or the Loan Agreement from and after the Effective Date. Original Borrower is expressly not released from any liability under the Note or the Loan Agreement and Guarantor is expressly not released from any liability under the Guaranty as a result of the Assumption.

2. <u>Consent to Deed of Trust to Secure Assumption</u>. In order to secure the Assumption, New Borrower will grant in favor of Original Borrower a deed of trust ("CPT Deed of Trust") covering the Mortgaged Property and securing New Borrower's obligations under the Assumption, which CPT Deed of Trust will be expressly subordinate to the Deed of Trust. Lender consents to the grant by New Borrower of the CPT Deed of Trust and Lender expressly acknowledges that no Event of Default (as defined in the Loan Agreement) will arise as a result of the grant by New Borrower of the CPT Deed of Trust.

3. <u>Release of Lender by Original Borrower</u>. Original Borrower does, by its execution of this Agreement, RELEASE, WAIVE, ACQUIT AND FOREVER DISCHARGE Lender and its agents, servants, officers, directors, shareholders, partners, representatives, attorneys, and all other persons, natural or corporate, in privity with it from any and all claims, damages, demands, actions, causes of action and liability which Original Borrower has or may have against Lender, known or unknown, now existing or that may hereafter arise, directly or indirectly, of every kind and character, and liability (i) arising out of or in relation to the Loan, the documents evidencing and securing the Loan (collectively, the "Loan Documents"), or the Mortgaged Property whether now or hereafter existing; (ii) arising out of or in relation to the Loan, the Loan Documents, or the Mortgaged Property under or pursuant to common or statutory law, rules or regulations including, but not limited to, state and/or federal law (including but not limited to all usury and environmental laws); (iii) for or because of any and all acts, matters or things done or omitted prior to the Effective Date that relate to any and all claims of any kind or character relating to both the Loan, the Loan Documents, or the Mortgaged Property, or otherwise, growing out of or in any way connected with or resulting from conduct, representations, acts, actions, or omissions in connection with any breach of fiduciary duty, sole or concurrent negligence, bad faith, malpractice, intentional or negligent infliction of mental distress, tortious interference with contractual relations, tortious interference with corporate or partnership governance or prospective business advantage, breach of contract, deceptive trade practices, injury to any person or entity of whatever nature, and libel or slander (without admitting or implying that any such claim exists or has any validity); and (iv) arising out of or attributable to any and all conduct, representations, acts, matters, or things done, omitted, or supposed to be done by Lender prior to the Effective Date.

4. <u>Current Note Balance</u>. Original Borrower and New Borrower acknowledge and agree that the current outstanding principal balance of the Note is $1,500,000.00.

5. <u>Representations and Consideration</u>. Original Borrower and New Borrower each represent and warrant to Lender that no Event of Default, breach or failure of condition has occurred, or would exist with notice or the lapse of time or both, under any of the Loan Documents, and that all of their respective representations and warranties in this Agreement and in the other Loan Documents (as applicable) are true and correct as of the Effective Date (after giving effect to this Agreement). Without in any way limiting any other provision of this

ASSUMPTION AGREEMENT – Page 2

MR.779

Agreement, New Borrower expressly represents and warrants that, as of the Effective Date and continuing hereafter, each and every representation and warranty in all of the Loan Documents as it relates to the "borrower" are true, correct and complete as it relates to New Borrower from and after the Effective Date. Original Borrower, New Borrower and Guarantor each agree, acknowledge and represent that (a) they have requested that Lender enter into this Agreement for their mutual benefit and financial accommodations, (b) Guarantor is a direct or indirect owner of Original Borrower and New Borrower, (c) Lender's entering into this Agreement is of value to Original Borrower, New Borrower and Guarantor, (d) in the absence of Original Borrower's, New Borrower's and Guarantor's agreements and undertakings under this Agreement, Lender would not enter into this Agreement, and (e) Original Borrower, New Borrower and Guarantor are receiving good and valuable consideration, the receipt, adequacy and sufficiency of which is acknowledged, as a result of and in exchange for Lender's entering into this Agreement.

6.      Knowledge. New Borrower warrants that New Borrower has personal knowledge of all terms and conditions of the Note and the Loan Agreement, and further agrees that Lender has no obligation or duty to provide any information to New Borrower regarding the terms and conditions of those documents.

7.      Conditions Precedent. As a condition precedent to the effectiveness of the terms and provisions of this Agreement, the following conditions must have been satisfied to the reasonable satisfaction of Lender:

(a)      Lender has received: (i) the executed original of this Agreement; and (ii) any other documents and agreements that are required pursuant to this Agreement or that Lender has requested pursuant to this Agreement or the Loan Documents.

(b)      Reimbursement to Lender of Lender's costs and expenses incurred in connection with this Agreement and the transactions contemplated by this Agreement, including, without limitation, title insurance costs, recording fees, attorneys' fees, appraisal, and documentation costs and charges, whether such services are furnished by Lender's employees or agents or independent contractors.

8.      Acknowledgment by New Borrower. Except as otherwise specified in this Agreement, the terms and provisions of this Agreement in no manner impair, limit, restrict or otherwise affect the obligations of New Borrower or any third party to Lender, as evidenced by the Loan Documents. New Borrower acknowledges, agrees and represents that from and after the Effective Date (i) New Borrower is indebted to Lender pursuant to the terms of the Note; (ii) the liens, security interests and assignments created and evidenced by the Loan Documents are, respectively, valid and subsisting liens, security interests and assignments of the respective dignity and priority recited in the Loan Documents; (iii) there are no claims or offsets against, or defenses or counterclaims to, the terms or provisions of the Loan Documents, and the other obligations created or evidenced by the Loan Documents; (iv) New Borrower has no claims, offsets, defenses or counterclaims arising from any of Lender's acts or omissions with respect to the Mortgaged Property, the Loan Documents or Lender's performance under the Loan Documents or with respect to the Mortgaged Property; and (v) Lender is not in default and no event has occurred which, with the passage of time, giving of notice, or both, would constitute a

ASSUMPTION AGREEMENT – Page 3

MR.780

default by Lender of Lender's obligations under the terms and provisions of the Loan Documents.

9.    Joinder of Guarantor.  By his execution of this Agreement, Guarantor (i) acknowledges and consents to the terms and provisions of this Agreement, (ii) ratifies and confirms the Guaranty, including all interest and costs of collection, to and for the benefit of Lender, (iii) agrees that the Guaranty is and remains in full force and effect, (iv) acknowledges that there are no claims or offsets against, or defenses or counterclaims to, the terms and provisions of and the obligations created and evidenced by the Guaranty (v) certifies that the representations and warranties contained in the Guaranty remain true and correct representations and warranties of Guarantor as of the Effective Date, and (vi) acknowledges that Lender has satisfied and performed its covenants and obligations under the Loan Documents (if any), and that no prior action or failure to act by or on behalf of Lender has or will give rise to any cause of action or other claim against Lender for breach of the Loan Documents or otherwise.

10.    No Waiver of Remedies.  Except as may be expressly set forth in this Agreement, nothing contained in this Agreement will prejudice, act as, or be deemed to be a waiver of any right or remedy available to Lender by reason of the occurrence or existence of any fact, circumstance or event constituting an Event of Default under the Loan Documents.

11.    Notices.  Any notices or other communications required or permitted under this Agreement or the Loan Documents must be provided in accordance with the requirements therefor as set forth in the Loan Documents; provided, however, from and after the Effective Date the addresses of Original Borrower and New Borrower are as follows:

Original Borrower:    Two Turtle Creek
3838 Oak Lawn Avenue, Suite 1150
Dallas, Texas 75219

New Borrower:    17950 Preston Road, Suite 1080
Dallas, Texas 75252

12.    Additional Documentation.  From time to time, New Borrower will execute or procure and deliver to Lender such other and further documents and instruments evidencing, securing or pertaining to the Loan or the Loan Documents as shall be reasonably requested by Lender so as to evidence or effect the terms and provisions of this Agreement. New Borrower and/or Original Borrower will furnish to Lender a true and correct copy of the recorded CPT Deed of Trust within three (3) days of execution of same, and will furnish Lender with the recording reference for the CPT Deed of Trust within three (3) days of the recording of same. In addition, Original Borrower will immediately notify Lender of any steps or actions that it may take to (a) accelerate any indebtedness which is owed by New Borrower to Original Borrower and secured by the CPT Deed of Trust or (b) foreclose the lien evidenced by the CPT Deed of Trust.

13.    Effectiveness of the Loan Documents.  Each of the terms and provisions of the Loan, Loan Documents, Deed of Trust and Guaranty are ratified and confirmed by each of the parties hereto, and shall remain in full force and effect.

ASSUMPTION AGREEMENT – Page 4

MR.781

14. <u>Governing Law, Venue, Waiver of Jury and Waiver of Certain Damages</u>. THE TERMS AND PROVISIONS OF THIS AGREEMENT ARE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS. THIS AGREEMENT IS BEING EXECUTED AND DELIVERED, AND IS INTENDED TO BE PERFORMED, IN THE STATE OF TEXAS, AND THE LAWS OF SUCH STATE AND OF THE UNITED STATES SHALL GOVERN THE RIGHTS AND DUTIES OF THE PARTIES HERETO AND THE VALIDITY, CONSTRUCTION, ENFORCEMENT, AND INTERPRETATION OF THIS AGREEMENT, EXCEPT TO THE EXTENT OTHERWISE SPECIFIED HEREIN. THIS AGREEMENT IS PERFORMABLE IN DALLAS COUNTY, TEXAS. VENUE OF ANY LITIGATION INVOLVING THIS AGREEMENT SHALL BE MAINTAINED IN AN APPROPRIATE STATE OR FEDERAL COURT LOCATED IN DALLAS COUNTY, TEXAS, TO THE EXCLUSION OF ALL OTHER VENUES. NOTHING HEREIN SHALL AFFECT OR LIMIT THE RIGHT OF BANK TO BRING ANY ACTION OR PROCEEDING AGAINST ORIGINAL BORROWER, NEW BORROWER OR GUARANTOR WITH RESPECT TO ANY OF ORIGINAL BORROWER'S OR NEW BORROWER'S OR GUARANTOR'S PROPERTY IN COURTS IN OTHER JURISDICTIONS. ORIGINAL BORROWER, NEW BORROWER AND GUARANTOR ACKNOWLEDGE THAT THESE WAIVERS ARE A MATERIAL INDUCEMENT TO BANK'S AGREEMENT TO ENTER INTO THIS AGREEMENT, THAT BANK IS RELYING ON THESE WAIVERS AND WILL CONTINUE TO RELY ON EACH OF THESE WAIVERS IN RELATED FUTURE DEALINGS. THE WAIVERS IN THIS SECTION ARE IRREVOCABLE, MEANING THAT THEY MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THESE WAIVERS APPLY TO ANY FUTURE RENEWALS, EXTENSIONS, AMENDMENTS, MODIFICATIONS, OR REPLACEMENTS IN RESPECT OF THE APPLICABLE LOAN DOCUMENTS. IN CONNECTION WITH ANY LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ORIGINAL BORROWER, NEW BORROWER AND GUARANTOR HEREBY IRREVOCABLY AND EXPRESSLY WAIVE ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY OR THE ACTIONS OF BANK IN THE NEGOTIATION, ADMINISTRATION, OR ENFORCEMENT THEREOF. BORROWER AND BANK AGREE THAT, IN CONNECTION WITH ANY ACTION, SUIT OR PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, EACH MUTUALLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY CLAIM FOR CONSEQUENTIAL, PUNITIVE OR SPECULATIVE DAMAGES.

15. <u>Time</u>. Time is of the essence in the performance of the covenants contained in this Agreement and in the Loan Documents.

16. <u>Binding Agreement</u>. This Agreement is binding upon the successors and assigns of the parties; provided, however, the foregoing will not be deemed or construed to (i) permit, sanction, authorize or condone the assignment of all or any part of the Mortgaged Property or any of New Borrower's rights, titles or interests in and to the Mortgaged Property or any rights, titles or interests in and to New Borrower, except as expressly authorized in the Loan Documents, or (ii) confer any right, title, benefit, cause of action or remedy upon any person or entity not a party hereto, which such party would not or did not otherwise possess.

ASSUMPTION AGREEMENT – Page 5

MR.782

17. Headings. The section headings of this Agreement are inserted for convenience of reference only and in no way alter, amend, define or be used in the construction or interpretation of the text of such section.

18. Construction. Whenever the context of this Agreement so requires, reference to the singular includes the plural and likewise, the plural includes the singular; words denoting gender will be construed to mean the masculine, feminine or neuter, as appropriate; and specific enumeration will not exclude the general, but will be construed as cumulative of the general recitation.

19. Severability. If any clause or provision of this Agreement is or should ever be held to be illegal, invalid or unenforceable under any present or future law applicable to the terms of this Agreement, then and in that event, it is the intention of the parties that the remainder of this Agreement not be affected thereby, and that in lieu of each such clause or provision of this Agreement that is illegal, invalid or unenforceable, such clause or provision will be judicially construed and interpreted to be as similar in substance and content to such illegal, invalid or unenforceable clause or provision, as the context of this Agreement would reasonably suggest, so as to thereafter be legal, valid and enforceable.

20. Counterparts. To facilitate execution, this Agreement may be executed in as many counterparts as may be convenient or required. It is not necessary that the signature and acknowledgment of, or on behalf of, each party, or that the signature and acknowledgment of all persons required to bind any party, appear on each counterpart. All counterparts collectively constitute a single instrument. It is not necessary in making proof of this Agreement to produce or account for more than a single counterpart containing the respective signatures and acknowledgment of, or on behalf of, each of the parties. Any signature and acknowledgment page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures and acknowledgments thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature and acknowledgment pages.

21. **ENTIRE AGREEMENT. THIS AGREEMENT AND THE OTHER DOCUMENTS, IF ANY, HEREIN REQUIRED TO BE EXECUTED REPRESENT THE FINAL AGREEMENT OR AGREEMENTS BETWEEN THE PARTIES AS TO THE SUBJECT MATTER OF THIS AGREEMENT AND THEREOF, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES. THIS INSTRUMENT MAY BE AMENDED ONLY BY AN INSTRUMENT IN WRITING EXECUTED BY THE PARTIES.**

[Signatures on following page.]

ASSUMPTION AGREEMENT – Page 6

MR.783

EXECUTED as of the date first above written.

LENDER:

TEXAS CAPITAL BANK, NATIONAL
ASSOCIATION, a national banking association

By: _____
Name: _____
Title: _____

NEW BORROWER:

CENTURION PECOS TERMINAL LLC,
a Texas limited liability company

By: _____
Name: James Hock
Title: President

ORIGINAL BORROWER:

BALLENGEE INTERESTS, LLC,
a Louisiana limited liability company

By: _____
James H. Ballengee, Manager

GUARANTOR:

_____
JAMES H. BALLENGEE

MR.784

STATE OF TEXAS §
§
COUNTY OF DALLAS §

This instrument was ACKNOWLEDGED before me on the _64th_ day of _April_, 2016, by _Kevin F. Smith_, the _SVP_ of TEXAS CAPITAL BANK, NATIONAL ASSOCIATION, a national banking association, on behalf of the bank.

[SEAL]

My Commission Expires:

_Sept 18, 2018_

Notary Public, State of Texas

_Yvonne Eaton_

Printed Name of Notary Public

YVONNE EATON
My Notary ID # 11355892
Expires September 18, 2018

STATE OF TEXAS §
§
COUNTY OF DALLAS §

This instrument was ACKNOWLEDGED before me on the _4th_ day of _April_, 2016, by _James Hock_, the _Pres_ of CENTURION PECOS TERMINAL LLC, a Texas limited liability company, on behalf of the company.

[SEAL]

My Commission Expires:

_7/14/19_

Notary Public, State of Texas

_Mary Kilpatrick_

Printed Name of Notary Public

MARY KILPATRICK
Notary Public, State of Texas
My Commission Expires
July 14, 2019

STATE OF TEXAS §
§
COUNTY OF DALLAS §

This instrument was ACKNOWLEDGED before me on the _1st_ day of _April_, 2016, by James H. Ballengee, the Manager of BALLENGEE INTERESTS, LLC, a Louisiana limited liability company, on behalf of the company.

[SEAL]

My Commission Expires:

_7/14/2019_

Notary Public, State of Texas

_Mary Kilpatrick_

Printed Name of Notary Public

MARY KILPATRICK
Notary Public, State of Texas
My Commission Expires
July 14, 2019

STATE OF TEXAS §
§
COUNTY OF DALLAS §

This instrument was ACKNOWLEDGED before me on the _1st_ day of _April_, 2016, by JAMES H. BALLENGEE.

[SEAL]

My Commission Expires:

_7/14/19_

Notary Public, State of Texas

_Mary Kilpatrick_

Printed Name of Notary Public

MARY KILPATRICK
Notary Public, State of Texas
My Commission Expires
July 14, 2019

ASSUMPTION AGREEMENT - Page S-2

MR.785

## EXHIBIT "A"

### Property Description

BEING a tract of land located in Section 76, Block 4, H&GN Survey, Reeves County, Texas, and being a part of a called 496.76 GRID (496.87 Surface) acre tract of land as described in a Deed recorded in Volume 905, Page 155, Official Public Records, Reeves County, Texas (O.P.R.R.C.T.), and being more particularly described as follows:

BEGINNING at a 5/8 inch iron rod set with cap stamped "TRANS TEXAS SURVEYING" for the Northwest corner of said Section 76, the Southwest corner of said Section 75, the Northeast corner of Section 77 and the Southeast corner of Section 78, said 5/8 inch iron rod set also being in the intersection of County Road No. 408 and County Road No. 404;

THENCE North 58 degrees 03 minutes 46 seconds East, with the common line of said Section 76 and Section 75, a distance of 2639.85 feet to a point in the East line of said 496.76 acre tract from which a 1/2 inch iron rod found with cap stamped "5358 TRUJILLO" bears South 58 degrees 03 minutes 46 seconds West, a distance of 0.63 feet, also from which a 1/2 inch iron rod found at the Northeast corner of said Section 76, Block 4, bears North 58 degrees 03 minutes 46 seconds East, a distance of 2639.85 feet;

THENCE South 32 degrees 08 minutes 23 seconds East, with the East line of said 496.76 acre tract, a distance of 3187.68 feet to a 5/8 inch iron rod set with cap stamped "TRANS TEXAS SURVEYING" for the Southeast corner of said 496.76 acre tract being 100 feet North of the centerline of the Texas & Pacific Railroad;

THENCE South 69 degrees 42 minutes 22 seconds West, with the South line of said 496.76 acre tract and 100 feet North of and parallel with the centerline of said Texas & Pacific Railroad, a distance of 2697.40 feet to a point in said County Road No. 408, the West line of said Section 76 and the East line of Section 77, Block 4, from which a 60D nail found bears South 69 degrees 42 minutes 22 seconds West, a distance of 0.37 feet, also from which a 1/2 inch iron rod found for the Southwest corner of said Section 76, Block 4, bears South 32 degrees 08 minutes 13 seconds East, a distance of 2657.42 feet;

THENCE North 32 degrees 08 minutes 13 seconds West, with the West line of said 496.76 acre tract and with the common line of said Section 76 and said Section 77, a distance of 2643.29 feet to the PLACE OF BEGINNING and CONTAINING 176.659 acres of land.

EXHIBIT "A", Property Description – Solo Page

MR.786

Exhibit "BB"

MR.787

## ASSUMPTION AGREEMENT

This ASSUMPTION AGREEMENT ("Agreement") is made as of **April 6**, 2016 (the "Effective Date") by and among TEXAS CAPITAL BANK, NATIONAL ASSOCIATION, a national banking association ("Lender"), BALLENGEE INTERESTS, LLC, a Louisiana limited liability company ("Original Borrower"), and CENTURION PECOS TERMINAL LLC, a Texas limited liability company ("New Borrower").

### RECITALS

A.   On August 17, 2015, Lender made a loan ("Loan") to Original Borrower, in the amount of $1,500,000.00) ("Loan Amount");

B.   Lender and Original Borrower executed a Business Loan Agreement ("Loan Agreement") dated August 17, 2015 pertaining to the Loan;

C.   Original Borrower executed and delivered to Lender a Promissory Note (the "Note") dated August 17, 2015, payable to the order of Lender in the amount of and evidencing the Loan;

D.   New Borrower executed and delivered a Deed of Trust dated of even date with the Note to John Hudgens, as trustee, for the benefit of the Lender, recorded as Instrument No. 15-07672 in the Real Property Records of Reeves County, Texas (as same may have been heretofore amended or extended, the "Deed of Trust") covering the land described in Exhibit "A" attached hereto and incorporated in this Agreement for all purposes, together with all improvements, appurtenances, other properties (whether real or personal), rights and interests described in and encumbered by the Deed of Trust ("Mortgaged Property"), to secure the payment of the Note and performance by Original Borrower of the other obligations set forth in the Note and the Loan Agreement; and

E.   Original Borrower caused James Ballengee ("Guarantor") to execute and deliver to Lender a Commercial Guaranty (the "Guaranty") of even date with the Note;

F.   New Borrower wishes to assume all of Original Borrower's obligations, responsibilities, duties, liabilities and costs under the Note and the Loan Agreement.

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Lender, New Borrower and Original Borrower agree as follows:

1.   Assumption and Indemnity by New Borrower; No Release of Original Borrower or Guarantor. New Borrower assumes and agrees to pay to Lender when due all sums now due and owing or which hereafter become due and owing under the Note and the Loan Agreement and agrees to perform all of Original Borrower's obligations under and be bound by all of the provisions of the Note and the Loan Agreement as if New Borrower was the original obligor thereunder (the "Assumption"). New Borrower will indemnify Original Borrower or Guarantor,

ASSUMPTION AGREEMENT – Page 1



MR.788

as the case may be, for and against any amounts required by Lender to be paid by Original Borrower or Guarantor, as the case may be, under the Note or the Loan Agreement from and after the Effective Date. Original Borrower is expressly not released from any liability under the Note or the Loan Agreement and Guarantor is expressly not released from any liability under the Guaranty as a result of the Assumption.

2.     Consent to Deed of Trust to Secure Assumption.   In order to secure the Assumption, New Borrower will grant in favor of Original Borrower a deed of trust ("CPT Deed of Trust") covering the Mortgaged Property and securing New Borrower's obligations under the Assumption, which CPT Deed of Trust will be expressly subordinate to the Deed of Trust. Lender consents to the grant by New Borrower of the CPT Deed of Trust and Lender expressly acknowledges that no Event of Default (as defined in the Loan Agreement) will arise as a result of the grant by New Borrower of the CPT Deed of Trust.

3.     Release of Lender by Original Borrower. Original Borrower does, by its execution of this Agreement, RELEASE, WAIVE, ACQUIT AND FOREVER DISCHARGE Lender and its agents, servants, officers, directors, shareholders, partners, representatives, attorneys, and all other persons, natural or corporate, in privity with it from any and all claims, damages, demands, actions, causes of action and liability which Original Borrower has or may have against Lender, known or unknown, now existing or that may hereafter arise, directly or indirectly, of every kind and character, and liability (i) arising out of or in relation to the Loan, the documents evidencing and securing the Loan (collectively, the "Loan Documents"), or the Mortgaged Property whether now or hereafter existing; (ii) arising out of or in relation to the Loan, the Loan Documents, or the Mortgaged Property under or pursuant to common or statutory law, rules or regulations including, but not limited to, state and/or federal law (including but not limited to all usury and environmental laws); (iii) for or because of any and all acts, matters or things done or omitted prior to the Effective Date that relate to any and all claims of any kind or character relating to both the Loan, the Loan Documents, or the Mortgaged Property, or otherwise, growing out of or in any way connected with or resulting from conduct, representations, acts, actions, or omissions in connection with any breach of fiduciary duty, sole or concurrent negligence, bad faith, malpractice, intentional or negligent infliction of mental distress, tortious interference with contractual relations, tortious interference with corporate or partnership governance or prospective business advantage, breach of contract, deceptive trade practices, injury to any person or entity of whatever nature, and libel or slander (without admitting or implying that any such claim exists or has any validity); and (iv) arising out of or attributable to any and all conduct, representations, acts, matters, or things done, omitted, or supposed to be done by Lender prior to the Effective Date.

4.     Current Note Balance. Original Borrower and New Borrower acknowledge and agree that the current outstanding principal balance of the Note is $1,500,000.00.

5.     Representations and Consideration. Original Borrower and New Borrower each represent and warrant to Lender that no Event of Default, breach or failure of condition has occurred, or would exist with notice or the lapse of time or both, under any of the Loan Documents, and that all of their respective representations and warranties in this Agreement and in the other Loan Documents (as applicable) are true and correct as of the Effective Date (after giving effect to this Agreement). Without in any way limiting any other provision of this

ASSUMPTION AGREEMENT – Page 2

MR.789

Agreement, New Borrower expressly represents and warrants that, as of the Effective Date and continuing hereafter, each and every representation and warranty in all of the Loan Documents as it relates to the "borrower" are true, correct and complete as it relates to New Borrower from and after the Effective Date. Original Borrower, New Borrower and Guarantor each agree, acknowledge and represent that (a) they have requested that Lender enter into this Agreement for their mutual benefit and financial accommodations, (b) Guarantor is a direct or indirect owner of Original Borrower and New Borrower, (c) Lender's entering into this Agreement is of value to Original Borrower, New Borrower and Guarantor, (d) in the absence of Original Borrower's, New Borrower's and Guarantor's agreements and undertakings under this Agreement, Lender would not enter into this Agreement, and (e) Original Borrower, New Borrower and Guarantor are receiving good and valuable consideration, the receipt, adequacy and sufficiency of which is acknowledged, as a result of and in exchange for Lender's entering into this Agreement.

6.     Knowledge. New Borrower warrants that New Borrower has personal knowledge of all terms and conditions of the Note and the Loan Agreement, and further agrees that Lender has no obligation or duty to provide any information to New Borrower regarding the terms and conditions of those documents.

7.     Conditions Precedent. As a condition precedent to the effectiveness of the terms and provisions of this Agreement, the following conditions must have been satisfied to the reasonable satisfaction of Lender:

(a)     Lender has received: (i) the executed original of this Agreement; and (ii) any other documents and agreements that are required pursuant to this Agreement or that Lender has requested pursuant to this Agreement or the Loan Documents.

(b)     Reimbursement to Lender of Lender's costs and expenses incurred in connection with this Agreement and the transactions contemplated by this Agreement, including, without limitation, title insurance costs, recording fees, attorneys' fees, appraisal, and documentation costs and charges, whether such services are furnished by Lender's employees or agents or independent contractors.

8.     Acknowledgment by New Borrower. Except as otherwise specified in this Agreement, the terms and provisions of this Agreement in no manner impair, limit, restrict or otherwise affect the obligations of New Borrower or any third party to Lender, as evidenced by the Loan Documents. New Borrower acknowledges, agrees and represents that from and after the Effective Date (i) New Borrower is indebted to Lender pursuant to the terms of the Note; (ii) the liens, security interests and assignments created and evidenced by the Loan Documents are, respectively, valid and subsisting liens, security interests and assignments of the respective dignity and priority recited in the Loan Documents; (iii) there are no claims or offsets against, or defenses or counterclaims to, the terms or provisions of the Loan Documents, and the other obligations created or evidenced by the Loan Documents; (iv) New Borrower has no claims, offsets, defenses or counterclaims arising from any of Lender's acts or omissions with respect to the Mortgaged Property, the Loan Documents or Lender's performance under the Loan Documents or with respect to the Mortgaged Property; and (v) Lender is not in default and no event has occurred which, with the passage of time, giving of notice, or both, would constitute a

ASSUMPTION AGREEMENT – Page 3

MR.790

default by Lender of Lender's obligations under the terms and provisions of the Loan Documents.

9.     Joinder of Guarantor. By his execution of this Agreement, Guarantor (i) acknowledges and consents to the terms and provisions of this Agreement, (ii) ratifies and confirms the Guaranty, including all interest and costs of collection, to and for the benefit of Lender, (iii) agrees that the Guaranty is and remains in full force and effect, (iv) acknowledges that there are no claims or offsets against, or defenses or counterclaims to, the terms and provisions of and the obligations created and evidenced by the Guaranty (v) certifies that the representations and warranties contained in the Guaranty remain true and correct representations and warranties of Guarantor as of the Effective Date, and (vi) acknowledges that Lender has satisfied and performed its covenants and obligations under the Loan Documents (if any), and that no prior action or failure to act by or on behalf of Lender has or will give rise to any cause of action or other claim against Lender for breach of the Loan Documents or otherwise.

10.     No Waiver of Remedies. Except as may be expressly set forth in this Agreement, nothing contained in this Agreement will prejudice, act as, or be deemed to be a waiver of any right or remedy available to Lender by reason of the occurrence or existence of any fact, circumstance or event constituting an Event of Default under the Loan Documents.

11.     Notices. Any notices or other communications required or permitted under this Agreement or the Loan Documents must be provided in accordance with the requirements therefor as set forth in the Loan Documents; provided, however, from and after the Effective Date the addresses of Original Borrower and New Borrower are as follows:

> Original Borrower:    Two Turtle Creek
> 3838 Oak Lawn Avenue, Suite 1150
> Dallas, Texas 75219
>
> New Borrower:    17950 Preston Road, Suite 1080
> Dallas, Texas 75252

12.     Additional Documentation. From time to time, New Borrower will execute or procure and deliver to Lender such other and further documents and instruments evidencing, securing or pertaining to the Loan or the Loan Documents as shall be reasonably requested by Lender so as to evidence or effect the terms and provisions of this Agreement. New Borrower and/or Original Borrower will furnish to Lender a true and correct copy of the recorded CPT Deed of Trust within three (3) days of execution of same, and will furnish Lender with the recording reference for the CPT Deed of Trust within three (3) days of the recording of same. In addition, Original Borrower will immediately notify Lender of any steps or actions that it may take to (a) accelerate any indebtedness which is owed by New Borrower to Original Borrower and secured by the CPT Deed of Trust or (b) foreclose the lien evidenced by the CPT Deed of Trust.

13.     Effectiveness of the Loan Documents. Each of the terms and provisions of the Loan, Loan Documents, Deed of Trust and Guaranty are ratified and confirmed by each of the parties hereto, and shall remain in full force and effect.

ASSUMPTION AGREEMENT – Page 4

MR.791

14. Governing Law, Venue, Waiver of Jury and Waiver of Certain Damages. **THE TERMS AND PROVISIONS OF THIS AGREEMENT ARE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS. THIS AGREEMENT IS BEING EXECUTED AND DELIVERED, AND IS INTENDED TO BE PERFORMED, IN THE STATE OF TEXAS, AND THE LAWS OF SUCH STATE AND OF THE UNITED STATES SHALL GOVERN THE RIGHTS AND DUTIES OF THE PARTIES HERETO AND THE VALIDITY, CONSTRUCTION, ENFORCEMENT, AND INTERPRETATION OF THIS AGREEMENT, EXCEPT TO THE EXTENT OTHERWISE SPECIFIED HEREIN. THIS AGREEMENT IS PERFORMABLE IN DALLAS COUNTY, TEXAS. VENUE OF ANY LITIGATION INVOLVING THIS AGREEMENT SHALL BE MAINTAINED IN AN APPROPRIATE STATE OR FEDERAL COURT LOCATED IN DALLAS COUNTY, TEXAS, TO THE EXCLUSION OF ALL OTHER VENUES. NOTHING HEREIN SHALL AFFECT OR LIMIT THE RIGHT OF BANK TO BRING ANY ACTION OR PROCEEDING AGAINST ORIGINAL BORROWER, NEW BORROWER OR GUARANTOR WITH RESPECT TO ANY OF ORIGINAL BORROWER'S OR NEW BORROWER'S OR GUARANTOR'S PROPERTY IN COURTS IN OTHER JURISDICTIONS. ORIGINAL BORROWER, NEW BORROWER AND GUARANTOR ACKNOWLEDGE THAT THESE WAIVERS ARE A MATERIAL INDUCEMENT TO BANK'S AGREEMENT TO ENTER INTO THIS AGREEMENT, THAT BANK IS RELYING ON THESE WAIVERS AND WILL CONTINUE TO RELY ON EACH OF THESE WAIVERS IN RELATED FUTURE DEALINGS. THE WAIVERS IN THIS SECTION ARE IRREVOCABLE, MEANING THAT THEY MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THESE WAIVERS APPLY TO ANY FUTURE RENEWALS, EXTENSIONS, AMENDMENTS, MODIFICATIONS, OR REPLACEMENTS IN RESPECT OF THE APPLICABLE LOAN DOCUMENTS. IN CONNECTION WITH ANY LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ORIGINAL BORROWER, NEW BORROWER AND GUARANTOR HEREBY IRREVOCABLY AND EXPRESSLY WAIVE ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY OR THE ACTIONS OF BANK IN THE NEGOTIATION, ADMINISTRATION, OR ENFORCEMENT THEREOF. BORROWER AND BANK AGREE THAT, IN CONNECTION WITH ANY ACTION, SUIT OR PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, EACH MUTUALLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY CLAIM FOR CONSEQUENTIAL, PUNITIVE OR SPECULATIVE DAMAGES.**

15. Time. Time is of the essence in the performance of the covenants contained in this Agreement and in the Loan Documents.

16. Binding Agreement. This Agreement is binding upon the successors and assigns of the parties; provided, however, the foregoing will not be deemed or construed to (i) permit, sanction, authorize or condone the assignment of all or any part of the Mortgaged Property or any of New Borrower's rights, titles or interests in and to the Mortgaged Property or any rights, titles or interests in and to New Borrower, except as expressly authorized in the Loan Documents, or (ii) confer any right, title, benefit, cause of action or remedy upon any person or entity not a party hereto, which such party would not or did not otherwise possess.

ASSUMPTION AGREEMENT -- Page 5

MR.792

17.    Headings.  The section headings of this Agreement are inserted for convenience of reference only and in no way alter, amend, define or be used in the construction or interpretation of the text of such section.

18.    Construction.  Whenever the context of this Agreement so requires, reference to the singular includes the plural and likewise, the plural includes the singular; words denoting gender will be construed to mean the masculine, feminine or neuter, as appropriate; and specific enumeration will not exclude the general, but will be construed as cumulative of the general recitation.

19.    Severability.  If any clause or provision of this Agreement is or should ever be held to be illegal, invalid or unenforceable under any present or future law applicable to the terms of this Agreement, then and in that event, it is the intention of the parties that the remainder of this Agreement not be affected thereby, and that in lieu of each such clause or provision of this Agreement that is illegal, invalid or unenforceable, such clause or provision will be judicially construed and interpreted to be as similar in substance and content to such illegal, invalid or unenforceable clause or provision, as the context of this Agreement would reasonably suggest, so as to thereafter be legal, valid and enforceable.

20.    Counterparts.  To facilitate execution, this Agreement may be executed in as many counterparts as may be convenient or required.  It is not necessary that the signature and acknowledgment of, or on behalf of, each party, or that the signature and acknowledgment of all persons required to bind any party, appear on each counterpart.  All counterparts collectively constitute a single instrument.  It is not necessary in making proof of this Agreement to produce or account for more than a single counterpart containing the respective signatures and acknowledgment of, or on behalf of, each of the parties.  Any signature and acknowledgment page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures and acknowledgments thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature and acknowledgment pages.

21.    **ENTIRE AGREEMENT.  THIS AGREEMENT AND THE OTHER DOCUMENTS, IF ANY, HEREIN REQUIRED TO BE EXECUTED REPRESENT THE FINAL AGREEMENT OR AGREEMENTS BETWEEN THE PARTIES AS TO THE SUBJECT MATTER OF THIS AGREEMENT AND THEREOF, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.  THIS INSTRUMENT MAY BE AMENDED ONLY BY AN INSTRUMENT IN WRITING EXECUTED BY THE PARTIES.**

[Signatures on following page.]

ASSUMPTION AGREEMENT – Page 6

MR.793

EXECUTED as of the date first above written.

LENDER:

TEXAS CAPITAL BANK, NATIONAL
ASSOCIATION, a national banking association

By: _____
Name: _____
Title: _____

NEW BORROWER:

CENTURION PECOS TERMINAL LLC,
a Texas limited liability company

By: _____
Name: _____
Title: _____

ORIGINAL BORROWER:

BALLENGEE INTERESTS, LLC,
a Louisiana limited liability company

By: _____
James H. Ballengee, Manager

GUARANTOR:

_____
JAMES H. BALLENGEE

ASSUMPTION AGREEMENT - Page S-1

MR.794

STATE OF TEXAS §
§
COUNTY OF DALLAS §

This instrument was ACKNOWLEDGED before me on the _6th_ day of _April_ , 2016, by _Kevin F Smith_ , the _SVP_ of TEXAS CAPITAL BANK, NATIONAL ASSOCIATION, a national banking association, on behalf of the bank.

[SEAL]

_____
Notary Public, State of Texas

My Commission Expires:

_Sep 18, 2018_

_____
Printed Name of Notary Public

YVONNE EATON
My Notary ID # 11355892
Expires September 18, 2018

STATE OF TEXAS §
§
COUNTY OF DALLAS §

This instrument was ACKNOWLEDGED before me on the _4th_ day of _April_ , 2016, by _James Hock_ , the _Pres_ of CENTURION PECOS TERMINAL LLC, a Texas limited liability company, on behalf of the company.

[SEAL]

_____
Notary Public, State of Texas

My Commission Expires:

_7/14/19_

_Mary Kilpatrick_
Printed Name of Notary Public

MARY KILPATRICK
Notary Public, State of Texas
My Commission Expires
July 14, 2019

STATE OF TEXAS §
§
COUNTY OF DALLAS §

This instrument was ACKNOWLEDGED before me on the _1st_ day of _April_ , 2016, by James H. Ballengee, the Manager of BALLENGEE INTERESTS, LLC, a Louisiana limited liability company, on behalf of the company.

[SEAL]

_____
Notary Public, State of Texas

My Commission Expires:

_7/14/19_

_Mary Kilpatrick_
Printed Name of Notary Public

MARY KILPATRICK
Notary Public, State of Texas
My Commission Expires
July 14, 2019

STATE OF TEXAS §
§
COUNTY OF DALLAS §

This instrument was ACKNOWLEDGED before me on the _1st_ day of _April_ , 2016, by JAMES H. BALLENGEE.

[SEAL]

_____
Notary Public, State of Texas

My Commission Expires:

_7/14/19_

_Mary Kilpatrick_
Printed Name of Notary Public

MARY KILPATRICK
Notary Public, State of Texas
My Commission Expires
July 14, 2019

ASSUMPTION AGREEMENT - Page S-2

MR.795

## EXHIBIT "A"

### Property Description

BEING A TRACT OF LAND LOCATED IN SECTIONS 73 AND 76, BLOCK 4, H&GN RAILROAD COMPANY SURVEY, REEVES COUNTY, TEXAS, AND BEING COMPOSED OF THE FOLLOWING: A PART OF A CALLED 84.2 ACRE TRACT OF LAND AS DESCRIBED IN A DEED RECORDED IN VOLUME 860, PAGE 82, OFFICIAL PUBLIC RECORDS, REEVES COUNTY, TEXAS (O.P.R.R.C.T.); A PART OF THE NORTHWEST QUARTER OF SAID SECTION 73 AS DESCRIBED IN A DEED RECORDED IN VOLUME 825, PAGE 784 OF SAID O.P.R.R.C.T.; AND ALL OF A CALLED 109.58 ACRE TRACT OF LAND AS DESCRIBED IN A DEED RECORDED IN VOLUME 1080, PAGE 17 OF SAID O.P.R.R.C.T., AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A 5/8" IRON ROD FOUND WITH CAP STAMPED "TRANS TEXAS SURVEYING" IN THE NORTH LINE OF THE T&P RAILROAD COMPANY RIGHT-OF-WAY AT THE SOUTHWEST CORNER OF THE SAID 109.58 ACRE TRACT AND THE SOUTHEAST CORNER OF THAT 176.659 ACRE TRACT OF LAND AS DESCRIBED IN A DEED RECORDED IN INST. No. 14-03664 OF SAID O.P.R.R.C.T. FOR THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE N 32°08'23" W, WITH THE WEST LINE OF THE SAID 109.58 ACRE TRACT AND THE EAST LINE OF THE SAID 176.659 ACRE TRACT, A DISTANCE OF 1537.04 FEET TO A POINT FOR THE NORTHWEST CORNER OF THE SAID 109.58 ACRE TRACT AND THE SOUTHWEST CORNER OF THAT 100.00 ACRE TRACT OF LAND DESCRIBED AS A SAVE AND EXCEPT TRACT IN A DEED RECORDED IN VOLUME 1006, PAGE 1 OF SAID O.P.R.R.C.T. FOR THE MOST SOUTHERLY NORTHWEST CORNER OF THE HEREIN DESCRIBED TRACT FROM WHICH A 1/2" IRON ROD FOUND WITH CAP STAMPED "TRUJILLO RPLS 5358" BEARS S 58°03'30" W A DISTANCE OF 0.91 FEET;

THENCE N 58°03'30" E, WITH THE NORTH LINE OF THE SAID 109.58 ACRE TRACT AND THE SOUTH OF THE SAID 100.00 ACRE TRACT, AT A DISTANCE OF 2639.42 FEET PASSING A 1/2" IRON ROD FOUND WITH CAP STAMPED "TRUJILLO RPLS 5358", IN ALL A TOTAL DISTANCE OF 2639.92 FEET TO A POINT IN THE COMMON LINE OF SAID SECTION 76 AND SAID SECTION 73 FOR THE NORTHEAST CORNER OF THE SAID 109.58 ACRE TRACT AND THE SOUTHEAST CORNER OF THE SAID 100.00 ACRE TRACT, BEING ALSO THE SOUTHWEST CORNER OF A 20.000 ACRE TRACT OF LAND THIS DATE SURVEYED;

THENCE CROSSING THE NORTHWEST QUARTER OF SAID SECTION 73 WITH THE SOUTH AND EAST LINE OF THE SAID 20.000 ACRE TRACT OF LAND THIS DATE SURVEYED, THE FOLLOWING BEARING AND DISTANCES:

N 58°03'30" E, A DISTANCE OF 527.87 FEET TO A 5/8" IRON ROD SET WITH CAP STAMPED "TRANS TEXAS SURVEYING" FOR THE SOUTHEAST CORNER OF THE SAID 20.000 ACRE TRACT AND AN INTERIOR CORNER OF THE HEREIN DESCRIBED TRACT;

N 32°08'32" W, A DISTANCE OF 1650.40 FEET TO A 5/8" IRON ROD SET WITH CAP STAMPED "TRANS TEXAS SURVEYING" IN THE COMMON LINE OF SAID SECTION 73 AND SECTION 74 OF SAID BLOCK 4, H&GN RAILROAD COMPANY SURVEY AND THE SOUTH LINE OF COUNTY ROAD NO. 404 FOR THE NORTHEAST CORNER OF THE SAID 20.000 ACRE TRACT AND THE MOST NORTHERLY NORTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE N 58°03'46" E, WITH THE COMMON LINE OF SAID SECTION 73 AND SAID SECTION 74 AND THE SOUTH LINE OF SAID COUNTY ROAD NO. 404, PASSING AT A DISTANCE OF 2034.62 FEET A 5/8" IRON ROD SET WITH CAP STAMPED "TRANS TEXAS SURVEYING" IN THE WEST RIGHT-OF-WAY LINE OF F.M. HIGHWAY NO. 2119, IN ALL A TOTAL DISTANCE OF 2117.21 FEET TO A POINT FOR THE NORTHEAST CORNER OF SAID NORTHWEST QUARTER AND THE NORTHWEST

CORNER OF THE NORTHEAST QUARTER OF SAID SECTION 73 AND FOR THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT, FROM WHICH A 1/2" IRON ROD FOUND WITH CAP AT THE NORTHEAST CORNER OF SAID SECTION 73 BEARS N 58°03'46" E, A DISTANCE OF 2645.08 FEET;

THENCE S 32°08'42" E, WITH THE EAST LINE OF THE SAID NORTHWEST QUARTER AND THE WEST LINE OF THE SAID NORTHEAST QUARTER OF SAID SECTION 73, A DISTANCE OF 2645.36 FEET TO A POINT FOR THE FOR THE SOUTHEAST CORNER OF THE SAID NORTHWEST QUARTER AND THE SOUTHWEST CORNER OF THE SAID SOUTHEAST QUARTER OF SAID SECTION 73 AND BEING IN THE NORTH LINE OF THE SOUTH HALF OF SAID SECTION 73 AND THE NORTH LINE OF A CALLED 120 ACRE TRACT OF LAND DESCRIBED IN A DEED RECORDED IN VOLUME 122, PAGE 521, DEED RECORDS OF REEVES COUNTY, TEXAS FOR THE MOST NORTHERLY SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE S 58°01'36" W, WITH THE SOUTH LINE OF THE SAID NORTHWEST QUARTER AND THE NORTH LINE OF THE SAID 120 ACRE TRACT, A DISTANCE OF 13.20 FEET TO A POINT FOR THE NORTHEAST CORNER OF THE SAID 84.2 ACRE TRACT AND THE NORTHWEST CORNER OF THE SAID 120 ACRE TRACT FOR AN INTERIOR CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE S 32°08'42" E, WITH THE EAST LINE OF THE SAID 84.2 ACRE TRACT AND THE WEST LINE OF THE SAID 120 ACRE TRACT A DISTANCE OF 1.61 FEET TO A POINT FOR THE NORTHEAST CORNER OF A 33.000 ACRE TRACT THIS DATE SURVEYED AND A SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE CROSSING THE SAID 84.2 ACRE TRACT WITH THE NORTH AND WEST LINE OF THE SAID 33.000 ACRE TRACT OF LAND THIS DATE SURVEYED, THE FOLLOWING BEARING AND DISTANCES:

S 58°03'32" W, AT A DISTANCE OF 61.35 FEET PASSING A 1/2" IRON ROD FOUND WITH CAP STAMPED "TRUJILLO RPLS 5358", AT A DISTANCE OF 61.51 FEET PASSING THE WEST RIGHT-OF-WAY LINE OF SAID F.M. HIGHWAY NO. 2119, IN ALL A TOTAL DISTANCE OF 933.83 FEET TO A 5/8' IRON ROD SET FOR THE NORTHWEST CORNER OF THE SAID 33.000 ACRE TRACT AND AN INTERIOR CORNER OF THE HEREIN DESCRIBED TRACT;

S 31°43'00" E, A DISTANCE OF 1432.68 FEET TO A 5/8" IRON ROD SET IN THE NORTH LINE OF THE SAID T&P RAILROAD RIGHT-OF-WAY FOR THE SOUTHWEST CORNER OF THE SAID 33.000 ACRE TRACT AND THE MOST SOUTHERLY SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE S 69°42'07" W, WITH THE NORTH LINE OF THE SAID T&P RAILROAD COMPANY RIGHT-OF-WAY, A DISTANCE OF 4421.63 FEET TO THE PLACE OF BEGINNING AND CONTAINING 299.325 ACRES OF LAND.

EXHIBIT "A", Property Description

Exhibit "CC"

MR.798

Ballengee Interests, LLC
3838 Oak Lawn Avenue, Suite 1150
Dallas, Texas 75219

May 25, 2016

Centurion Pecos Terminal LLC
17950 Preston Road, Suite 1080
Dallas, Texas 75252

*Via Hand Delivery*

RE:     Unsecured Promissory Note dated September 16, 2014 (the "**Note**") in the amount of
        $1,500,000.00, issued by Centurion Pecos Terminal LLC ("**CPT**") to Ballengee Interests,
        LLC (the "**Company**")

Dear Sirs:

The Company hereby delivers this notice of acceleration of the unpaid principal balance of the
Note, together with all accrued interest thereon and all other amounts payable under the Note
(collectively, the "**Indebtedness**"), due to CPT's breach of the covenant set forth in Section 3(d)
of the Note. Specifically, the breach by CPT arises out of CPT's failure to timely perform its
obligation to make interest payments due on April 16th and May 16th of this year on the
Promissory Note dated September 16, 2014 in the amount of $1,500,000.00, issued by the
Company to Texas Capital Bank, National Association, the breach of which obligation is
expressly an Event of Default under the Note pursuant to Section 2.1(d).

As a result of the foregoing acceleration, the entire Indebtedness is immediately due and
payable.

Very truly yours,

BALLENGEE INTERESTS, LLC

By: James Ballengee, its Manager

MR.799

# Exhibit "DD"

MR.800

Ballengee Interests, LLC
3838 Oak Lawn Avenue, Suite 1150
Dallas, Texas 75219

May 25, 2016

Centurion Pecos Terminal LLC
17950 Preston Road, Suite 1080
Dallas, Texas 75252

*Via Hand Delivery*

RE:     Unsecured Promissory Note dated August 17, 2015 (the "**Note**") in the amount of
        $1,500,000.00, issued by Centurion Pecos Terminal LLC ("**CPT**") to Ballengee Interests,
        LLC (the "**Company**")

Dear Sirs:

The Company hereby delivers this notice of acceleration of the unpaid principal balance of the
Note, together with all accrued interest thereon and all other amounts payable under the Note
(collectively, the "**Indebtedness**"), due to CPT's breach of the covenant set forth in Section 3(d)
of the Note. Specifically, the breach by CPT arises out of CPT's failure to timely perform its
obligation to make interest payments due on April 16th and May 16th of this year on the
Promissory Note dated August 17, 2015 in the amount of $1,500,000.00, issued by the
Company to Texas Capital Bank, National Association, the breach of which obligation is
expressly an Event of Default under the Note pursuant to Section 2.1(d).

As a result of the foregoing acceleration, the entire Indebtedness is immediately due and
payable.

Very truly yours,

BALLENGEE INTERESTS, LLC

By: James Ballengee, its Manager

EXHIBIT
13

Exhibit "EE"

MR.802

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

## SPECIAL WARRANTY DEED

16-06584
FILED FOR RECORD
REEVES COUNTY, TEXAS
May 31, 2016 at 01:40:00 PM

VOL 12775

PG 0418

| STATE OF TEXAS | § |
| COUNTY OF REEVES | § |

CENTURION PECOS TERMINAL, LLC, a Texas limited liability company ("**Grantor**"), for good and valuable consideration, the receipt and sufficiency of which consideration are hereby acknowledged, has Granted, Sold, and Conveyed, and by these presents does Grant, Sell, and Convey, unto BALLENGEE INTERESTS, LLC, a Louisiana limited liability company ("**Grantee**"), having an address of Two Turtle Creek, 3838 Oak Lawn Avenue, Suite 1150, Dallas, Texas 75219, (a) all that certain real property situated in the County of Reeves, State of Texas, and more particularly described on Exhibit A attached hereto and made a part hereof for all purposes, (b) together with all buildings and improvements now or hereafter situated thereon, and the lessor's or landlord's interest in all space leases or occupancy agreements covering all or any portion thereof and the buildings and improvements situated thereon, and (c) together with all of the right, title and interest in and to the easements in anywise appertaining or belonging thereto (collectively, the "**Property**").

This Deed is made and accepted expressly subject to the validly existing and enforceable rights of third parties in connection with the matters set forth in Exhibit B attached hereto and made a part hereof for all purposes.

This deed is intended as an absolute conveyance rather than as security for any obligation, and Grantor expressly waives any statutory, equitable or other right to redeem any interest in the Property; this deed does not result in the merger of the liens described in Exhibit B with the title conveyed hereby, or in the subordination or extinguishment of any such liens in favor of any other lien or encumbrance; and the interest of the beneficiary of each of the liens described in Exhibit B, on the one hand, and Grantee's title to the Property, on the other hand, are and will remain separate and distinct.

TO HAVE AND TO HOLD the Property, together with all and singular the rights and appurtenances belonging in any way to the Property, unto Grantee, its successors and assigns forever, and Grantor binds itself and its successors and assigns to warrant and forever defend all and singular the Property, subject to the validly existing and enforceable rights of third parties in connection with the matters set forth in Exhibit B, to Grantee, its successors and assigns, against every person lawfully claiming or to claim all or any part of the Property, by, through, or under Grantor, but not otherwise.

Return to: PSG
Republic Title of Texas, Inc.
2626 Howell Street, 10th Floor
Dallas TX 75204

d 41.00

1


EXHIBIT
8

MR.803

IN WITNESS WHEREOF, Grantor has executed this Deed on May 26, 2016.

**GRANTOR:**

CENTURION PECOS TERMINAL LLC,
a Texas limited liability company

By: _____

Name: _John Calce_____

Title: _President_____

THE STATE OF TEXAS          §

COUNTY OF DALLAS          §

BEFORE ME, the undersigned authority, a Notary Public in and for the State of Texas, on this day personally appeared _John Calce_____, _President_____ of Centurion Pecos Terminal LLC, a Texas limited liability company, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that s/he executed the same for the purposes and consideration expressed therein and on behalf of such company.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 26th day of _May_____, 2016.

MARY KILPATRICK
Notary Public, State of Texas
My Commission Expires
July 14, 2019

_____
Notary Public State of Texas

My Commission Expires:
_7/14/19_____

Mary Kilpatrick
Typed or Printed Name of Notary

Exhibit A – Legal Description
Exhibit B – Permitted Exceptions

V O L
1 2 7 5

P G

0 4 1 9

2

BEING a tract of land located in Section 76, Block 4, H&GN Survey, Reeves County, Texas, and being a part of a called 496.76 GRID (496.87 Surface) acre tract of land as described in a Deed recorded in Volume 905, Page 155, Official Public Records, Reeves County, Texas (O.P.R.R.C.T.), and being more particularly described as follows:

BEGINNING at a 5/8 inch iron rod set with cap stamped "TRANS TEXAS SURVEYING" for the Northwest corner of said Section 76, the Southwest corner of said Section 75, the Northeast corner of Section 77 and the Southeast corner of Section 78, said 5/8 inch iron rod set also being in the intersection of County Road No. 408 and County Road No. 404;

THENCE North 58 degrees 03 minutes 46 seconds East, with the common line of said Section 76 and Section 75, a distance of 2639.85 feet to a point in the East line of said 496.76 acre tract from which a 1/2 inch iron rod found with cap stamped "5358 TRUJILLO" bears South 58 degrees 03 minutes 46 seconds West, a distance of 0.63 feet, also from which a 1/2 inch iron rod found at the Northeast corner of said Section 76, Block 4, bears North 58 degrees 03 minutes 46 seconds East, a distance of 2639.85 feet;

THENCE South 32 degrees 08 minutes 23 seconds East, with the East line of said 496.76 acre tract, a distance of 3187.68 feet to a 5/8 inch iron rod set with cap stamped "TRANS TEXAS SURVEYING" for the Southeast corner of said 496.76 acre tract being 100 feet North of the centerline of the Texas & Pacific Railroad;

THENCE South 69 degrees 42 minutes 22 seconds West, with the South line of said 496.76 acre tract and 100 feet North of and parallel with the centerline of said Texas & Pacific Railroad, a distance of 2697.40 feet to a point in said County Road No. 408, the West line of said Section 76 and the East line of Section 77, Block 4, from which a 60D nail found bears South 69 degrees 42 minutes 22 seconds West, a distance of 0.37 feet, also from which a 1/2 inch iron rod found for the Southwest corner of said Section 76, Block 4, bears South 32 degrees 08 minutes 13 seconds East, a distance of 2657.42 feet;

THENCE North 32 degrees 08 minutes 13 seconds West, with the West line of said 496.76 acre tract and with the common line of said Section 76 and said Section 77, a distance of 2643.29 feet to the PLACE OF BEGINNING and CONTAINING 176.659 acres of land.

VOL 1275 PG 0420

3

MR.805

Exhibit B
To
Special Warranty Deed

1.      Deed of Trust dated September 16, 2014, executed by CPT and recorded as Document No. 14-09181 of the Real Property Records of Reeves County, Texas and encumbering the Project (the "TCB Deed of Trust").

2.      Deed of Trust to Secure Assumption against the Project dated April 6, 2016 that is expressly subordinate to the TCB Deed of Trust and is recorded in Volume 1259, Page 364 of the Real Property Records of Reeves County, Texas.

3.

b.      Mineral reservation in coal, lignite, oil, gas and other minerals together with all rights, privileges and immunities incident thereto contained in Deed from Jimmy D. McNeil and wife, Bobbie Ann McNeil, to Fred Hammond, dated 11/19/1984, recorded in Volume 450, Page 304, Real Property Records, Reeves County, Texas. Title to said interest not checked subsequent to the date thereof.

c.      Right of Way Grant granted by R.H. Brown, to Pecos Growers Gas Co., dated 03/14/1955, recorded in Volume , Page , Real Property Records, Reeves County, Texas, and as noted on survey prepared by Robert L. Young, R.P.L.S. #5400, dated 06/05/2014, last revised 06/20/2014.

d.      Right of Way Easement granted by Jimmy McNeil to Madera Valley Water Supply Corporation, dated 12/16/1970, recorded in Volume 300, Page 854, Real Property Records, Reeves County, Texas, and as noted on survey prepared by Robert L. Young, R.P.L.S. #5400, dated 06/05/2014, last revised 06/20/2014.

e.      Right of Way Easement granted by Peppy McKinney to Madera Valley Water Supply Corporation, dated 12/03/1970, recorded in Volume 300, Page 855, Real Property Records, Reeves County, Texas, and as noted on survey prepared by Robert L. Young, R.P.L.S. #5400, dated 06/05/2014, last revised 06/20/2014.

f.      Easement and Right-of-Way granted by Harold Wendt and Mrs. Bessie Wendt to Community Public Service Company, dated 02/06/1946, recorded in Volume 105, Page 549, Real Property Records, Reeves County, Texas, and as noted on survey prepared by Robert L. Young, R.P.L.S. #5400, dated 06/05/2014, last revised 06/20/2014.

g.      Right of Way Grant granted by Harold Wendt and Mrs. Bessie Wendt to Pecos Growers Gas Co., dated 02/14/1955, recorded in Volume 163, Page 413, Real Property Records, Reeves County, Texas, and as noted on survey prepared by Robert L. Young, R.P.L.S. #5400, dated 06/05/2014, last revised 06/20/2014.

h.      Easement of Right-of-Way granted by Mrs. B.G. Smith to Community Public Service Company, dated 04/15/1958, recorded in Volume 181, Page 456, Real Property Records, Reeves County, Texas, and as noted on survey prepared by Robert L. Young, R.P.L.S. #5400, dated 06/05/2014, last revised 06/20/2014.

i.      Right of Way Easement granted by M.J. Mills to Madera Valley Water Supply Corp., dated 12/01/1970, recorded in Volume 300, Page 840, Real Property Records, Reeves County, Texas, and as noted on survey prepared by Robert L. Young, R.P.L.S. #5400, dated 06/05/2014, last revised 06/20/2014.

4

VOL 1275 PG 0421

MR.806

j.    Assignment of Pipelines, Rights-of-Way and Metering Facilities granted by Delhi Gas Pipeline Corporation, successor to Pecos Growers Gas Company, to Trans Pecos Gas Co., Inc., dated 11/22/1976, but effective 12/01/1976, recorded in Volume 342, Page 54, Real Property Records, Reeves County, Texas, and as noted on survey prepared by Robert L. Young, R.P.L.S. #5400, dated 06/05/2014, last revised 06/20/2014.

k.    Conveyance, Assignment and Bill of Sale granted by Delhi Gas Pipeline Corporation to Delhi Gas Marketing Corp., dated 03/01/1995, recorded in Volume 548, Page 144, Real Property Records, Reeves County, Texas, and as noted on survey prepared by Robert L. Young, R.P.L.S. #5400, dated 06/05/2014, last revised 06/20/2014.

l.    Conveyance, Assignment and Bill of Sale granted by West Texas Gas, Inc., to WTG Gas Transmission Company, dated 08/01/2002, recorded in Volume 655, Page 717, Real Property Records, Reeves County, Texas, and as noted on survey prepared by Robert L. Young, R.P.L.S. #5400, dated 06/05/2014, last revised 06/20/2014.

m.    Rights of any and all parties to concrete irrigation channels, as shown on survey prepared by Robert L. Young, R.P.L.S. #5400, dated 06/05/2014, last revised 06/20/2014.

n.    Overhead electric lines and poles and buried cable lines without the benefit of an easement, as shown on survey prepared by Robert L. Young, R.P.L.S. #5400, dated 06/05/2014, last revised 06/20/2014.

o.    Rights of any and all parties to that portion of property lying within County Roads 404 and 408, as shown on survey prepared by Robert L. Young, R.P.L.S. #5400, dated 06/05/2014, last revised 06/20/2014.

p.    Sign at Southwest corner of property, as shown on survey prepared by Robert L. Young, R.P.L.S. #5400, dated 06/05/2014, last revised 06/20/2014.

q.    Chesapeake gas lines and West Texas gas lines and signs without the benefit of an easement, as shown on survey prepared by Robert L. Young, R.P.L.S. #5400, dated 06/05/2014, last revised 06/20/2014.

r.    Encroachment/Protrusion of fences, as shown on survey prepared by Robert L. Young, R.P.L.S. #5400, dated 06/05/2014, last revised 06/20/2014.

s.    Terms, provisions, and conditions contained in Access Easement Agreement filed 09/24/2014, recorded in Volume 1107, Page 175, Real Property Records, Reeves County, Texas.

t.    All leases, grants, exceptions or reservations of coal, lignite, oil, gas and other minerals, together with all rights, privileges, and immunities relating thereto, appearing in the Public Records whether listed in Schedule B or not. There may be leases, grants, exceptions or reservations of mineral interest that are not listed.

VOL 1275 PG 0422

Inst No. 16-06584
DIANNE O. FLOREZ
COUNTY CLERK
2016 May 31 at 01:49 PM
REEVES COUNTY, TEXAS
By: BA _____, DEPUTY

Exhibit "FF"

MR.808

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

## SPECIAL WARRANTY DEED

16-06585
FILED FOR RECORD
REEVES COUNTY, TEXAS
May 31, 2016 at 01:40:00 PM

STATE OF TEXAS §
§
COUNTY OF REEVES §

CENTURION PECOS TERMINAL LLC, a Texas limited liability company ("**Grantor**"), for good and valuable consideration, the receipt and sufficiency of which consideration are hereby acknowledged, has Granted, Sold, and Conveyed, and by these presents does Grant, Sell, and Convey, unto BALLENGEE INTERESTS, LLC, a Louisiana limited liability company ("**Grantee**"), having an address of Two Turtle Creek, 3838 Oak Lawn Avenue, Suite 1150, Dallas, Texas 75219, (a) all that certain real property situated in the County of Reeves, State of Texas, and more particularly described on Exhibit A attached hereto and made a part hereof for all purposes, (b) together with all buildings and improvements now or hereafter situated thereon, and the lessor's or landlord's interest in all space leases or occupancy agreements covering all or any portion thereof and the buildings and improvements situated thereon, and (c) together with all of the right, title and interest in and to the easements in anywise appertaining or belonging thereto (collectively, the "**Property**").

This Deed is made and accepted expressly subject to the validly existing and enforceable rights of third parties in connection with the matters set forth in Exhibit B attached hereto and made a part hereof for all purposes.

This deed is intended as an absolute conveyance rather than as security for any obligation, and Grantor expressly waives any statutory, equitable or other right to redeem any interest in the Property; this deed does not result in the merger of the liens described in Exhibit B with the title conveyed hereby, or in the subordination or extinguishment of any such liens in favor of any other lien or encumbrance; and the interest of the beneficiary of each of the liens described in Exhibit B, on the one hand, and Grantee's title to the Property, on the other hand, are and will remain separate and distinct.

TO HAVE AND TO HOLD the Property, together with all and singular the rights and appurtenances belonging in any way to the Property, unto Grantee, its successors and assigns forever, and Grantor binds itself and its successors and assigns to warrant and forever defend all and singular the Property, subject to the validly existing and enforceable rights of third parties in connection with the matters set forth in Exhibit B, to Grantee, its successors and assigns, against every person lawfully claiming or to claim all or any part of the Property, by, through, or under Grantor, but not otherwise.

1



MR.809

IN WITNESS WHEREOF, Grantor has executed this Deed on May 26, 2016.

**GRANTOR:**

CENTURION PECOS TERMINAL LLC,
a Texas limited liability company

By: _____

Name: _____

Title: _____

THE STATE OF TEXAS     §

COUNTY OF DALLAS     §

BEFORE ME, the undersigned authority, a Notary Public in and for the State of Texas, on this day personally appeared John Calce , President of Centurion Pecos Terminal LLC, a Texas limited liability company, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that s/he executed the same for the purposes and consideration expressed therein and on behalf of such company.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 26th day of May , 2016.

MARY KILPATRICK
Notary Public, State of Texas
My Commission Expires
July 14, 2019

_____
Notary Public State of Texas

My Commission Expires:
7/14/19

Mary Kilpatrick
_____
Typed or Printed Name of Notary

Exhibit A – Legal Description
Exhibit B – Permitted Exceptions

V
O
L

1
2
7
5

P
G

0
4
2
4

MR.810

BEING A TRACT OF LAND LOCATED IN SECTIONS 73 AND 76, BLOCK 4, H&GN RAILROAD COMPANY SURVEY, REEVES COUNTY, TEXAS, AND BEING COMPOSED OF THE FOLLOWING: A PART OF A CALLED 84.2 ACRE TRACT OF LAND AS DESCRIBED IN A DEED RECORDED IN VOLUME 860, PAGE 82, OFFICIAL PUBLIC RECORDS, REEVES COUNTY, TEXAS (O.P.R.R.C.T.); A PART OF THE NORTHWEST QUARTER OF SAID SECTION 73 AS DESCRIBED IN A DEED RECORDED IN VOLUME 825, PAGE 784 OF SAID O.P.R.R.C.T.; AND ALL OF A CALLED 109.58 ACRE TRACT OF LAND AS DESCRIBED IN A DEED RECORDED IN VOLUME 1080, PAGE 17 OF SAID O.P.R.R.C.T., AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A 5/8" IRON ROD FOUND WITH CAP STAMPED "TRANS TEXAS SURVEYING" IN THE NORTH LINE OF THE T&P RAILROAD COMPANY RIGHT-OF-WAY AT THE SOUTHWEST CORNER OF THE SAID 109.58 ACRE TRACT AND THE SOUTHEAST CORNER OF THAT 176.659 ACRE TRACT OF LAND AS DESCRIBED IN A DEED RECORDED IN INST. No. 14-03664 OF SAID O.P.R.R.C.T. FOR THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE N 32°08'23" W, WITH THE WEST LINE OF THE SAID 109.58 ACRE TRACT AND THE EAST LINE OF THE SAID 176.659 ACRE TRACT, A DISTANCE OF 1537.04 FEET TO A POINT FOR THE NORTHWEST CORNER OF THE SAID 109.58 ACRE TRACT AND THE SOUTHWEST CORNER OF THAT 100.00 ACRE TRACT OF LAND DESCRIBED AS A SAVE AND EXCEPT TRACT IN A DEED RECORDED IN VOLUME 1006, PAGE 1 OF SAID O.P.R.R.C.T. FOR THE MOST SOUTHERLY NORTHWEST CORNER OF THE HEREIN DESCRIBED TRACT FROM WHICH A 1/2" IRON ROD FOUND WITH CAP STAMPED "TRUJILLO RPLS 5358" BEARS S 58°03'30" W A DISTANCE OF 0.91 FEET;

THENCE N 58°03'30" E, WITH THE NORTH LINE OF THE SAID 109.58 ACRE TRACT AND THE SOUTH OF THE SAID 100.00 ACRE TRACT, AT A DISTANCE OF 2639.42 FEET PASSING A 1/2" IRON ROD FOUND WITH CAP STAMPED "TRUJILLO RPLS 5358", IN ALL A TOTAL DISTANCE OF 2639.92 FEET TO A POINT IN THE COMMON LINE OF SAID SECTION 76 AND SAID SECTION 73 FOR THE NORTHEAST CORNER OF THE SAID 109.58 ACRE TRACT AND THE SOUTHEAST CORNER OF THE SAID 100.00 ACRE TRACT, BEING ALSO THE SOUTHWEST CORNER OF A 20.000 ACRE TRACT OF LAND THIS DATE SURVEYED;

THENCE CROSSING THE NORTHWEST QUARTER OF SAID SECTION 73 WITH THE SOUTH AND EAST LINE OF THE SAID 20.000 ACRE TRACT OF LAND THIS DATE SURVEYED, THE FOLLOWING BEARING AND DISTANCES:

N 58°03'30" E, A DISTANCE OF 527.87 FEET TO A 5/8" IRON ROD SET WITH CAP STAMPED "TRANS TEXAS SURVEYING" FOR THE SOUTHEAST CORNER OF THE

V
O
L

1
2
7
5

P
G

0
4
2
5

3

SAID 20.000 ACRE TRACT AND AN INTERIOR CORNER OF THE HEREIN DESCRIBED TRACT;

N 32°08'32" W, A DISTANCE OF 1650.40 FEET TO A 5/8" IRON ROD SET WITH CAP STAMPED "TRANS TEXAS SURVEYING" IN THE COMMON LINE OF SAID SECTION 73 AND SECTION 74 OF SAID BLOCK 4, H&GN RAILROAD COMPANY SURVEY AND THE SOUTH LINE OF COUNTY ROAD NO. 404 FOR THE NORTHEAST CORNER OF THE SAID 20.000 ACRE TRACT AND THE MOST NORTHERLY NORTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE N 58°03'46" E, WITH THE COMMON LINE OF SAID SECTION 73 AND SAID SECTION 74 AND THE SOUTH LINE OF SAID COUNTY ROAD NO. 404, PASSING AT A DISTANCE OF 2034.62 FEET A 5/8" IRON ROD SET WITH CAP STAMPED "TRANS TEXAS SURVEYING" IN THE WEST RIGHT-OF-WAY LINE OF F.M. HIGHWAY NO. 2119, IN ALL A TOTAL DISTANCE OF 2117.21 FEET TO A POINT FOR THE NORTHEAST CORNER OF SAID NORTHWEST QUARTER AND THE NORTHWEST CORNER OF THE NORTHEAST QUARTER OF SAID SECTION 73 AND FOR THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT, FROM WHICH A 1/2" IRON ROD FOUND WITH CAP AT THE NORTHEAST CORNER OF SAID SECTION 73 BEARS N 58°03'46" E, A DISTANCE OF 2645.08 FEET;

THENCE S 32°08'42" E, WITH THE EAST LINE OF THE SAID NORTHWEST QUARTER AND THE WEST LINE OF THE SAID NORTHEAST QUARTER OF SAID SECTION 73, A DISTANCE OF 2645.36 FEET TO A POINT FOR THE FOR THE SOUTHEAST CORNER OF THE SAID NORTHWEST QUARTER AND THE SOUTHWEST CORNER OF THE SAID SOUTHEAST QUARTER OF SAID SECTION 73 AND BEING IN THE NORTH LINE OF THE SOUTH HALF OF SAID SECTION 73 AND THE NORTH LINE OF A CALLED 120 ACRE TRACT OF LAND DESCRIBED IN A DEED RECORDED IN VOLUME 122, PAGE 521, DEED RECORDS OF REEVES COUNTY, TEXAS FOR THE MOST NORTHERLY SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE S 58°01'36" W, WITH THE SOUTH LINE OF THE SAID NORTHWEST QUARTER AND THE NORTH LINE OF THE SAID 120 ACRE TRACT, A DISTANCE OF 13.20 FEET TO A POINT FOR THE NORTHEAST CORNER OF THE SAID 84.2 ACRE TRACT AND THE NORTHWEST CORNER OF THE SAID 120 ACRE TRACT FOR AN INTERIOR CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE S 32°08'42" E, WITH THE EAST LINE OF THE SAID 84.2 ACRE TRACT AND THE WEST LINE OF THE SAID 120 ACRE TRACT A DISTANCE OF 1.61 FEET TO A POINT FOR THE NORTHEAST CORNER OF A 33.000 ACRE TRACT THIS DATE SURVEYED AND A SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE CROSSING THE SAID 84.2 ACRE TRACT WITH THE NORTH AND WEST LINE OF THE SAID 33.000 ACRE TRACT OF LAND THIS DATE SURVEYED, THE FOLLOWING BEARING AND DISTANCES:

4

S 58°03'32" W, AT A DISTANCE OF 61.35 FEET PASSING A 1/2" IRON ROD FOUND WITH CAP STAMPED "TRUJILLO RPLS 5358", AT A DISTANCE OF 61.51 FEET PASSING THE WEST RIGHT-OF-WAY LINE OF SAID F.M. HIGHWAY NO. 2119, IN ALL A TOTAL DISTANCE OF 933.83 FEET TO A 5/8' IRON ROD SET FOR THE NORTHWEST CORNER OF THE SAID 33.000 ACRE TRACT AND AN INTERIOR CORNER OF THE HEREIN DESCRIBED TRACT;

S 31°43'00" E, A DISTANCE OF 1432.68 FEET TO A 5/8" IRON ROD SET IN THE NORTH LINE OF THE SAID T&P RAILROAD RIGHT-OF-WAY FOR THE SOUTHWEST CORNER OF THE SAID 33.000 ACRE TRACT AND THE MOST SOUTHERLY SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE S 69°42'07" W, WITH THE NORTH LINE OF THE SAID T&P RAILROAD COMPANY RIGHT-OF-WAY, A DISTANCE OF 4421.63 FEET TO THE PLACE OF BEGINNING AND CONTAINING 299.325 ACRES OF LAND.

VOL 12755

PG

0427

MR.813

1.    Deed of Trust dated August 17, 2015, executed by CPT and recorded as Document No. 15-07672 of the Real Property Records of Reeves County, Texas and encumbering the Project (the "TCB Deed of Trust")

2.    Deed of Trust to Secure Assumption against the Project dated April 6, 2016 that is expressly subordinate to the TCB Deed of Trust and is recorded in Volume 1259, Page 370 of the Real Property Records of Reeves County, Texas

3.

a.    All leases, grants, exceptions or reservations of coal, lignite, oil, gas and other minerals, together with all rights, privileges, and immunities relating thereto, appearing in the Public Records whether listed in Schedule B or not. There may be leases, grants, exceptions or reservations of mineral interest that are not listed.

b.    Easement and Right of Way as shown in instrument from Harold Wendt, and Mrs. Bessie Wendt to Community Public Service Company, dated February 6, 1946 and filed in Volume 105, page 549, Deed Records of Reeves County, Texas, as noted on survey prepared by Trans Texas Surveying and Mapping, Robert L. Young, RPLS No. 5400, Job No. 20140085, dated 7/16/2015 (the "Survey").

c.    Gas Salte Contract and Easement and Right of Way as shown in Instrument from Harold Wendt to Pecos Growers Gas Company, dated October 4, 1954 and filed in Volume 163, page 345, Deed Records of Reeves County, Texas, as noted on Survey.

d.    Right of Way Grant as shown in instrument from Harold Wendt to Pecos Growers Gas Company, dated February 4, 1955 and filed in Volume 163, page 412, Deed Records of Reeves County, Texas, as noted on Survey.

e.    Right of Way Easement as shown in instrument from Peppy McKinney to Madera Valley Water Supply Corporation, dated December 3, 1970 and filed in Volume 300, page 855, Deed Records of Reeves County, Texas, as noted on Survey.

f.    Right-Of-Way Easement as shown in instrument from J.F. Wellington et al to Texas-Louisiana Power Company, dated January 27, 1928 and filed in Volume 66, page 500, Deed Records of Reeves County, Texas, as shown on Survey.

g.    Right-Of-Way Easement as shown in instrument from Lila B. Brooks to Reeves County, dated January 23, 1954 and filed in Volume 154, page 546, Deed Records of Reeves County, Texas, as shown on Survey.

h.    Oil and Gas Lease and Surface Use, Damage Schedule and Right of Way Agreement dated October 23, 2014 by and between Zane Kiehne and Tanya Kiehne and KEW Drilling, a memorandum of which was recorded in Volume 1125, Page 564, of the Official Public Records of Reeves County, Texas, as amended by that certain Amendment to the Oil and Gas Lease and Surface Use, Damage Schedule and Right of Way Agreement dated January 26, 2015 entered into for purposes of removing the surface estate of the land, and all rights thereto, a memorandum of which Amendment was recorded on February 20, 2015 in Volume 1146, Page 306, of the Official Public Records of Reeves County, Texas.

i.    Title to all coal, lignite, oil, gas and other minerals in, under and that may be produced from the land, together with all rights, privileges, and immunities relating thereto, all of such interest, to the extent not previously reserved or conveyed, being reserved or conveyed in instrument filed 08/26/2015, recorded in Volume 1190, Page 763, Real Property Records, Reeves County, Texas. Title to said interest not checked subsequent to the date thereof.

MR.814

VOL 1275 PG 0429

Inst No. 16-06585
DIANNE O. FLOREZ
COUNTY CLERK
2016 May 31 at 01:40 PM
REEVES COUNTY, TEXAS
By: BA _____ DEPUTY

MR.815

Exhibit "GG"

MR.816

## RELEASE AND CONVEYANCE AGREEMENT

THIS RELEASE AND CONVEYANCE AGREEMENT (this "**Agreement**") is entered into as of May 26, 2016 (the "**Effective Date**") by and among BALLENGEE INTERESTS, LLC, a Louisiana limited liability company ("**BI LLC**"), JAMES H. BALLENGEE ("**Ballengee**"), and CENTURION PECOS TERMINAL LLC, a Texas limited liability company ("**CPT**"), on the following terms and conditions:

### RECITALS:

A.     CPT owns the land in Reeves County, Texas that is described on Exhibit A attached hereto, together with the improvements and any personalty located on such land (collectively, the "**Project**").

B.     In order to finance CPT's acquisition of the Project, BI LLC secured a loan from Texas Capital Bank, National Association ("**TCB**") in the amount of $1,500,000.00 (as amended and extended to date, the "**TCB Loan**"), as evidenced and/or secured in part by that (1) Business Loan Agreement dated September 16, 2014 between BI LLC and TCB (the "**Loan Agreement**"), (2) Promissory Note dated September 16, 2014 in the stated principal amount of $1,500,000.00, executed by BI LLC, bearing interest and being payable to the order of TCB as therein provided (the "**TCB Note**"), (3) Deed of Trust dated September 16, 2014, executed by CPT and recorded as Document No. 14-09181 of the Real Property Records of Reeves County, Texas and encumbering the Project (the "**TCB Deed of Trust**"), and (4) Commercial Guaranty dated September 16, 2014 executed by Ballengee.

C.     In order to provide that, as between CPT, on the one hand, and BI LLC and Ballengee (together "**BI LLC/Ballengee**"), on the other hand, CPT would be ultimately liable for the purchase money financing for the Project, CPT issued to BI LLC an Unsecured Promissory Note on September 16, 2014 in the stated principal amount of $1,500,000.00, bearing interest and being payable to the order of BI LLC as therein provided (the "**Unsecured Note**").

D.     Clause (d) of Section 3 of the Unsecured Note contemplates that CPT would make timely payments of interest due on the TCB Loan.

E.     On April 6, 2016, BI LLC/Ballengee, CPT, and TCB entered into an Assumption Agreement (herein so called) related to the TCB Loan wherein, among other things, CPT (i) assumed the obligation to pay and perform all of the obligations of BI LLC under the TCB Note and the Loan Agreement and (ii) agreed to indemnify BI LLC or Ballengee, as the case may be, for any amounts required by TCB to be paid by BI LLC or by Ballengee, as the case may be, under the TCB Note or the Loan Agreement from and after the effective date of the Assumption Agreement.

F.     In order to secure CPT's obligations described in clauses (i) and (ii) of the foregoing Recital paragraph E (collectively, the "**Assumption Obligations**"), CPT executed a

1



EXHIBIT

11

MD-817

Deed of Trust to Secure Assumption against the Project dated April 6, 2016 that is expressly subordinate to the TCB Deed of Trust and is recorded in Volume 1259, Page 364 of the Real Property Records of Reeves County, Texas (the "**Deed of Trust to Secure Assumption**").

G.      CPT failed to make the requisite interest payments on the TCB Loan for the months of April and May 2016 and, as a result, BI LLC sent written notice to CPT on May 25, 2016 that the entire unpaid principal balance of the Unsecured Note, together with interest accrued and unpaid thereon (together, the "**Unsecured Note Indebtedness**"), was immediately due and payable.

H.      As of the Effective Date, the amount of the Unsecured Note Indebtedness is $1,703,178.08.

I.      CPT has made an analysis of market conditions affecting the Project and of its own financial condition and ability and has determined (1) that the ownership, operation, and development of the Project is not economically viable and will not be economically viable for CPT within the foreseeable future, (2) that CPT is not financially able to continue to own, operate, and develop the Project or to continue to pay interest on the TCB Loan as it becomes payable, and (3) the value of the Project is less than the amount of the Unsecured Note Indebtedness as of the Effective Date.

J.      CPT and BI LLC have initiated discussions concerning (1) the release of CPT and assumption by BI LLC from and after the Effective Date of the existing responsibilities, obligations, and liabilities of owning, operating, and developing the Project and (2) the release of CPT by BI LLC/Ballengee from the Assumption Obligations, the obligations of CPT under the Deed of Trust to Secure Assumption, and the Unsecured Note Indebtedness (collectively, the "**CPT Obligations**"), subject to certain Retained Liabilities (defined below).

K.      BI LLC/Ballengee and CPT (collectively, the "**Parties**") have entered into this Agreement to provide for the conveyance of the Project to BI LLC in consideration for the release of CPT by BI LLC and by Ballengee (but by Ballengee only to the extent of the Assumption Obligations) from the CPT Obligations and the indemnity of CPT in Section 2(d) herein, all subject to and in accordance with the terms and conditions hereinafter set forth.

**AGREEMENTS:**

NOW, THEREFORE, for the mutual premises herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.      **Conveyance of the Project to BI LLC**.

        (a)      **Conveyance**.  Contemporaneously herewith, CPT will convey all legal and equitable title and interest in and to the Project to BI LLC, subject only to the permitted exceptions set forth in Exhibit B to the Deed (defined below), by executing and delivering to BI LLC the following:

2

MR.818

(1)     Special Warranty Deed (the "**Deed**") in substantially the same form attached hereto as Exhibit B; and

(2)     Assignment of Personal Property, Warranties, and Leases (the "**General Assignment**") in substantially the same form as the form attached hereto as Exhibit C assigning and transferring to BI LLC all personal property, contracts, and warranties comprising the Project and the lessor's interest in any and all leases of the Project (or any portion thereof).

The Deed and the General Assignment, and the conveyances to BI LLC therein (collectively, the "**Conveyance**"), are subject to the TCB Loan and the TCB Deed of Trust and to the Deed of Trust to Secure Assumption. Further, the Conveyance constitutes an absolute conveyance of the Project (and not a deed of trust, security agreement or other security interest of whatever nature), thereby expressly waiving any right, claim, or interest of CPT in any profits that may thereafter accrue or be payable from the ownership, use, lease, sale or other disposition of the Project. The Deed, the General Assignment, and all other documents or instruments executed or delivered in connection with this Agreement (including without limitation any non-foreign tax affidavits or title affidavits necessary or reasonably appropriate to consummate the Conveyance) are hereinafter collectively called the "**Conveyance Documents**."

(b)     **Further Assurances**.  At BI LLC's request, CPT will cooperate with BI LLC and execute such further documents or instruments as reasonably may be required by BI LLC consistent with this Agreement to ensure the orderly Conveyance and transfer of the Project as of the Effective Date.

2.     **No Obligations of BI LLC to Third Parties; CPT's Retained Liabilities; Release of CPT by BI LLC/Ballengee**.

(a)     **No Obligations of BI LLC to Third Parties**.  The acceptance by BI LLC of title to the Project pursuant to this Agreement and the Conveyance Documents does not create any obligations on the part of BI LLC to third parties that have claims of any kind whatsoever against CPT with respect to the Project or with respect to CPT's acquisition, ownership or operation of the Project.  BI LLC does not assume or agree to discharge any liabilities pertaining to the Project that accrued prior to the Effective Date.  No person not a party to this Agreement has any 'third-party beneficiary' or other rights under this Agreement.

(b)     **Retained Liabilities**.  Notwithstanding anything to the contrary in this Agreement, CPT remains liable for, and is not released from its obligations related to, the following matters (collectively, the "**Retained Liabilities**"):

(1)     any warranty of title to the Project contained in the Conveyance Documents;

(2)     any obligations and liabilities of CPT arising under, or any breach of any representation, warranty, covenant of CPT contained in, this Agreement; and

(3)     any and all claims of third parties described in Section 2(a).

3

MR.819

The Retained Liabilities expressly survive the execution and delivery of this Agreement and the Conveyance Documents.

(c) **Release of CPT by BI LLC/Ballengee**. Effective on the Effective Date, subject in all respects to CPT having executed and delivered to BI LLC on or before the Effective Date all of the Conveyance Documents, and without waiving any of the Retained Liabilities, each of BI LLC and Ballengee (but by Ballengee only to the extent of the Assumption Obligations) hereby release, acquit, and forever discharge CPT and its direct or indirect beneficial owners, directors, officers, agents, servants, employees, attorneys, and representatives (collectively, the "**CPT Released Parties**") of and from any and all of the CPT Obligations and any and all claims, demands, damages, costs, losses, expenses, commissions, actions and causes of action of whatever nature in connection with or arising or to arise from or resulting or to result from or relating to the CPT Obligations. Further, except with respect to any Retained Liabilities, BI LLC will not bring or institute any action or suit in connection with any of the CPT Obligations against any of the CPT Released Parties. Notwithstanding the foregoing, nothing contained in this Agreement releases, reduces, limits, impairs or adversely affects the rights or remedies of BI LLC under the Conveyance Documents or with respect to the Retained Liabilities, including without limitation the right to institute any action or suit against any person other than the CPT Released Parties. This release inures to the benefit of CPT and the other CPT Released Parties and their respective successors and assigns and is binding on BI LLC/Ballengee and their respective heirs, successors, and assigns.

(d) **Indemnity**. Effective on the Effective Date, BI LLC agrees to indemnify, defend and protect the CPT Released Parties from any and all claims of TCB arising out of breach or discharge of the Assumption Obligations.

3. **Release by CPT**. Effective on the Effective Date, CPT, for itself and the other CPT Released Parties, hereby releases, acquits and forever discharges BI LLC and its direct or indirect beneficial owners, directors, officers, agents, servants, employees, attorneys, and representatives (collectively, the "**BI LLC Released Parties**") of and from any and all claims, demands, damages, costs, losses, expenses, commissions, actions and causes of action of whatever nature in connection with or arising or to arise from or resulting or to result from or relating to the TCB Loan, the Unsecured Note, the Assumption Agreement, the Deed of Trust to Secure Assumption or the Project, specifically including any claim of usury. Further, neither CPT nor any of the other CPT Released Parties will institute any action or suit against any of the BI LLC Released Parties in connection with any of the matters for which the BI LLC Released Parties are released pursuant to this Section 3. No promise or inducement for this release has been offered except as may be expressly set forth in this Agreement, and this release is executed without reliance upon any statement or representation of any person or parties released, or their representatives, concerning the nature and extent of the damages and/or the legal liability therefor. This release inures to the benefit of BI LLC/Ballengee and the other BI LLC Released Parties and their respective heirs, successors, and assigns and is binding on the CPT Released Parties and their respective successors and assigns.

4. **CPT's Representations, Warranties and Covenants**. As a material inducement for BI LLC/Ballengee to enter into this Agreement and in recognition that BI LLC/Ballengee are

4

MR.820

relying on the accuracy of the following, CPT represents, warrants and covenants to BI LLC/Ballengee that:

(a)     CPT is entering into this Agreement of its own free will and accord, upon knowledge of the facts, and with the advice of legal counsel of CPT's selection.

(b)     The statements contained in the Recitals to this Agreement are true and correct.

(c)     CPT acknowledges that, upon the delivery of the Deed to BI LLC, CPT will have waived, and does hereby waive, any redemption and cure rights with respect to the Project, and CPT acknowledges that the releases granted to CPT by BI LLC and by Ballengee and the indemnity provided for in Section 2(d) in this Agreement constitute new, fair, and adequate consideration for CPT's waiver of such rights.

(d)     CPT owns the Project in fee simple absolute and, except for the permitted exceptions set forth in Exhibit B to the Deed, there are no existing liens, security interests, encumbrances, agreements, encroachments, special assessments, claims, leases, tenancies, other adverse interests or defects on or affecting the Project.

(e)     The transactions described in this Agreement and in the Conveyance Documents (collectively, the "**Conveyance Transactions**") benefit and are in the best interests of CPT and are being entered into by CPT voluntarily and without undue influence or duress.

(f)     The consideration to be received by CPT in connection with the consummation of the Conveyance Transactions, including payment by BI LLC of ad valorem taxes on the Project through the Effective Date, equals or exceeds the value of the Project as of the Effective Date, and CPT will not take a contrary position in a court of law or otherwise.

(g)     CPT is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Texas, having all powers required to carry on its business and to enter into and carry out the Conveyance Transactions.

(h)     CPT has duly taken all action necessary to authorize the execution and delivery by CPT of this Agreement and the Conveyance Documents and to authorize the consummation of the transactions contemplated thereby and the performance of its obligations thereunder.

(i)     The execution, delivery and performance by CPT of this Agreement and the Conveyance Documents, and the consummation by CPT of the Conveyance Transactions, do not and will not conflict with any provision of (A) to CPT's current actual knowledge, any law, statute, rule or regulation, (B) the organizational documents governing CPT, or (C) any agreement, judgment, license, order or permit applicable to or binding upon CPT or the Project. No consent, approval, authorization or order of, and no notice to or filing with, any court or governmental authority or third party is required in connection with the execution, delivery or performance by CPT of this Agreement or any Conveyance Document or to consummate any of the Conveyance Transactions.

5

MR.821

(j)     This Agreement and the Conveyance Documents are legal, valid and binding obligations of CPT, enforceable in accordance with their respective terms.

CPT will indemnify and hold BI LLC harmless from and against any loss, damage, cost or expense, including without limitation attorneys' fees and expenses, incurred by BI LLC as a direct or indirect result of any breach by CPT of any representations, warranties or covenants contained in this Agreement or in any of the Conveyance Documents, all of which survive the execution and delivery of this Agreement and the Conveyance Documents.

5.     **BI LLC's Representations and Warranties.** BI LLC represents and warrants to CPT that:

(a)     BI LLC is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Louisiana, having all powers required to carry on its business and to enter into and carry out the transactions contemplated by this Agreement.

(b)     BI LLC has taken all action necessary to authorize the execution and delivery of this Agreement and to authorize the consummation of the transactions contemplated hereby and the performance of its obligations hereunder.

(c)     This Agreement imposes legal and binding obligations on BI LLC, enforceable in accordance with its terms.

6.     **No Extinguishment or Merger; Subsequent Foreclosure.**

(a)     **No Extinguishment.** Notwithstanding the releases granted by BI LLC/Ballengee in Section 2(c) and the other transactions contemplated by this Agreement, the Unsecured Note and the Deed of Trust to Secure Assumption are to remain in full force and effect after the Conveyance Transactions have been consummated.

(b)     **No Merger.** The interest of BI LLC in the Project after the Conveyance Transactions have been consummated do not merge with the interest of BI LLC in the Project under the Deed of Trust to Secure Assumption. It is the express intention of each of the Parties (and the Conveyance Documents so recite) that the interest of BI LLC in the Project under the Deed of Trust to Secure Assumption, on the one hand, and the interest of BI LLC in the Project under the Conveyance Documents, on the other hand, do not merge, but are and will remain at all times separate and distinct, and that the liens and the security interests of BI LLC in the Project created by the Deed of Trust to Secure Assumption remain at all times valid and continuous liens and security interests on the Project.

(c)     **Subsequent Foreclosure.** Nothing in this Agreement will be deemed to waive or release any rights to void the Deed that BI LLC may have under Texas Property Code §51.006 ("**§51.006**"). BI LLC is relying on CPT to disclose to BI LLC all liens or encumbrances affecting the Project that may exist as of the Effective Date and BI LLC would not have entered into this Agreement if it could not so rely upon CPT. To the extent that BI LLC, in its sole discretion, elects to exercise its rights under §51.006, CPT will execute any instrument necessary or appropriate, as determined by BI LLC in its sole discretion, to effect a foreclosure under the Deed of Trust to Secure Assumption as contemplated in §51.006.

6

MR.822

7.     **Reinstatement.** If at any time this Agreement or the conveyance and transfer of the Project to BI LLC under the Conveyance Documents are restrained, enjoined, set aside, avoided or held to be invalid or unenforceable for any reason, in a bankruptcy proceeding or otherwise, then the CPT Obligations automatically will be reinstated and all of the respective rights, privileges and duties of each of CPT and BI LLC/Ballengee related to the CPT Obligations will be reinstated. CPT will not seek to restrain, enjoin, upset, disturb, set aside, avoid, or otherwise overturn any portion of this Agreement or the conveyance and transfer of the Project to BI LLC under the Conveyance Documents, and CPT hereby waives any rights it may have to restrain, enjoin, upset, disturb, set aside, avoid or otherwise overturn this Agreement or the conveyance and transfer of the Project to BI LLC under the Conveyance Documents.

8.     **Miscellaneous.**

(a)     **Notices.** Any notices or requests hereunder must be in writing and mailed by certified or registered mail, return receipt requested, postage prepaid, or delivered by Federal Express or any similar overnight air courier service, addressed to BI LLC/Ballengee or CPT as follows:

| If to BI LLC/Ballengee: | Two Turtle Creek<br>3838 Oak Lawn Avenue, Suite 1150<br>Dallas, Texas 75219 |
|---|---|
| If to CPT: | 17950 Preston Road, Suite 1080<br>Dallas, Texas 75252 |

or to such other addresses as may be designated from time to time by BI LLC/Ballengee or CPT in accordance with these provisions. Any such notice or request sent in accordance with these provisions will be deemed to have been validly and effectively delivered on the third business day following deposit in United States mail or the first business day following deposit with Federal Express or other similar overnight air courier service. For purposes of this Agreement "business day" means any day on which national banking associations are required and authorized to be open for business.

(b)     **Entire Agreement; No Representations.** This Agreement and the Conveyance Documents, as executed or amended in accordance with this Agreement, constitute the entire understanding and agreement among BI LLC, Ballengee, and CPT with respect to the matters addressed herein and therein and supersede all prior written or oral understandings and agreements of BI LLC, Ballengee, and CPT in connection therewith. None of BI LLC, Ballengee or CPT are relying on any representation, warranty, indemnity or assurance, except for the representations expressed in this Agreement or in any Conveyance Document, in entering into this Agreement and consummating the transactions contemplated hereby. This Agreement, including without limitation all representations, warranties and agreements made herein, will survive and continue to be in full force and effect following the execution of the Conveyance Documents, any modifications and amendments thereto and any other instruments necessary to effectuate the transactions contemplated in this Agreement.

7

MR.823

(c) **Severability.** Except as set forth in Section 7 of this Agreement, in case any of the provisions of this Agreement are for any reason by held to be invalid, illegal, or unenforceable, such invalidity, illegality or unenforceability will not affect any other provision of this Agreement, and this Agreement is to be construed as if such invalid, illegal, or unenforceable provision had never been included.

(d) **Costs and Expenses.** BI LLC will pay all costs and expenses relating to this Agreement and the consummation of the transactions contemplated in this Agreement, including but not limited to recording costs, title search fees and costs, and any other matters arising in connection herewith; provided, however, that each of BI LLC/Ballengee and CPT will bear and pay the fees and expenses of its own legal counsel.

(e) **APPLICABLE LAW.** THIS AGREEMENT IS GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS AND THE LAWS OF THE UNITED STATES APPLICABLE TO TRANSACTIONS WITHIN THE STATE OF TEXAS.

(f) **Successors and Assigns.** The covenants and obligations contained in this Agreement bind, and the benefits and advantages inure to, the respective heirs, personal representatives, successors, and assigns of BI LLC, Ballengee, and CPT.

(g) **Exhibits.** The following exhibits to this Agreement are incorporated herein and made a part hereof:

A — Legal Description
B — Deed
C — General Assignment

(h) **Multiple Counterparts.** This Agreement may be executed in multiple counterparts, each of which constitutes an original, but all of which together constitute one agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]

8

MR.824

**CPT:**

CENTURION PECOS TERMINAL LLC,
a Texas limited liability company

By: _____

Name: _JOH___CAR_C_____

Title: _PRESIDENT_____

MR.825

EXECUTED as of the Effective Date.

**BI LLC:**

BALLENGEE INTERESTS, LLC,
a Louisiana limited liability company.

By: _____

James H. Ballengee, Manager

**BALLENGEE:**

_____

JAMES H. BALLENGEE

MR.826

## EXHIBIT A

## LEGAL DESCRIPTION

BEING a tract of land located in Section 76, Block 4, H&GN Survey, Reeves County, Texas, and being a part of a called 496.76 GRID (496.87 Surface) acre tract of land as described in a Deed recorded in Volume 905, Page 155, Official Public Records, Reeves County, Texas (O.P.R.R.C.T.), and being more particularly described as follows:

BEGINNING at a 5/8 inch iron rod set with cap stamped "TRANS TEXAS SURVEYING" for the Northwest corner of said Section 76, the Southwest corner of said Section 75, the Northeast corner of Section 77 and the Southeast corner of Section 78, said 5/8 inch iron rod set also being in the intersection of County Road No. 408 and County Road No. 404;

THENCE North 58 degrees 03 minutes 46 seconds East, with the common line of said Section 76 and Section 75, a distance of 2639.85 feet to a point in the East line of said 496.76 acre tract from which a 1/2 inch iron rod found with cap stamped "5358 TRUJILLO" bears South 58 degrees 03 minutes 46 seconds West, a distance of 0.63 feet, also from which a 1/2 inch iron rod found at the Northeast corner of said Section 76, Block 4, bears North 58 degrees 03 minutes 46 seconds East, a distance of 2639.85 feet;

THENCE South 32 degrees 08 minutes 23 seconds East, with the East line of said 496.76 acre tract, a distance of 3187.68 feet to a 5/8 inch iron rod set with cap stamped "TRANS TEXAS SURVEYING" for the Southeast corner of said 496.76 acre tract being 100 feet North of the centerline of the Texas & Pacific Railroad;

THENCE South 69 degrees 42 minutes 22 seconds West, with the South line of said 496.76 acre tract and 100 feet North of and parallel with the centerline of said Texas & Pacific Railroad, a distance of 2697.40 feet to a point in said County Road No. 408, the West line of said Section 76 and the East line of Section 77, Block 4, from which a 60D nail found bears South 69 degrees 42 minutes 22 seconds West, a distance of 0.37 feet, also from which a 1/2 inch iron rod found for the Southwest corner of said Section 76, Block 4, bears South 32 degrees 08 minutes 13 seconds East, a distance of 2657.42 feet;

THENCE North 32 degrees 08 minutes 13 seconds West, with the West line of said 496.76 acre tract and with the common line of said Section 76 and said Section 77, a distance of 2643.29 feet to the PLACE OF BEGINNING and CONTAINING 176.659 acres of land.

MR.827

Exhibit "HH"

MR.828

## RELEASE AND CONVEYANCE AGREEMENT

THIS RELEASE AND CONVEYANCE AGREEMENT (this "**Agreement**") is entered into as of May 26, 2016 (the "**Effective Date**") by and among BALLENGEE INTERESTS, LLC, a Louisiana limited liability company ("**BI LLC**"), JAMES H. BALLENGEE ("**Ballengee**"), and CENTURION PECOS TERMINAL LLC, a Texas limited liability company ("**CPT**"), on the following terms and conditions:

### RECITALS:

A.     CPT owns the land in Reeves County, Texas that is described on Exhibit A attached hereto, together with the improvements and any personalty located on such land (collectively, the "**Project**").

B.     In order to finance CPT's acquisition of the Project, BI LLC secured a loan from Texas Capital Bank, National Association ("**TCB**") in the amount of $1,500,000.00 (as amended and extended to date, the "**TCB Loan**"), as evidenced and/or secured in part by that (1) Business Loan Agreement dated August 17, 2015 between BI LLC and TCB (the "**Loan Agreement**"), (2) Promissory Note dated August 17, 2015 in the stated principal amount of $1,500,000.00, executed by BI LLC, bearing interest and being payable to the order of TCB as therein provided (the "**TCB Note**"), (3) Deed of Trust dated August 17, 2015, executed by CPT and recorded as Document No. 15-07672 of the Real Property Records of Reeves County, Texas and encumbering the Project (the "**TCB Deed of Trust**"), and (4) Commercial Guaranty dated August 17, 2015 executed by Ballengee.

C.     In order to provide that, as between CPT, on the one hand, and BI LLC and Ballengee (together "**BI LLC/Ballengee**"), on the other hand, CPT would be ultimately liable for the purchase money financing for the Project, CPT issued to BI LLC an Unsecured Promissory Note on August 17, 2015 in the stated principal amount of $1,500,000.00, bearing interest and being payable to the order of BI LLC as therein provided (the "**Unsecured Note**").

D.     Clause (d) of Section 3 of the Unsecured Note contemplates that CPT would make timely payments of interest due on the TCB Loan.

E.     On April 6, 2016, BI LLC/Ballengee, CPT, and TCB entered into an Assumption Agreement (herein so called) related to the TCB Loan wherein, among other things, CPT (i) assumed the obligation to pay and perform all of the obligations of BI LLC under the TCB Note and the Loan Agreement and (ii) agreed to indemnify BI LLC or Ballengee, as the case may be, for any amounts required by TCB to be paid by BI LLC or by Ballengee, as the case may be, under the TCB Note or the Loan Agreement from and after the effective date of the Assumption Agreement.

F.     In order to secure CPT's obligations described in clauses (i) and (ii) of the foregoing Recital paragraph E (collectively, the "**Assumption Obligations**"), CPT executed a

1



EXHIBIT
9
MR.829

Deed of Trust to Secure Assumption against the Project dated April 6, 2016 that is expressly subordinate to the TCB Deed of Trust and is recorded in Volume 1259, Page 370 of the Real Property Records of Reeves County, Texas (the "**Deed of Trust to Secure Assumption**").

G.     CPT failed to make the requisite interest payments on the TCB Loan for the months of April and May 2016 and, as a result, BI LLC sent written notice to CPT on May 25, 2016 that the entire unpaid principal balance of the Unsecured Note, together with interest accrued and unpaid thereon (together, the "**Unsecured Note Indebtedness**"), was immediately due and payable.

H.     As of the Effective Date, the amount of the Unsecured Note Indebtedness is $1,593,041.10.

I.     CPT has made an analysis of market conditions affecting the Project and of its own financial condition and ability and has determined (1) that the ownership, operation, and development of the Project is not economically viable and will not be economically viable for CPT within the foreseeable future, (2) that CPT is not financially able to continue to own, operate, and develop the Project or to continue to pay interest on the TCB Loan as it becomes payable, and (3) the value of the Project is less than the amount of the Unsecured Note Indebtedness as of the Effective Date.

J.     CPT and BI LLC have initiated discussions concerning (1) the release of CPT and assumption by BI LLC from and after the Effective Date of the existing responsibilities, obligations, and liabilities of owning, operating, and developing the Project and (2) the release of CPT by BI LLC/Ballengee from the Assumption Obligations, the obligations of CPT under the Deed of Trust to Secure Assumption, and the Unsecured Note Indebtedness (collectively, the "**CPT Obligations**"), subject to certain Retained Liabilities (defined below).

K.     BI LLC/Ballengee and CPT (collectively, the "**Parties**") have entered into this Agreement to provide for the conveyance of the Project to BI LLC in consideration for the release of CPT by BI LLC and by Ballengee (but by Ballengee only to the extent of the Assumption Obligations) from the CPT Obligations and the indemnity of CPT in Section 2(d) herein, all subject to and in accordance with the terms and conditions hereinafter set forth.

### AGREEMENTS:

NOW, THEREFORE, for the mutual premises herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.     **Conveyance of the Project to BI LLC.**

(a)     **Conveyance.** Contemporaneously herewith, CPT will convey all legal and equitable title and interest in and to the Project to BI LLC, subject only to the permitted exceptions set forth in Exhibit B to the Deed (defined below), by executing and delivering to BI LLC the following:

2

MR.830

(1)     Special Warranty Deed (the "**Deed**") in substantially the same form attached hereto as Exhibit B; and

(2)     Assignment of Personal Property, Warranties, and Leases (the "**General Assignment**") in substantially the same form as the form attached hereto as Exhibit C assigning and transferring to BI LLC all personal property, contracts, and warranties comprising the Project and the lessor's interest in any and all leases of the Project (or any portion thereof).

The Deed and the General Assignment, and the conveyances to BI LLC therein (collectively, the "**Conveyance**"), are subject to the TCB Loan and the TCB Deed of Trust and to the Deed of Trust to Secure Assumption. Further, the Conveyance constitutes an absolute conveyance of the Project (and not a deed of trust, security agreement or other security interest of whatever nature), thereby expressly waiving any right, claim, or interest of CPT in any profits that may thereafter accrue or be payable from the ownership, use, lease, sale or other disposition of the Project. The Deed, the General Assignment, and all other documents or instruments executed or delivered in connection with this Agreement (including without limitation any non-foreign tax affidavits or title affidavits necessary or reasonably appropriate to consummate the Conveyance) are hereinafter collectively called the "**Conveyance Documents**."

(b)     **Further Assurances.**  At BI LLC's request, CPT will cooperate with BI LLC and execute such further documents or instruments as reasonably may be required by BI LLC consistent with this Agreement to ensure the orderly Conveyance and transfer of the Project as of the Effective Date.

2.     **No Obligations of BI LLC to Third Parties; CPT's Retained Liabilities; Release of CPT by BI LLC/Ballengee.**

(a)     **No Obligations of BI LLC to Third Parties.**  The acceptance by BI LLC of title to the Project pursuant to this Agreement and the Conveyance Documents does not create any obligations on the part of BI LLC to third parties that have claims of any kind whatsoever against CPT with respect to the Project or with respect to CPT's acquisition, ownership or operation of the Project. BI LLC does not assume or agree to discharge any liabilities pertaining to the Project that accrued prior to the Effective Date. No person not a party to this Agreement has any 'third-party beneficiary' or other rights under this Agreement.

(b)     **Retained Liabilities.**  Notwithstanding anything to the contrary in this Agreement, CPT remains liable for, and is not released from its obligations related to, the following matters (collectively, the "**Retained Liabilities**"):

(1)     any warranty of title to the Project contained in the Conveyance Documents;

(2)     any obligations and liabilities of CPT arising under, or any breach of any representation, warranty, covenant of CPT contained in, this Agreement; and

(3)     any and all claims of third parties described in Section 2(a).

3

MR.831

The Retained Liabilities expressly survive the execution and delivery of this Agreement and the Conveyance Documents.

(c) **Release of CPT by BI LLC/Ballengee.** Effective on the Effective Date, subject in all respects to CPT having executed and delivered to BI LLC on or before the Effective Date all of the Conveyance Documents, and without waiving any of the Retained Liabilities, each of BI LLC and Ballengee (but by Ballengee only to the extent of the Assumption Obligations) hereby release, acquit, and forever discharge CPT and its direct or indirect beneficial owners, directors, officers, agents, servants, employees, attorneys, and representatives (collectively, the "**CPT Released Parties**") of and from any and all of the CPT Obligations and any and all claims, demands, damages, costs, losses, expenses, commissions, actions and causes of action of whatever nature in connection with or arising or to arise from or resulting or to result from or relating to the CPT Obligations. Further, except with respect to any Retained Liabilities, BI LLC will not bring or institute any action or suit in connection with any of the CPT Obligations against any of the CPT Released Parties. Notwithstanding the foregoing, nothing contained in this Agreement releases, reduces, limits, impairs or adversely affects the rights or remedies of BI LLC under the Conveyance Documents or with respect to the Retained Liabilities, including without limitation the right to institute any action or suit against any person other than the CPT Released Parties. This release inures to the benefit of CPT and the other CPT Released Parties and their respective successors and assigns and is binding on BI LLC/Ballengee and their respective heirs, successors, and assigns.

(d) **Indemnity.** Effective on the Effective Date, BI LLC agrees to indemnify, defend and protect the CPT Released Parties from any and all claims of TCB arising out of breach or discharge of the Assumption Obligations.

3. **Release by CPT.** Effective on the Effective Date, CPT, for itself and the other CPT Released Parties, hereby releases, acquits and forever discharges BI LLC and its direct or indirect beneficial owners, directors, officers, agents, servants, employees, attorneys, and representatives (collectively, the "**BI LLC Released Parties**") of and from any and all claims, demands, damages, costs, losses, expenses, commissions, actions and causes of action of whatever nature in connection with or arising or to arise from or resulting or to result from or relating to the TCB Loan, the Unsecured Note, the Assumption Agreement, the Deed of Trust to Secure Assumption or the Project, specifically including any claim of usury. Further, neither CPT nor any of the other CPT Released Parties will institute any action or suit against any of the BI LLC Released Parties in connection with any of the matters for which the BI LLC Released Parties are released pursuant to this Section 3. No promise or inducement for this release has been offered except as may be expressly set forth in this Agreement, and this release is executed without reliance upon any statement or representation of any person or parties released, or their representatives, concerning the nature and extent of the damages and/or the legal liability therefor. This release inures to the benefit of BI LLC/Ballengee and the other BI LLC Released Parties and their respective heirs, successors, and assigns and is binding on the CPT Released Parties and their respective successors and assigns.

4. **CPT's Representations, Warranties and Covenants.** As a material inducement for BI LLC/Ballengee to enter into this Agreement and in recognition that BI LLC/Ballengee are

4

MR.832

relying on the accuracy of the following, CPT represents, warrants and covenants to BI LLC/Ballengee that:

(a)    CPT is entering into this Agreement of its own free will and accord, upon knowledge of the facts, and with the advice of legal counsel of CPT's selection.

(b)    The statements contained in the Recitals to this Agreement are true and correct.

(c)    CPT acknowledges that, upon the delivery of the Deed to BI LLC, CPT will have waived, and does hereby waive, any redemption and cure rights with respect to the Project, and CPT acknowledges that the releases granted to CPT by BI LLC and by Ballengee and the indemnity provided for in Section 2(d) in this Agreement constitute new, fair, and adequate consideration for CPT's waiver of such rights.

(d)    CPT owns the Project in fee simple absolute and, except for the permitted exceptions set forth in Exhibit B to the Deed, there are no existing liens, security interests, encumbrances, agreements, encroachments, special assessments, claims, leases, tenancies, other adverse interests or defects on or affecting the Project.

(e)    The transactions described in this Agreement and in the Conveyance Documents (collectively, the "**Conveyance Transactions**") benefit and are in the best interests of CPT and are being entered into by CPT voluntarily and without undue influence or duress.

(f)    The consideration to be received by CPT in connection with the consummation of the Conveyance Transactions, including payment by BI LLC of ad valorem taxes on the Project through the Effective Date, equals or exceeds the value of the Project as of the Effective Date, and CPT will not take a contrary position in a court of law or otherwise.

(g)    CPT is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Texas, having all powers required to carry on its business and to enter into and carry out the Conveyance Transactions.

(h)    CPT has duly taken all action necessary to authorize the execution and delivery by CPT of this Agreement and the Conveyance Documents and to authorize the consummation of the transactions contemplated thereby and the performance of its obligations thereunder.

(i)    The execution, delivery and performance by CPT of this Agreement and the Conveyance Documents, and the consummation by CPT of the Conveyance Transactions, do not and will not conflict with any provision of (A) to CPT's current actual knowledge, any law, statute, rule or regulation, (B) the organizational documents governing CPT, or (C) any agreement, judgment, license, order or permit applicable to or binding upon CPT or the Project. No consent, approval, authorization or order of, and no notice to or filing with, any court or governmental authority or third party is required in connection with the execution, delivery or performance by CPT of this Agreement or any Conveyance Document or to consummate any of the Conveyance Transactions.

5

MR.833

(j)    This Agreement and the Conveyance Documents are legal, valid and binding obligations of CPT, enforceable in accordance with their respective terms.

CPT will indemnify and hold BI LLC harmless from and against any loss, damage, cost or expense, including without limitation attorneys' fees and expenses, incurred by BI LLC as a direct or indirect result of any breach by CPT of any representations, warranties or covenants contained in this Agreement or in any of the Conveyance Documents, all of which survive the execution and delivery of this Agreement and the Conveyance Documents.

5.    **BI LLC's Representations and Warranties**.  BI LLC represents and warrants to CPT that:

(a)    BI LLC is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Louisiana, having all powers required to carry on its business and to enter into and carry out the transactions contemplated by this Agreement.

(b)    BI LLC has taken all action necessary to authorize the execution and delivery of this Agreement and to authorize the consummation of the transactions contemplated hereby and the performance of its obligations hereunder.

(c)    This Agreement imposes legal and binding obligations on BI LLC, enforceable in accordance with its terms.

6.    **No Extinguishment or Merger; Subsequent Foreclosure**.

(a)    **No Extinguishment**.  Notwithstanding the releases granted by BI LLC/Ballengee in Section 2(c) and the other transactions contemplated by this Agreement, the Unsecured Note and the Deed of Trust to Secure Assumption are to remain in full force and effect after the Conveyance Transactions have been consummated.

(b)    **No Merger**.  The interest of BI LLC in the Project after the Conveyance Transactions have been consummated do not merge with the interest of BI LLC in the Project under the Deed of Trust to Secure Assumption.  It is the express intention of each of the Parties (and the Conveyance Documents so recite) that the interest of BI LLC in the Project under the Deed of Trust to Secure Assumption, on the one hand, and the interest of BI LLC in the Project under the Conveyance Documents, on the other hand, do not merge, but are and will remain at all times separate and distinct, and that the liens and the security interests of BI LLC in the Project created by the Deed of Trust to Secure Assumption remain at all times valid and continuous liens and security interests on the Project.

(c)    **Subsequent Foreclosure**.  Nothing in this Agreement will be deemed to waive or release any rights to void the Deed that BI LLC may have under Texas Property Code §51.006 ("**§51.006**").  BI LLC is relying on CPT to disclose to BI LLC all liens or encumbrances affecting the Project that may exist as of the Effective Date and BI LLC would not have entered into this Agreement if it could not so rely upon CPT.  To the extent that BI LLC, in its sole discretion, elects to exercise its rights under §51.006, CPT will execute any instrument necessary or appropriate, as determined by BI LLC in its sole discretion, to effect a foreclosure under the Deed of Trust to Secure Assumption as contemplated in §51.006.

6

MR.834

7.     **Reinstatement**. If at any time this Agreement or the conveyance and transfer of the Project to BI LLC under the Conveyance Documents are restrained, enjoined, set aside, avoided or held to be invalid or unenforceable for any reason, in a bankruptcy proceeding or otherwise, then the CPT Obligations automatically will be reinstated and all of the respective rights, privileges and duties of each of CPT and BI LLC/Ballengee related to the CPT Obligations will be reinstated. CPT will not seek to restrain, enjoin, upset, disturb, set aside, avoid, or otherwise overturn any portion of this Agreement or the conveyance and transfer of the Project to BI LLC under the Conveyance Documents, and CPT hereby waives any rights it may have to restrain, enjoin, upset, disturb, set aside, avoid or otherwise overturn this Agreement or the conveyance and transfer of the Project to BI LLC under the Conveyance Documents.

8.     **Miscellaneous**.

(a)     **Notices**. Any notices or requests hereunder must be in writing and mailed by certified or registered mail, return receipt requested, postage prepaid, or delivered by Federal Express or any similar overnight air courier service, addressed to BI LLC/Ballengee or CPT as follows:

If to BI LLC/Ballengee:          Two Turtle Creek
                                 3838 Oak Lawn Avenue, Suite 1150
                                 Dallas, Texas 75219

If to CPT:                       17950 Preston Road, Suite 1080
                                 Dallas, Texas 75252

or to such other addresses as may be designated from time to time by BI LLC/Ballengee or CPT in accordance with these provisions. Any such notice or request sent in accordance with these provisions will be deemed to have been validly and effectively delivered on the third business day following deposit in United States mail or the first business day following deposit with Federal Express or other similar overnight air courier service. For purposes of this Agreement "business day" means any day on which national banking associations are required and authorized to be open for business.

(b)     **Entire Agreement; No Representations**. This Agreement and the Conveyance Documents, as executed or amended in accordance with this Agreement, constitute the entire understanding and agreement among BI LLC, Ballengee, and CPT with respect to the matters addressed herein and therein and supersede all prior written or oral understandings and agreements of BI LLC, Ballengee, and CPT in connection therewith. None of BI LLC, Ballengee or CPT are relying on any representation, warranty, indemnity or assurance, except for the representations expressed in this Agreement or in any Conveyance Document, in entering into this Agreement and consummating the transactions contemplated hereby. This Agreement, including without limitation all representations, warranties and agreements made herein, will survive and continue to be in full force and effect following the execution of the Conveyance Documents, any modifications and amendments thereto and any other instruments necessary to effectuate the transactions contemplated in this Agreement.

7

MR.835

(c)     **Severability.** Except as set forth in Section 7 of this Agreement, in case any of the provisions of this Agreement are for any reason by held to be invalid, illegal, or unenforceable, such invalidity, illegality or unenforceability will not affect any other provision of this Agreement, and this Agreement is to be construed as if such invalid, illegal, or unenforceable provision had never been included.

(d)     **Costs and Expenses.** BI LLC will pay all costs and expenses relating to this Agreement and the consummation of the transactions contemplated in this Agreement, including but not limited to recording costs, title search fees and costs, and any other matters arising in connection herewith; provided, however, that each of BI LLC/Ballengee and CPT will bear and pay the fees and expenses of its own legal counsel.

(e)     **APPLICABLE LAW.** THIS AGREEMENT IS GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS AND THE LAWS OF THE UNITED STATES APPLICABLE TO TRANSACTIONS WITHIN THE STATE OF TEXAS.

(f)     **Successors and Assigns.** The covenants and obligations contained in this Agreement bind, and the benefits and advantages inure to, the respective heirs, personal representatives, successors, and assigns of BI LLC, Ballengee, and CPT.

(g)     **Exhibits.** The following exhibits to this Agreement are incorporated herein and made a part hereof:

A — Legal Description
B — Deed
C — General Assignment

(h)     **Multiple Counterparts.** This Agreement may be executed in multiple counterparts, each of which constitutes an original, but all of which together constitute one agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]

8

MR.836

EXECUTED as of the Effective Date.

**BI LLC:**

BALLENGEE INTERESTS, LLC,
a Louisiana limited liability company

By: _____
James H. Ballengee, Manager

**BALLENGEE:**

_____
JAMES H. BALLENGEE

MR.837

**CPT:**

**CENTURION PECOS TERMINAL LLC,**
a Texas limited liability company

By: _____

Name: _____

Title: _____

MR.838

## EXHIBIT A

## LEGAL DESCRIPTION

BEING A TRACT OF LAND LOCATED IN SECTIONS 73 AND 76, BLOCK 4, H&GN RAILROAD COMPANY SURVEY, REEVES COUNTY, TEXAS, AND BEING COMPOSED OF THE FOLLOWING: A PART OF A CALLED 84.2 ACRE TRACT OF LAND AS DESCRIBED IN A DEED RECORDED IN VOLUME 860, PAGE 82, OFFICIAL PUBLIC RECORDS, REEVES COUNTY, TEXAS (O.P.R.R.C.T.); A PART OF THE NORTHWEST QUARTER OF SAID SECTION 73 AS DESCRIBED IN A DEED RECORDED IN VOLUME 825, PAGE 784 OF SAID O.P.R.R.C.T.; AND ALL OF A CALLED 109.58 ACRE TRACT OF LAND AS DESCRIBED IN A DEED RECORDED IN VOLUME 1080, PAGE 17 OF SAID O.P.R.R.C.T., AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A 5/8" IRON ROD FOUND WITH CAP STAMPED "TRANS TEXAS SURVEYING" IN THE NORTH LINE OF THE T&P RAILROAD COMPANY RIGHT-OF-WAY AT THE SOUTHWEST CORNER OF THE SAID 109.58 ACRE TRACT AND THE SOUTHEAST CORNER OF THAT 176.659 ACRE TRACT OF LAND AS DESCRIBED IN A DEED RECORDED IN INST. No. 14-03664 OF SAID O.P.R.R.C.T. FOR THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE N 32°08'23" W, WITH THE WEST LINE OF THE SAID 109.58 ACRE TRACT AND THE EAST LINE OF THE SAID 176.659 ACRE TRACT, A DISTANCE OF 1537.04 FEET TO A POINT FOR THE NORTHWEST CORNER OF THE SAID 109.58 ACRE TRACT AND THE SOUTHWEST CORNER OF THAT 100.00 ACRE TRACT OF LAND DESCRIBED AS A SAVE AND EXCEPT TRACT IN A DEED RECORDED IN VOLUME 1006, PAGE 1 OF SAID O.P.R.R.C.T. FOR THE MOST SOUTHERLY NORTHWEST CORNER OF THE HEREIN DESCRIBED TRACT FROM WHICH A 1/2" IRON ROD FOUND WITH CAP STAMPED "TRUJILLO RPLS 5358" BEARS S 58°03'30" W A DISTANCE OF 0.91 FEET;

THENCE N 58°03'30" E, WITH THE NORTH LINE OF THE SAID 109.58 ACRE TRACT AND THE SOUTH OF THE SAID 100.00 ACRE TRACT, AT A DISTANCE OF 2639.42 FEET PASSING A 1/2" IRON ROD FOUND WITH CAP STAMPED "TRUJILLO RPLS 5358", IN ALL A TOTAL DISTANCE OF 2639.92 FEET TO A POINT IN THE COMMON LINE OF SAID SECTION 76 AND SAID SECTION 73 FOR THE NORTHEAST CORNER OF THE SAID 109.58 ACRE TRACT AND THE SOUTHEAST CORNER OF THE SAID 100.00 ACRE TRACT, BEING ALSO THE SOUTHWEST CORNER OF A 20.000 ACRE TRACT OF LAND THIS DATE SURVEYED;

THENCE CROSSING THE NORTHWEST QUARTER OF SAID SECTION 73 WITH THE SOUTH AND EAST LINE OF THE SAID 20.000 ACRE TRACT OF LAND THIS DATE SURVEYED, THE FOLLOWING BEARING AND DISTANCES:

N 58°03'30" E, A DISTANCE OF 527.87 FEET TO A 5/8" IRON ROD SET WITH CAP STAMPED "TRANS TEXAS SURVEYING" FOR THE SOUTHEAST CORNER OF THE

A-1

MR.839

SAID 20.000 ACRE TRACT AND AN INTERIOR CORNER OF THE HEREIN DESCRIBED TRACT;

N 32°08'32" W, A DISTANCE OF 1650.40 FEET TO A 5/8" IRON ROD SET WITH CAP STAMPED "TRANS TEXAS SURVEYING" IN THE COMMON LINE OF SAID SECTION 73 AND SECTION 74 OF SAID BLOCK 4, H&GN RAILROAD COMPANY SURVEY AND THE SOUTH LINE OF COUNTY ROAD NO. 404 FOR THE NORTHEAST CORNER OF THE SAID 20.000 ACRE TRACT AND THE MOST NORTHERLY NORTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE N 58°03'46" E, WITH THE COMMON LINE OF SAID SECTION 73 AND SAID SECTION 74 AND THE SOUTH LINE OF SAID COUNTY ROAD NO. 404, PASSING AT A DISTANCE OF 2034.62 FEET A 5/8" IRON ROD SET WITH CAP STAMPED "TRANS TEXAS SURVEYING" IN THE WEST RIGHT-OF-WAY LINE OF F.M. HIGHWAY NO. 2119, IN ALL A TOTAL DISTANCE OF 2117.21 FEET TO A POINT FOR THE NORTHEAST CORNER OF SAID NORTHWEST QUARTER AND THE NORTHWEST CORNER OF THE NORTHEAST QUARTER OF SAID SECTION 73 AND FOR THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT, FROM WHICH A 1/2" IRON ROD FOUND WITH CAP AT THE NORTHEAST CORNER OF SAID SECTION 73 BEARS N 58°03'46" E, A DISTANCE OF 2645.08 FEET;

THENCE S 32°08'42" E, WITH THE EAST LINE OF THE SAID NORTHWEST QUARTER AND THE WEST LINE OF THE SAID NORTHEAST QUARTER OF SAID SECTION 73, A DISTANCE OF 2645.36 FEET TO A POINT FOR THE FOR THE SOUTHEAST CORNER OF THE SAID NORTHWEST QUARTER AND THE SOUTHWEST CORNER OF THE SAID SOUTHEAST QUARTER OF SAID SECTION 73 AND BEING IN THE NORTH LINE OF THE SOUTH HALF OF SAID SECTION 73 AND THE NORTH LINE OF A CALLED 120 ACRE TRACT OF LAND DESCRIBED IN A DEED RECORDED IN VOLUME 122, PAGE 521, DEED RECORDS OF REEVES COUNTY, TEXAS FOR THE MOST NORTHERLY SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE S 58°01'36" W, WITH THE SOUTH LINE OF THE SAID NORTHWEST QUARTER AND THE NORTH LINE OF THE SAID 120 ACRE TRACT, A DISTANCE OF 13.20 FEET TO A POINT FOR THE NORTHEAST CORNER OF THE SAID 84.2 ACRE TRACT AND THE NORTHWEST CORNER OF THE SAID 120 ACRE TRACT FOR AN INTERIOR CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE S 32°08'42" E, WITH THE EAST LINE OF THE SAID 84.2 ACRE TRACT AND THE WEST LINE OF THE SAID 120 ACRE TRACT A DISTANCE OF 1.61 FEET TO A POINT FOR THE NORTHEAST CORNER OF A 33.000 ACRE TRACT THIS DATE SURVEYED AND A SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE CROSSING THE SAID 84.2 ACRE TRACT WITH THE NORTH AND WEST LINE OF THE SAID 33.000 ACRE TRACT OF LAND THIS DATE SURVEYED, THE FOLLOWING BEARING AND DISTANCES:

A-2

S 58°03'32" W, AT A DISTANCE OF 61.35 FEET PASSING A 1/2" IRON ROD FOUND WITH CAP STAMPED "TRUJILLO RPLS 5358", AT A DISTANCE OF 61.51 FEET PASSING THE WEST RIGHT-OF-WAY LINE OF SAID F.M. HIGHWAY NO. 2119, IN ALL A TOTAL DISTANCE OF 933.83 FEET TO A 5/8' IRON ROD SET FOR THE NORTHWEST CORNER OF THE SAID 33.000 ACRE TRACT AND AN INTERIOR CORNER OF THE HEREIN DESCRIBED TRACT;

S 31°43'00" E, A DISTANCE OF 1432.68 FEET TO A 5/8" IRON ROD SET IN THE NORTH LINE OF THE SAID T&P RAILROAD RIGHT-OF-WAY FOR THE SOUTHWEST CORNER OF THE SAID 33.000 ACRE TRACT AND THE MOST SOUTHERLY SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE S 69°42'07" W, WITH THE NORTH LINE OF THE SAID T&P RAILROAD COMPANY RIGHT-OF-WAY, A DISTANCE OF 4421.63 FEET TO THE PLACE OF BEGINNING AND CONTAINING 299.325 ACRES OF LAND.

MR.841

Exhibit "II"

MR.842

## ASSIGNMENT OF PERSONAL PROPERTY, WARRANTIES AND LEASES

STATE OF TEXAS       §
                                §

COUNTY OF REEVES     §

        CENTURION PECOS TERMINAL LLC, a Texas limited liability company ("**Grantor**"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, has Granted, Sold, Assigned, Transferred, Conveyed, and Delivered and does by these presents Grant, Sell, Assign, Transfer, Convey and Deliver unto BALLENGEE INTERESTS, LLC, a Louisiana limited liability company ("**Grantee**"), all of Grantor's rights, titles, and interests in and to the following described properties located on, affixed to, and/or arising or used in connection with the tract of land in Reeves County, Texas that is more particularly described on Exhibit A attached hereto and made a part hereof for all purposes (the "**Land**"):

        1.      All fixtures, equipment, machinery, building materials, furniture, furnishings, and other personal property, tangible or intangible, owned by Grantor (the "**Personal Property**"), and located on, attached to, or used in connection with the operation and maintenance of the Land;

        2.      Any leases for all or any portion of the Land (the "**Leases**"), together with security and other deposits owned or held by Grantor pursuant to the Leases; and

        3.      Any assignable warranties and guaranties relating to the Land and/or the Personal Property (collectively, the "**Warranties**").

        This Assignment may be executed in multiple counterparts, each of which constitutes an original, but all of which together constitute one agreement.

        IN WITNESS WHEREOF, Grantor and Grantee have executed this Assignment of Personal Property, Warranties and Leases as of May 26, 2016.

*[Remainder of page intentionally left blank.]*



EXHIBIT

12

MR.843

**GRANTOR:**

CENTURION PECOS TERMINAL LLC,
a Texas limited liability company

By: _____

Name: _____

Title: _____

**GRANTEE:**

BALLENGEE INTERESTS, LLC,
a Louisiana limited liability company

By: _____
     James H. Ballengee, Manager

Exhibit A – Legal Description of the Land

2

MR.844

**GRANTOR:**

CENTURION PECOS TERMINAL LLC,
a Texas limited liability company

By: _____

Name: _____

Title: _____

**GRANTEE:**

BALLENGEE INTERESTS, LLC,
a Louisiana limited liability company

By: _____
James H. Ballengee, Manager

Exhibit A – Legal Description of the Land

2

MR.845

Exhibit A
To
General Assignment

BEING a tract of land located in Section 76, Block 4, H&GN Survey, Reeves County, Texas, and being a part of a called 496.76 GRID (496.87 Surface) acre tract of land as described in a Deed recorded in Volume 905, Page 155, Official Public Records, Reeves County, Texas (O.P.R.R.C.T.), and being more particularly described as follows:

BEGINNING at a 5/8 inch iron rod set with cap stamped "TRANS TEXAS SURVEYING" for the Northwest corner of said Section 76, the Southwest corner of said Section 75, the Northeast corner of Section 77 and the Southeast corner of Section 78, said 5/8 inch iron rod set also being in the intersection of County Road No. 408 and County Road No. 404;

THENCE North 58 degrees 03 minutes 46 seconds East, with the common line of said Section 76 and Section 75, a distance of 2639.85 feet to a point in the East line of said 496.76 acre tract from which a 1/2 inch iron rod found with cap stamped "5358 TRUJILLO" bears South 58 degrees 03 minutes 46 seconds West, a distance of 0.63 feet, also from which a 1/2 inch iron rod found at the Northeast corner of said Section 76, Block 4, bears North 58 degrees 03 minutes 46 seconds East, a distance of 2639.85 feet;

THENCE South 32 degrees 08 minutes 23 seconds East, with the East line of said 496.76 acre tract, a distance of 3187.68 feet to a 5/8 inch iron rod set with cap stamped "TRANS TEXAS SURVEYING" for the Southeast corner of said 496.76 acre tract being 100 feet North of the centerline of the Texas & Pacific Railroad;

THENCE South 69 degrees 42 minutes 22 seconds West, with the South line of said 496.76 acre tract and 100 feet North of and parallel with the centerline of said Texas & Pacific Railroad, a distance of 2697.40 feet to a point in said County Road No. 408, the West line of said Section 76 and the East line of Section 77, Block 4, from which a 60D nail found bears South 69 degrees 42 minutes 22 seconds West, a distance of 0.37 feet, also from which a 1/2 inch iron rod found for the Southwest corner of said Section 76, Block 4, bears South 32 degrees 08 minutes 13 seconds East, a distance of 2657.42 feet;

THENCE North 32 degrees 08 minutes 13 seconds West, with the West line of said 496.76 acre tract and with the common line of said Section 76 and said Section 77, a distance of 2643.29 feet to the PLACE OF BEGINNING and CONTAINING 176.659 acres of land.

MR.846

Exhibit "JJ"

MR.847

## ASSIGNMENT OF PERSONAL PROPERTY, WARRANTIES AND LEASES

STATE OF TEXAS       §
§
COUNTY OF REEVES    §

CENTURION PECOS TERMINAL LLC, a Texas limited liability company ("**Grantor**"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, has Granted, Sold, Assigned, Transferred, Conveyed, and Delivered and does by these presents Grant, Sell, Assign, Transfer, Convey and Deliver unto BALLENGEE INTERESTS, LLC, a Louisiana limited liability company ("**Grantee**"), all of Grantor's rights, titles, and interests in and to the following described properties located on, affixed to, and/or arising or used in connection with the tract of land in Reeves County, Texas that is more particularly described on Exhibit A attached hereto and made a part hereof for all purposes (the "**Land**"):

1. All fixtures, equipment, machinery, building materials, furniture, furnishings, and other personal property, tangible or intangible, owned by Grantor (the "**Personal Property**"), and located on, attached to, or used in connection with the operation and maintenance of the Land;

2. Any leases for all or any portion of the Land (the "**Leases**"), together with security and other deposits owned or held by Grantor pursuant to the Leases; and

3. Any assignable warranties and guaranties relating to the Land and/or the Personal Property (collectively, the "**Warranties**").

This Assignment may be executed in multiple counterparts, each of which constitutes an original, but all of which together constitute one agreement.

IN WITNESS WHEREOF, Grantor and Grantee have executed this Assignment of Personal Property, Warranties and Leases as of May 26, 2016.

*[Remainder of page intentionally left blank.]*



EXHIBIT

10

**GRANTOR:**

CENTURION PECOS TERMINAL LLC,
a Texas limited liability company

By: _____

Name: _____

Title: _____

**GRANTEE:**

BALLENGEE INTERESTS, LLC,
a Louisiana limited liability company

By: _____
    James H. Ballengee, Manager

Exhibit A – Legal Description of the Land

2

MR.849

**GRANTOR:**

CENTURION PECOS TERMINAL LLC,
a Texas limited liability company

By: _____

Name: _____

Title: _____

**GRANTEE:**

BALLENGEE INTERESTS, LLC,
a Louisiana limited liability company

By: _____
James H. Ballengee, Manager

Exhibit A – Legal Description of the Land

2

MR.850

Exhibit A
To
General Assignment

BEING A TRACT OF LAND LOCATED IN SECTIONS 73 AND 76, BLOCK 4, H&GN RAILROAD COMPANY SURVEY, REEVES COUNTY, TEXAS, AND BEING COMPOSED OF THE FOLLOWING: A PART OF A CALLED 84.2 ACRE TRACT OF LAND AS DESCRIBED IN A DEED RECORDED IN VOLUME 860, PAGE 82, OFFICIAL PUBLIC RECORDS, REEVES COUNTY, TEXAS (O.P.R.R.C.T.); A PART OF THE NORTHWEST QUARTER OF SAID SECTION 73 AS DESCRIBED IN A DEED RECORDED IN VOLUME 825, PAGE 784 OF SAID O.P.R.R.C.T.; AND ALL OF A CALLED 109.58 ACRE TRACT OF LAND AS DESCRIBED IN A DEED RECORDED IN VOLUME 1080, PAGE 17 OF SAID O.P.R.R.C.T., AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A 5/8" IRON ROD FOUND WITH CAP STAMPED "TRANS TEXAS SURVEYING" IN THE NORTH LINE OF THE T&P RAILROAD COMPANY RIGHT-OF-WAY AT THE SOUTHWEST CORNER OF THE SAID 109.58 ACRE TRACT AND THE SOUTHEAST CORNER OF THAT 176.659 ACRE TRACT OF LAND AS DESCRIBED IN A DEED RECORDED IN INST. No. 14-03664 OF SAID O.P.R.R.C.T. FOR THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE N 32°08'23" W, WITH THE WEST LINE OF THE SAID 109.58 ACRE TRACT AND THE EAST LINE OF THE SAID 176.659 ACRE TRACT, A DISTANCE OF 1537.04 FEET TO A POINT FOR THE NORTHWEST CORNER OF THE SAID 109.58 ACRE TRACT AND THE SOUTHWEST CORNER OF THAT 100.00 ACRE TRACT OF LAND DESCRIBED AS A SAVE AND EXCEPT TRACT IN A DEED RECORDED IN VOLUME 1006, PAGE 1 OF SAID O.P.R.R.C.T. FOR THE MOST SOUTHERLY NORTHWEST CORNER OF THE HEREIN DESCRIBED TRACT FROM WHICH A 1/2" IRON ROD FOUND WITH CAP STAMPED "TRUJILLO RPLS 5358" BEARS S 58°03'30" W A DISTANCE OF 0.91 FEET;

THENCE N 58°03'30" E, WITH THE NORTH LINE OF THE SAID 109.58 ACRE TRACT AND THE SOUTH OF THE SAID 100.00 ACRE TRACT, AT A DISTANCE OF 2639.42 FEET PASSING A 1/2" IRON ROD FOUND WITH CAP STAMPED "TRUJILLO RPLS 5358", IN ALL A TOTAL DISTANCE OF 2639.92 FEET TO A POINT IN THE COMMON LINE OF SAID SECTION 76 AND SAID SECTION 73 FOR THE NORTHEAST CORNER OF THE SAID 109.58 ACRE TRACT AND THE SOUTHEAST CORNER OF THE SAID 100.00 ACRE TRACT, BEING ALSO THE SOUTHWEST CORNER OF A 20.000 ACRE TRACT OF LAND THIS DATE SURVEYED;

THENCE CROSSING THE NORTHWEST QUARTER OF SAID SECTION 73 WITH THE SOUTH AND EAST LINE OF THE SAID 20.000 ACRE TRACT OF LAND THIS DATE SURVEYED, THE FOLLOWING BEARING AND DISTANCES:

N 58°03'30" E, A DISTANCE OF 527.87 FEET TO A 5/8" IRON ROD SET WITH CAP STAMPED "TRANS TEXAS SURVEYING" FOR THE SOUTHEAST CORNER OF THE SAID 20.000 ACRE TRACT AND AN INTERIOR CORNER OF THE HEREIN DESCRIBED TRACT;

N 32°08'32" W, A DISTANCE OF 1650.40 FEET TO A 5/8" IRON ROD SET WITH CAP STAMPED "TRANS TEXAS SURVEYING" IN THE COMMON LINE OF SAID SECTION 73 AND SECTION 74 OF SAID BLOCK 4, H&GN RAILROAD COMPANY SURVEY AND THE SOUTH LINE OF COUNTY ROAD NO. 404 FOR THE NORTHEAST CORNER OF THE SAID 20.000 ACRE TRACT AND THE MOST NORTHERLY NORTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE N 58°03'46" E, WITH THE COMMON LINE OF SAID SECTION 73 AND SAID SECTION 74 AND THE SOUTH LINE OF SAID COUNTY ROAD NO. 404, PASSING AT A DISTANCE OF 2034.62 FEET A 5/8" IRON ROD SET WITH CAP STAMPED "TRANS TEXAS SURVEYING" IN THE WEST RIGHT-OF-WAY LINE OF F.M. HIGHWAY NO. 2119, IN ALL A TOTAL DISTANCE OF 2117.21 FEET TO A POINT FOR THE NORTHEAST CORNER OF SAID NORTHWEST QUARTER AND THE NORTHWEST CORNER OF THE NORTHEAST QUARTER OF SAID SECTION 73 AND FOR THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT, FROM WHICH A 1/2" IRON ROD FOUND WITH CAP AT THE NORTHEAST CORNER OF SAID SECTION 73 BEARS N 58°03'46" E, A DISTANCE OF 2645.08 FEET;

THENCE S 32°08'42" E, WITH THE EAST LINE OF THE SAID NORTHWEST QUARTER AND THE WEST LINE OF THE SAID NORTHEAST QUARTER OF SAID SECTION 73, A DISTANCE OF 2645.36 FEET TO A POINT FOR THE FOR THE SOUTHEAST CORNER OF THE SAID NORTHWEST QUARTER AND THE SOUTHWEST CORNER OF THE SAID SOUTHEAST QUARTER OF SAID SECTION 73 AND BEING IN THE NORTH LINE OF THE SOUTH HALF OF SAID SECTION 73 AND THE NORTH LINE OF A CALLED 120 ACRE TRACT OF LAND DESCRIBED IN A DEED RECORDED IN VOLUME 122, PAGE 521, DEED RECORDS OF REEVES COUNTY, TEXAS FOR THE MOST NORTHERLY SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE S 58°01'36" W, WITH THE SOUTH LINE OF THE SAID NORTHWEST QUARTER AND THE NORTH LINE OF THE SAID 120 ACRE TRACT, A DISTANCE OF 13.20 FEET TO A POINT FOR THE NORTHEAST CORNER OF THE SAID 84.2 ACRE TRACT AND THE NORTHWEST CORNER OF THE SAID 120 ACRE TRACT FOR AN INTERIOR CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE S 32°08'42" E, WITH THE EAST LINE OF THE SAID 84.2 ACRE TRACT AND THE WEST LINE OF THE SAID 120 ACRE TRACT A DISTANCE OF 1.61 FEET TO A POINT FOR THE NORTHEAST CORNER OF A 33.000 ACRE TRACT THIS DATE SURVEYED AND A SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE CROSSING THE SAID 84.2 ACRE TRACT WITH THE NORTH AND WEST LINE OF THE SAID 33.000 ACRE TRACT OF LAND THIS DATE SURVEYED, THE FOLLOWING BEARING AND DISTANCES:

S 58°03'32" W, AT A DISTANCE OF 61.35 FEET PASSING A 1/2" IRON ROD FOUND WITH CAP STAMPED "TRUJILLO RPLS 5358", AT A DISTANCE OF 61.51 FEET PASSING THE

WEST RIGHT-OF-WAY LINE OF SAID F.M. HIGHWAY NO. 2119, IN ALL A TOTAL DISTANCE OF 933.83 FEET TO A 5/8' IRON ROD SET FOR THE NORTHWEST CORNER OF THE SAID 33.000 ACRE TRACT AND AN INTERIOR CORNER OF THE HEREIN DESCRIBED TRACT;

S 31°43'00" E, A DISTANCE OF 1432.68 FEET TO A 5/8" IRON ROD SET IN THE NORTH LINE OF THE SAID T&P RAILROAD RIGHT-OF-WAY FOR THE SOUTHWEST CORNER OF THE SAID 33.000 ACRE TRACT AND THE MOST SOUTHERLY SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE S 69°42'07" W, WITH THE NORTH LINE OF THE SAID T&P RAILROAD COMPANY RIGHT-OF-WAY, A DISTANCE OF 4421.63 FEET TO THE PLACE OF BEGINNING AND CONTAINING 299.325 ACRES OF LAND.

# Exhibit "KK"

MR.854

HOME ABOUT OPERATIONS NEWS CONTACT CAREERS



# Mission

To provide our customers with the best crude oil marketing, logistics, and processing solutions.

JupiterMLP LLC is a private company that provides crude oil producers and gas plants with off take and logistics solutions. Jupiter's strategically located terminals in the Permian Basin connect to Gulf Coast refining markets by utilizing our trucks and third-party pipelines, with our primary focus being in the

MR.855

Delaware Basin

# OPERATIONS



Click Image to Enlarge



Click Image to Enlarge



Click Image to Enlarge

## WEST TEXAS & NEW MEXICO MARKETING & LOGISTICS

Jupiter is an active first purchaser of both high & low gravity crude and plant condensate in New Mexico and West Texas. Through acquisitions of Permian Crude Transport (PCT), based in Midland, TX, & Remuda Energy Transportation, based in Artesia, NM, Jupiter Transport owns and operates a fleet of crude oil, NGL and water trucks.

Jupiter owns 10 proprietary pipeline injection stations, and the Company has access to an additional 25+ leased pipeline injection stations that provide injection capability to all major pipelines in the Permian Basin.

Beyond the Permian Basin, Jupiter Marketing & Trading buys crude oil and refined products which are sold in both domestic and international markets.

## JUPITER PIPELINE

Jupiter is constructing a 670+ mile, dedicated high gravity crude oil pipeline that originates in Orla, Texas, with additional inject and offtake points at Pecos and Three Rivers, Texas. The pipeline terminates in the Port of Brownsville at the Jupiter Crude Upgrading, Processing and Export Terminal.

- Expected start-up in 4Q 2019
- 46+ API Gravity
- Batch Capable
- Direct connection into the Kinder Morgan's Double Eagle & Kinder Morgan Crude & Condensate Pipeline Systems
- This is the only Permian pipeline with direct access to all three major Texas deep water ports (Houston, Corpus Christi, Brownsville)

## JUPITER CRUDE UPGRADING, PROCESSING & EXPORT TERMINAL

Jupiter is constructing a crude upgrading, processing and export terminal on approximately 270 acres of land located in the Port of Brownsville, Texas. This facility is designed specifically to process and upgrade high gravity crude (46+ API).

**Key Features:**
- Capable of producing Ultra Low Sulfur Diesel (ULSD), gasoline & Atmospheric Gas Oil (AGO)
- Up to 10 million barrels of storage
- Deep water dock access (42 ft draft)
- Fully intermodal solution
  - Pipeline served
  - Ocean going vessels
  - Unit train & manifest rail
  - Truck loading

MR.856

# 4Q 2019
### Projected In-Service Date for Jupiter Pipeline
### & Jupiter Crude Upgrading, Processing & Export Terminal

## NEWS

There are no items in this list

## CONTACT



## Inquiries

For any inquiries, fill out the following form:

Name

Email

Subject

Message

## Dallas Office
15851 Dallas Parkway
Suite 650
Addison, TX 75001

## Houston Office
440 Louisiana Street
Suite 700
Houston, TX 77002

## Midland Office
200 W Illinois Street
Suite 200
Midland, TX 79701

Send

MR.857

CAUSE NO. DC-16-07706

| | | |
|---|---|---|
| CENTURION LOGISTICS LLC, | § | IN THE DISTRICT COURT OF |
| individually and derivatively on behalf of | § | |
| CENTURION PECOS TERMINAL LLC, | § | |
| a Texas Limited Liability Company, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| JAMES BALLENGEE, BALLENGEE | § | |
| INTERESTS, LLC, JOHN CALCE, | § | DALLAS COUNTY, TEXAS |
| STAMPEDE TX ENERGY, LLC, | § | |
| CENTURION MIDSTREAM GROUP, | § | |
| LLC, CENTURION TERMINALS, LLC | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and CENTURION PECOS TERMINAL | § | |
| LLC, a Texas Limited Liability Company | § | |
| | § | |
| Nominal Defendant. | § | 44th JUDICIAL DISTRICT[1] |

JOHN CALCE'S REPLY BRIEF IN SUPPORT OF AMENDED MOTION FOR
PARTIAL SUMMARY JUDGMENT REGARDING COUNTERCLAIM AGAINST
CENTURION LOGISTICS LLC

TO THE HONORABLE COURT:

Defendant/Counter-Plaintiff John Calce ("Calce") files this Reply Brief in support of

Calce's Amended Motion for Partial Summary Judgment (the "Motion") regarding his

Counterclaim against Plaintiff/Counter-Defendant Centurion Logistics LLC ("Centurion

Logistics") and, in support thereof, would respectfully show the Court as follows:

---

[1] On November 8, 2017, after the deadline to add additional parties, Centurion Logistics filed its Motion for Leave to File Amended Petition seeking to add six additional defendants (the "Potential Defendants"). To Calce's knowledge, the Court has not granted Centurion Logistics' request. Notwithstanding the lack of an order granting leave, in its Response, Centurion Logistics added the Potential Defendants to the style of the case. It appears that Centurion Logistics has also caused citation to be issued for the Potential Defendants. Calce objects to Centurion Logistics adding any additional parties without first obtaining leave of Court in accordance with the Scheduling Order.

MR.859

In an effort to cloud a simple issue, Centurion Logistics filed a lengthy Response accompanied by a legion of irrelevant exhibits. The Motion, on the other hand, is straight-forward and supports Calce's right to advancement/reimbursement of his defense costs. The purpose of this Reply is to refocus the issues and clarify some of the misstatements set forth in Centurion Logistics' Response.

**ARGUMENT AND AUTHORITIES**

1. **Calce does not have to show that he is entitled to indemnification to establish his right to advancement/reimbursement of defense costs.**

The right to advancement/reimbursement of expenses and the right to indemnification are separate and distinct legal concepts. *See* the Motion § A; *see also In re Aguilar*, 344 S.W.3d 41, 46 (Tex. App.—El Paso 2011, orig. proceeding) (providing that "[a]lthough the right to indemnification and advancement are correlative, they are separate and distinct legal actions"). In its Response, Centurion Logistics badly conflates the two concepts—specifically with respect to the applicable standards for each.[2]

Centurion Logistics correctly notes that Calce is only entitled to *indemnification* for "Damages arising from any Proceeding relating to the conduct of [Centurion Logistics'] business or to any act or omission by such Indemnified Person within the scope of the Indemnified Person's authority in the course of [Centurion Logistics'] business . . . ."[3] That is the standard

---

[2] Centurion Logistics instructs the Court to employ a duty to defend analysis when determining the Motion. *See, e.g.*, Pl.'s Response ¶ 34. Any discussion regarding the duty to defend is a red herring. Calce is not asking Centurion Logistics to assume his defense. He is seeking enforcement of his contractual entitlement to advancement/reimbursement of his defense costs. The *Aguilar* court did not perform a duty to defend analysis when determining the same issue that is now before the Court. That concept is equally inapplicable here.

[3] *See* the Company Agreement of Centurion Logistics (the "Agreement"), which is attached to the Motion as Exhibit A-1, at Section 6.2.

MR.860

for indemnification. But it is not the standard for advancement/reimbursement of defense costs. Section 6.2 of the Agreement addresses advancement/reimbursement by providing that "[a]n Indemnified Person's expenses paid or incurred in defending itself against any Proceeding shall be reimbursed as paid or incurred."[4] Calce is therefore entitled to reimbursement/advancement of the "expenses" he pays or incurs in defending himself so long as he is an "Indemnified Person" and this lawsuit constitutes a "Proceeding" (as those terms are defined in the Agreement).[5]

Centurion Logistics does not dispute that Calce is an "Indemnified Person" and that this lawsuit constitutes a "Proceeding" under the Agreement.[6] Accordingly, there should be no dispute that Calce is entitled to advancement/reimbursement of the "expenses" he pays or incurs in defending himself in this lawsuit. Centurion Logistics contends, however, that Calce must prove his right to indemnification in order to establish his entitlement to advancement/reimbursement of defense costs. That is simply wrong. *See Aguilar*, 344 S.W.3d at 46 (providing that "[t]he right to advancement is ***not dependent*** on the right to indemnification") (emphasis added). Requiring Calce to establish his right to indemnification before granting his contractual entitlement to reimbursement of defense costs (as such costs are paid or incurred) would eliminate the purpose/benefit of his right to advancement/reimbursement. *See id.* at 55 (providing that [b]y its very nature, advancement of

---

[4] *See* Ex. A-1 to the Motion at Section 6.2.

[5] *See* Ex. A-1 to the Motion at Section 6.2.

[6] *See* Ex. C to the Motion at 2.

**JOHN CALCE'S REPLY BRIEF IN SUPPORT OF AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING COUNTERCLAIM AGAINST CENTURION LOGISTICS LLC** **PAGE 3**
9569942.1/SP/40086/0102/121217

MR.861

expenses can occur only during the course of the trial court proceedings" and that "[i]t is indemnification of expenses that occurs at the conclusion of the case").[7]

## 2. Calce's "expenses" include his attorneys' fees.

Centurion Logistics claims that the term "expenses," as used in Section 6.2 of the Agreement does not include attorneys' fees. *Aguilar* squarely addressed and rejected this argument. *See Aguilar*, 344 S.W.3d at 51. Moreover, Centurion Logistics completely ignores the fact that Section 8.001 of the TBOC defines the term "expenses" to include "reasonable attorney's fees." *See* TEX. BUS. ORGS. CODE § 8.001(3)(B). As stated in *Aguilar*, Centurion Logistics' interpretation would render the relevant language in Section 6.2 "insignificant and practically useless." *See Aguilar*, 344 S.W.3d at 51. Such an interpretation cannot stand under Texas law. *See Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.*, 256 S.W.3d 660, 668 n.27 (Tex. 2008) (providing that "[w]e cannot adopt a construction that renders any portion of a policy meaningless, useless, or inexplicable.")

## 3. Centurion Logistics' attempt to distinguish *Aguilar* is unpersuasive.

Centurion Logistics urges the Court to ignore *Aguilar*, which is directly on-point and supports Calce's entitlement to advancement/reimbursement of defense costs. Centurion Logistics claims that *Aguilar* is inapplicable because the *Aguilar* court was tasked with interpreting bylaws and, therefore, did not apply rules of contract interpretation. *See* Pl.'s Resp. ¶ 37. This contention is false.

---

[7] Centurion Logistics argues that following *Aguilar* "would generate some absurd outcomes, namely, that Centurion Logistics would owe Calce reimbursement for a host of potential lawsuits that are entirely unrelated to Centurion Logistics." *See* Pl.'s Response ¶ 60. This hypothetical fear need not be addressed here as it is undisputed that this lawsuit constitutes a "Proceeding" under the Agreement. Moreover, this is the exact type of case—one in which the corporation is suing an official for breach of fiduciary duty— where "the right to advancement attaches most strongly." *See Aguilar*, 344 S.W.3d at 47; *see also* Pl.'s Orig. Pet ¶¶ 36 – 42.

JOHN CALCE'S REPLY BRIEF IN SUPPORT OF AMENDED MOTION FOR PARTIAL SUMMARY
JUDGMENT REGARDING COUNTERCLAIM AGAINST CENTURION LOGISTICS LLC       PAGE 4
9569942.1/SP/40086/0102/121217

MR.862

*Aguilar* explicitly states that "[i]n construing the bylaws, we apply the rules that govern the interpretation of contracts." *See Aguilar*, 344 S.W.3d at 49. Multiple appellate courts have cited *Aguilar* for this exact proposition. *See, e.g.*, *Arch Ins. Co. v. U.S. Youth Soccer Ass'n*, No. 05-12-00596-CV, 2014 Tex. App. LEXIS 5068, at *13 (Tex. App.—Dallas May 12, 2014, no pet.); *Evans v. Davis*, No. 14-12-01053-CV, 2013 Tex. App. LEXIS 14122, at *9 (Tex. App.— Houston [14th Dist.] Nov. 19, 2013, no pet.). This transparently weak attempt to distinguish and cast doubt on the validity/applicability of the *Aguilar* holding should be ignored.

**4.    The Affidavits of Marrocco and Albanese are irrelevant and the legal opinions set forth therein are inadmissible.**

In support of its Response, Centurion Logistics submitted the Amended Affidavit of Marc Marrocco (the "Marrocco Affidavit") and the Amended Affidavit of Antonio Albanese (the "Albanese Affidavit").[8] Both affidavits include the following statement:

> It was never my intent in negotiating and executing the Centurion Logistics LLC Company Agreement to indemnify or pay the expenses, defense costs, or attorney fees of the Managers of Centurion Logistics LLC that breached fiduciary duties to the Centurion Logistics LLC, nor was it my intent in negotiating and executing the Centurion Logistics LLC Company Agreement to agree to reimburse or advance the expenses, defense costs, or attorney fees of a Manager for conduct that is not related to the business of Centurion Logistics LLC or conduct that is outside the scope of that Manager's authority.

*See* the Marrocco Affidavit ¶ 7; *see also* the Albanese Affidavit ¶ 7.

These self-serving statements are irrelevant and should not be considered because the pertinent language of Section 6.2 of the Agreement is unambiguous—*i.e.*, its interpretation is a question of law for the court. *See Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 7 (Tex. 2014) (citing *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650 (Tex. 1999)); *see also Peterson v. Farmers Tex. Cnty. Mut. Ins. Co.*, No. 05-15-00678-CV, 2016 Tex.

---

[8] The Marrocco Affidavit is attached to Plaintiff's Response as Exhibit B and the Albanese Affidavit is attached to Plaintiff's Response as Exhibit C.

MR.863

App. LEXIS 6586, at *9 (Tex. App.—Dallas June 22, 2016, no pet.) (providing that "[a]bsent a finding of ambiguity, a court must interpret the meaning and intent of a contract from the four corners of the document without the aid of extrinsic evidence"). The mere fact that the parties advance different interpretations does not render the provision ambiguous. *PopCap Games, Inc. v. MumboJumbo, LLC*, 350 S.W.3d 699, 707 (Tex. App.—Dallas 2011, pet. denied).

The Marrocco and Albanese Affidavits also try to tell this Court what the Agreement means. *See* the Marrocco Affidavit ¶ 7 ("[t]he indemnification language in the Centurion Logistics LLC Company Agreement does not mean, and has never meant . . . ."); *see also* the Albanese Affidavit ¶ 7 (same). Even legal experts (Marrocco and Albanese are not lawyers) are not allowed to offer legal opinions regarding contract interpretation. *See Akin v. Santa Clara Land Co.*, 34 S.W.3d 334, 339 (Tex. App.—San Antonio 2000, pet. denied) (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)) (providing that "the construction or interpretation of an unambiguous contract is a question of law for the court" and that "[e]xpert testimony regarding the legal interpretation of an unambiguous agreement encroaches upon the trial court's province to determine the correct legal interpretation"). The Court has the ability to construe the meaning of Section 6.2 of the Agreement without the aid of the inadmissible legal opinions from non-lawyers. Calce objects to such portions of the Marrocco and Albanese Affidavits and requests that same be stricken.

<u>CONCLUSION</u>

Section 6.2 of the Agreement provides that "[a]n Indemnified Person's expenses paid or incurred in defending itself against any Proceeding ***shall*** be reimbursed as paid or incurred."[9] The applicable language is mandatory and unambiguous. Moreover, it is undisputed that (1)

---

[9] *See* Ex. A-1 to the Motion at Section 6.2 (emphasis added).

MR.864

Calce is an "Indemnified Person"; and (2) this lawsuit constitutes a "Proceeding." This issue is simple. Calce is entitled to reimbursement as a matter of law. The Court should not be distracted by Centurion Logistics' efforts to create the illusion of a fact issue.

Calce respectfully requests that the Court grant his Amended Motion for Partial Summary Judgment in its entirety and award him the relief requested therein. Calce further requests that the Court strike the impermissible portions of the Marrocco and Albanese Affidavits described above. Calce further requests such other and further relief to which he shows himself justly entitled.

Respectfully submitted,

/s/ David N. Kitner

**DAVID N. KITNER**
State Bar No. 11541500
david.kitner@strasburger.com
**CHASE J. POTTER**
State Bar No. 24088245
chase.potter@strasburger.com
**STRASBURGER & PRICE, LLP**
901 Main Street, Suite 6000
Dallas, TX 75202-3794
(214) 651-4300
(214) 651-4330 Fax

**ATTORNEYS FOR JOHN CALCE,
CENTURION MIDSTREAM GROUP, LLC,
CENTURION TERMINALS, LLC, AND
STAMPEDE TX ENERGY, LLC**

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on the 12th day of December, 2017, a true and correct copy of the foregoing was forwarded to all known counsel in compliance with the Texas Rules of Civil Procedure.

/s/ Chase J. Potter

Chase J. Potter

JOHN CALCE'S REPLY BRIEF IN SUPPORT OF AMENDED MOTION FOR PARTIAL SUMMARY
JUDGMENT REGARDING COUNTERCLAIM AGAINST CENTURION LOGISTICS LLC       PAGE 7
9569942.1/SP/40086/0102/121217

MR.865

December 15, 2017

DAVID N KITNER
901 MAIN STREET
SUITE 6000
DALLAS TX 75202

DC-16-07706
CENTURION LOGISTICS LLC vs. JAMES BALLENGEE, et al

ALL COUNSEL OF RECORD/PRO SE LITIGANTS:

PLEASE TAKE NOTE OF THE FOLLOWING SETTINGS:

JURY TRIAL: 12/10/2018 @ 9:00 AM

TRIAL ANNOUNCEMENTS MUST BE MADE IN ACCORDANCE WITH RULE 3.02, LOCAL RULES OF
THE CIVIL COURT OF DALLAS COUNTY, TEXAS.

WHEN NO ANNOUNCEMENT IS MADE FOR DEFENDANT, DEFENDANT WILL BE PRESUMED READY.
IF NO PLAINTIFF FAILS TO ANNOUNCE OR TO APPEAR AT TRIAL, THE CASE WILL BE DISMISSED
FOR WANT OF PROSECUTION IN ACCORDANCE WITH RULE 165a, TEXAS RULES OF CIVIL
PROCEDURE.

COMPLETION OF DISCOVERY, PRESENTATION OF PRETRIAL MOTIONS AND OTHER MATTERS
RELATING TO PREPARATION FOR TRIAL ARE GOVERNED BY THE TEXAS RULES OF CIVIL
PROCEDURE.

PLEASE FORWARD A COPY OF THIS NOTICE TO COUNSEL OF RECORD FOR EACH PARTY AND ALL
PRO SE PARTIES BY A METHOD APPROVED IN TEXAS RULES OF CIVIL PROCEDURE 21a.

SINCERELY,

BONNIE LEE GOLDSTEIN
JUDGE, 44TH DISTRICT COURT
DALLAS COUNTY, TEXAS

Cc:
JAMES HOCK, CHRIS MOTT; ROBERT MCNIEL, CENTURION PECOS TERMINAL LLC; TOM RAMSEY; VISPI JILLA; C GREGORY
SHAMOUN, CENTURION BROWNSVILLE TERMINAL, LLC, DAVID N KITNER; JUPITER MLP, LLC; STAMPEDE TX ENERGY LLC

MR.866

CAUSE NO. DC-16-07706

| | | |
|---|---|---|
| CENTURION LOGISTICS LLC, | § | IN THE DISTRICT COURT OF |
| individually and derivatively on behalf of | § | |
| CENTURION PECOS TERMINAL LLC, | § | |
| a Texas Limited Liability Company; and | § | |
| MARC MARROCCO and ANTONIO | § | |
| ALBANESE, individually and derivatively | § | |
| on behalf of CENTURION LOGISTICS, LLC | § | |
| | § | |
| **Plaintiffs** | § | |
| | § | |
| vs. | § | DALLAS COUNTY, TEXAS |
| | § | |
| JAMES BALLENGEE; BALLENGEE | § | |
| INTERESTS, LLC; JOHN CALCE, | § | |
| CHRIS A. MOTT; TOM RAMSEY, | § | |
| STAMPEDE TX ENERGY, LLC; | § | |
| CENTURION MIDSTREAM GROUP, LLC; | § | |
| CENTURION TERMINALS, LLC; | § | |
| CENTURION BROWNSVILLE | § | |
| TERMINAL, LLC; JAMES HOCK; VISPI | § | |
| JILLA; and JUPITERMLP, LLC | § | |
| | § | |
| **Defendants,** | § | |
| | § | B-44th JUDICIAL DISTRICT |
| and CENTURION PECOS TERMINAL | § | |
| LLC, a Texas Limited Liability Company | § | |
| | § | |
| **Nominal Defendant.** | § | |

**PLAINTIFF'S SECOND AMENDED PETITION**

Plaintiffs Centurion Logistics LLC ("Centurion Logistics") individually and derivatively on behalf of Centurion Pecos Terminal LLC ("Centurion Pecos"); and Marc Marrocco and Antonio Albanese, individually and derivatively on behalf of Centurion Logistics, file this *Second Amended Petition* against James Ballengee ("Ballengee"), Ballengee Interests, LLC ("Ballengee Interests"), John Calce ("Calce"), Chris A. Mott ("Mott"), Stampede TX Energy, LLC ("Stampede"), Tom Ramsey ("Ramsey"), Centurion Midstream Group, LLC ("Centurion Midstream"), Centurion Terminals, LLC ("Centurion Terminals"), Centurion Brownsville

PLAINTIFFS' SECOND AMENDED PETITION                                                      Page 1

MR.867

Terminal, LLC ("Centurion Brownsville"), James Hock ("Hock"), Vispi Jilla ("Jilla"), and JupiterMLP, LLC ("JupiterMLP"), bringing claims directly and derivatively on behalf of Centurion Pecos and directly and derivatively on behalf of Centurion Logistics for: breach of fiduciary duty, aiding and abetting breaches of fiduciary duty, money had and received (unjust enrichment), fraudulent concealment, aiding and abetting fraudulent concealment, violation of the Theft Liability Act, Tex. Civ. Code §§ 134.001-134.005, tortious interference with contract, fraudulent inducement, promissory estoppel, declaratory judgment and fraudulent transfer. Accordingly, Plaintiffs would respectfully show the Court as follows:

## I.
## DISCOVERY CONTROL PLAN

1.      Pursuant to Texas Rules of Civil Procedure 190.1-190.6, Plaintiffs hereby designate that discovery will be conducted under Level 3. Pursuant to Rule 47 of the Texas Rules of Civil Procedure, at this time, Plaintiffs seeks monetary relief in excess of $1,000,000.

## II.
## PARTIES

2.      Plaintiff Centurion Logistics is a Texas limited liability company, with its principal office in Dallas, Texas. Centurion Logistics is the sole member and the sole manager of Centurion Pecos. The members of Centurion Logistics are: Marc Marrocco ("Marrocco"), Antonio Albanese ("Albanese"), and TXC Energy LLC ("TXC Energy"), an affiliate of Calce.

3.      Nominal Defendant Centurion Pecos is a Texas limited liability company, with its principal office in Dallas, Texas. The current member and manager of Centurion Pecos is Centurion Logistics. Stampede was a member and manager of Centurion Pecos until June 13, 2016.

4.      Plaintiff Marrocco is an individual residing in Dallas County, Texas.

MR.868

5.      Plaintiff Albanese is an individual residing in Dallas County, Texas.

6.      Defendant Ballengee is an individual residing in Dallas County, Texas. Ballengee has already entered an appearance in this matter. Ballengee is a member and manager of Defendant Ballengee Interests. Ballengee has already entered an appearance in this matter.

7.      Defendant Ballengee Interests is a Louisiana limited liability company. Ballengee is a managing member of Ballengee Interests. Ballengee Interests has already entered an appearance in this matter.

8.      Defendant Calce is an individual residing at 5601 Preakness Lane, Plano, TX 75093. Calce has already entered an appearance in this matter.

9.      Defendant Stampede is a Texas limited liability company, with its principal place of business in Dallas, Texas. Stampede was a manager and member of Centurion Pecos, but was removed as a manager and member on June 13, 2016. Mott is the managing member of Stampede. Stampede has already entered an appearance in this matter.

10.     Defendant Mott is an individual residing at 631 Milam Street, Shreveport Louisiana 71101. Mott (as detailed below), engages in business in Texas, but does not maintain a regular place of business in the State or a designated agent for service of process. Hence, the Texas Secretary of State is an agent for service of process for Mott, and service of process can be made pursuant to Texas Civil Practice and Remedies Code § 17.044.

11.     Defendant Ramsey resides in the Houston, Texas area. He may be served at his residence or wherever he may be found. Ramsey is the Chief Executive Officer of Centurion Midstream, Centurion Terminals, and JupiterMLP. Ramsey has already entered an appearance in this matter.

MR.869

12.     Defendant Centurion Midstream is a Texas limited liability company, formed on October 20, 2015, with its principal place of business in Dallas, Texas. Calce is the manager of Centurion Midstream. Centurion Midstream has already entered an appearance in this matter.

13.     Defendant Centurion Terminals is a Texas limited liability company, with a principal place of business in Dallas, Texas. On information and belief, Centurion Terminals is an entity controlled by Defendant Calce. The manager of Centurion Terminals is 58C, LLC, a Texas limited liability company, whose manager is LV III, LLC, whose manager is Calce. Centurion Terminals has already entered an appearance in this matter.

14.     Defendant Centurion Brownsville is a Texas limited liability company, with its principal place of business in Dallas, TX. The manager of Centurion Brownsville is Centurion Terminals. Centurion Brownsville may be served by serving its registered agent, John Calce, at 15851 Dallas North Parkway, Suite 650, Addison, Texas 75001. Centurion Brownsville has already entered an appearance in this matter.

15.     Defendant Hock resides in the Houston, Texas area. He may be served at his residence or wherever he may be found. Hock is the former President of Stampede Louisiana and Stampede. Hock has already entered an appearance in this matter.

16.     Defendant Jilla is an individual residing at 5719 Twin Brooks, Drive, Dallas, Texas 75252. He may be served at his residence or wherever he may be found. Jilla is the former designated representative of Stampede Louisiana and Stampede. Jilla has already entered an appearance in this matter.

17.     Defendant JupiterMLP is a Delaware limited liability company, with its principal place of business in Dallas, Texas. Jupiter MLP may be served by serving its registered agent,

MR.870

Capitol Services, Inc., 1675 S. State Street, Suite B, Delaware 19901. JupiterMLP has already entered an appearance in this matter.

## III.
## JURISDICTION AND VENUE

18. This Court has jurisdiction over this case because the amount in controversy is in excess of the Court's minimum jurisdictional limits. Moreover, Defendants have engaged in sufficient conduct in the State of Texas to confer jurisdiction over them. The Court has jurisdiction over the subject matter of the action because a substantial portion of the events giving rise to Plaintiffs' claims occurred in Dallas County, Texas.

19. Venue is proper in Dallas County, Texas, pursuant to Texas Civil Practice and Remedies Code Sections 15.002-15.007, because it is the county where all or a substantial part of the events or omissions giving rise to the claims occurred as detailed in the following paragraphs.

## IV.
## BACKGROUND

20. Who can you trust? Apparently, when large potential profits are at issue, trust and honesty are in short supply. Here, a project to create a rail terminal in Pecos, Texas to service the oil and gas industry became the lynchpin of a grand scheme to steal the ideas, capital, business and opportunities of Centurion Logistics and Centurion Pecos, by any means necessary. Moreover, Defendants, by means of fraudulent activity and use of corrupt insiders, stole and fraudulently utilized Centurion Pecos' looted assets to pursue a much-expanded grand scheme – creating a complex project stretching at least from the oilfields of West Texas all the way to the Port of Brownsville, while cutting Centurion Logistics and Centurion Pecos out of the entire operation.

MR.871

## A.    Creation of Centurion Logistics and Centurion Pecos

21.    Several years ago, Marrocco and Albanese were looking for ways to use their expertise in real estate to invest in projects related to the booming oil and gas industry. During their investigations, Marrocco became better acquainted with Calce, who worked in the oil and gas industry, and whom Albanese happened to know from outside his business dealings. After some investigation, Marrocco, Albanese and Calce decided to pursue a project to purchase real estate and to develop a railway terminal for the shipping of crude oil and related materials. In order to pursue that project, Marrocco, Albanese and Calce formed Centurion Logistics on September 16, 2013. Centurion Logistics is manager-managed and its managers are Marrocco, Albanese and Calce. Under the company agreement of Centurion Logistics, a majority of the managers are required to take any action.

22.    Initially, the Centurion Logistics managers utilized their skills to the benefit of the company. Albanese used his connections to obtain the interest of a possible anchor tenant who might want to ship hydraulic-fracturing sand through a terminal in that area, as a way to build Centurion Logistics' credibility with oil companies and the railroad. Marrocco identified, and placed under contract, an approximately 177-acre parcel in Reeves County, Texas (the "First Parcel") to use for the terminal, and obtained a contract for Centurion Logistics to purchase it.

23.    In order to obtain funds to purchase the First Parcel, Calce, Marrocco and Albanese discussed bringing an equity partner into the Pecos project to contribute cash. Calce offered two potential investors from the oil and gas industry with whom he was acquainted. Because Marrocco had already begun to hear rumors that Calce had a reputation for self-dealing, Marrocco proposed that Centurion Logistics work with the investor to whom he believed Calce had fewer ties, namely Ballengee. Additionally, Ballengee was already involved with a company

MR.872

that was trucking crude oil in the vicinity, Bridger Logistics. Ballengee agreed to contribute cash to the project, in order to purchase the First Parcel without any liens or encumbrances. However, unbeknownst to Marrocco and Albanese, Ballengee was in the process of selling his interest in Bridger Logistics and would then be subject to a non-compete agreement, which would not allow his personal involvement with this type of endeavor. Therefore, in order to conceal his activities, Ballengee insisted on using an ostensibly unrelated entity, CAM Oil and Natural Gas, LLC ("CAM") as the funnel for his cash contributions. This came as a surprise to Marrocco and Albanese, who had believed that Ballengee would use Bridger Logistics as the entity for his cash contributions. Hence, Centurion Logistics and CAM formed Centurion Pecos, on September 12, 2014, with Calce as the sole manager, and Centurion Logistics assigned the contract to purchase the First Parcel to Centurion Pecos on September 15, 2014.

24. Shortly before the closing of the sale of the First Parcel, Ballengee announced to Centurion Logistics and (and Marrocco and Albanese) that he would not simply contribute cash (through CAM), as he had represented, even though he had more than adequate cash to fund the purchase of the First Parcel. Instead, Ballengee announced that he would use his existing line of credit at Texas Capital Bank ("TCB"). Then, less than 48 hours before the closing of the First Parcel purchase, Ballengee informed Marrocco and Albanese that TCB was requiring a deed of trust on the property to secure the extension of credit to Ballengee. Because of the last-minute nature of this announcement, Centurion Logistics (and Centurion Pecos) had no other way to fund the purchase of the First Parcel before the required closing date, it being too late to look for other funding sources. Moreover, there was a real risk that Centurion Logistics (and Centurion Pecos) would lose the ability to purchase the First Parcel, since the seller was already threatening to sell to another purchaser. Having no other choice, Centurion Pecos acceded to Ballinger's

MR.873

demands and granted the deed of trust to TCB. The proceeds of the loan by TCB to Ballengee Interests were then contributed by Ballengee, through CAM Oil and Natural Gas, and used to purchase the First Parcel on September 19, 2014.

25. What Centurion Logistics, Marrocco and Albanese did not know at that time, was that Calce and Ballengee had a plan to create a mechanism by which they could cause control of the property to be involuntarily removed from Centurion Pecos through foreclosure, with the first step of the plan being to force Centurion Pecos to grant the deed of trust to TCB, thereby encumbering the First Parcel.

26. Centurion Logistics next determined that the terminal project could be expanded by acquiring an approximately 300-acre parcel adjacent to the First Parcel (the "Second Parcel"). Marrocco obtained a contract for an entity he controlled, in order to purchase the Second Parcel. Marrocco was increasingly concerned about Calce's reputation for underhandedness, and, as a condition to assigning the purchase agreement to Centurion Pecos, insisted that the company agreement of Centurion Pecos be amended in order to remove Calce as the sole manager of Centurion Pecos, as of November 2014. By this time, unbeknownst to Marrocco or Albanese, Ballengee had sold his interest in Bridger Logistics, and had become subject to a non-compete agreement which would prohibit his involvement in Centurion Pecos. Since CAM was too closely associated with Ballengee, and its continued participation in Centurion Pecos could cause Bridger Logistics to discover Ballengee's violation of his non-compete agreement, Ballengee or Calce caused CAM Oil and Natural Gas to be removed as a member of Centurion Pecos, and be replaced by Stampede Energy, LLC ("Stampede Louisiana" – a predecessor Stampede TX Energy, LLC), a company unlikely to be identified by Bridger Logistics as being associated with Ballengee.

MR.874

27. Under the amended and restated company agreement of Centurion Pecos, Centurion Logistics and Stampede Louisiana were the members and managers of Centurion Pecos. Centurion Pecos is manager-managed, and, under the amended and restated company agreement, any action requires the consent of all managers.

28. At the closing of the Second Parcel, Ballengee again insisted that rather than fulfilling his representation to contribute his cash to fund the purchase of the Second Parcel free of any liens or encumbrances, he would instead take out another loan from TCB. Once again, Ballengee insisted that Centurion Pecos grant a deed of trust to the Second Parcel to TCB to secure this second loan. As with Ballengee's First Parcel scam, his pattern here was part of his plan to create a mechanism to remove control of the Second Parcel from Centurion Pecos through foreclosure, making sure it was encumbered by the deed of trust. The purchase of the Second Parcel closed on August 21, 2015. The First Parcel and the Second Parcel are collectively referred to as the "Reeves County Property."

29. As with the purchase of the First Parcel, Ballengee did not provide the funds for the Second Parcel directly to Centurion Pecos. Rather, he funneled the funds through Stampede Louisiana because his participation in the Centurion Pecos venture was circumscribed by his non-compete.

30. Both deeds of trust, granted at the closings of the Reeves County Property, contain a cross-collateralization clause pledging the Reeves County Property as collateral for all obligations of Ballengee Interests to TCB, even obligations not involving Centurion Pecos. Calce signed both deeds of trust, purportedly in his capacity as manager of Centurion Pecos, although he was no longer a manager of Centurion Pecos at the time he signed the deed of trust

MR.875

to the Second Parcel, and had no other authority to sign the second deed of trust for Centurion Pecos.

**B.      Calce and Ballengee Hatch Their Grand Scheme**

31.     While Centurion Pecos was purchasing the parcels for the Pecos railroad terminal, Calce and Ballengee realized that the Pecos terminal idea was an incredible idea, and could be the nexus of an extremely profitable and much more extensive project.  They began using the planned Pecos terminal (and its assets) as the focus point of a connection to the Port of Brownsville.  This would involve building a terminal at the Port of Brownsville, along with storage facilities and fractioning towers for processing condensate.  They realized that the Pecos terminal in Reeves County was the key to a huge money-making opportunity, but first, they needed absolute control over Centurion Pecos and its Reeves County Property.  Since Calce and Ballengee had already set up a way to steal Centurion Pecos' assets, they realized that they had the opportunity to cut Marrocco, Albanese and Centurion Logistics (and Centurion Pecos) completely out of this opportunity if they chose.  To conceal activities related to this incredible opportunity from Marrocco and Albanese, Calce created a new entity, Centurion Terminals (and designated himself manager) on August 27, 2015.  By September 11, 2015, Centurion Terminals was breaking ground on a Brownsville terminal.

**C.      Defendants' Fraudulent Scheme Begins to Unfold**

32.     As Calce and Ballengee's grand scheme began to progress in late 2015, Calce began communicating to Marrocco that Calce and Ballengee wanted to bring other participants into the project, and wanted Marrocco and Albanese to take a more passive role and a reduced share of the profits.  Calce then had a private meeting with Marrocco, expressing his desire to force Albanese out as a manager of Centurion Logistics, and to require Albanese to sell his

MR.876

membership interest in Centurion Logistics for less than its fair value. Calce claimed that the Pecos terminal was just a small part of an overall project that Ballengee was putting together. Calce threatened that if Marrocco did not cooperate in removing Albanese from Centurion Logistics and agree to turn over the Pecos terminal project to Calce and Ballengee for a very small percentage of the "new" project, Calce and Ballengee would exclude Marrocco from participation in the entire project, including the Pecos terminal. Calce told Marrocco that they could do this by removing the Reeves County Property from Centurion Pecos through the foreclosure scheme Ballengee and Calce had set up during the two purchases constituting the Reeves County Property. However, if Calce could get Albanese out, his plans could go forward unhindered, since without Albanese, Marrocco could not outvote Calce, and would have no way to stop Calce and Ballengee from taking complete control of the Reeves County Property – without the necessity of foreclosure. Although Marrocco agreed to consider taking a smaller percentage in the grand scheme, he refused to participate in removing Albanese from Centurion Logistics.

33. Ballengee subsequently met with Marrocco and Albanese, again trying to induce them into agreeing to take a small percentage of the much larger project, and agreeing that it was Centurion Logistics that had the original idea. At that meeting, Marrocco informed Ballengee that Calce had threatened to foreclose on the Reeves County Property and take it from Centurion Pecos if Marrocco did not agree to cut Albanese out. Ballengee then indicated that they were willing to buy Marrocco and Albanese out if they did not agree to trade control of the Pecos terminal for a very small piece of the larger project.

34. Calce and Ballengee then demanded a meeting with Marrocco to negotiate a fair price for Marrocco's interest in Centurion Logistics. However, this proposal was actually a ruse

MR.877

to trick Marrocco into attending an uncalled meeting of the managers of Centurion Pecos to approve an "assignment and assumption agreement," handing the Reeves County Property over to Ballengee Interests. Marrocco refused to attend the meeting.

35. Before Marrocco could give an answer as to whether he and Albanese were willing to agree to a significantly reduced percentage of the "new" opportunity or to take a buy-out of their interest, Calce and Ballengee decided to go forward with the "new" opportunity and began to execute on their plan to strip Centurion Pecos of its assets.

36. The actions of Ballengee and Calce were a part of their grand scheme to move the Reeves County Property out of Centurion Pecos and into an entity in which Marrocco and Albanese have no interest, depriving Marrocco and Albanese of their entire interests in the terminal project. To these ends, Calce and Ballengee began negotiating with Union Pacific to establish rail service to the Reeves County Property through Centurion Midstream, an entity unrelated to Centurion Logistics or Centurion Pecos – an entity with Calce as President and Ramsey as CEO. Centurion Midstream represented to Union Pacific that it was the owner of the Reeves County Property. After Centurion Logistics notified Union Pacific that Centurion Midstream had no affiliation with Centurion Pecos, Calce, Ballengee and Ramsey told Union Pacific that Marrocco and Centurion Logistics were no longer involved in the project, and that Centurion Midstream would own the Reeves County Property "within a few weeks." On its website at this time, Centurion Midstream claimed to own the property purchased by Centurion Pecos and purported to be creating a terminal at Pecos, Texas.

37. In furtherance of this grand scheme, Calce, Ballengee and/or Mott and Stampede (or its predecessor, Stampede Louisiana), created a number of unauthorized and/or fraudulent documents purporting to pledge the Reeves County Property or create unauthorized obligations

MR.878

of Centurion Pecos. These unauthorized transactions and documents were not only concealed from Plaintiffs, but, on information and belief, were actually backdated.

38. As noted above, the grand scheme to cut Marrocco, Albanese, Centurion Logistics and Centurion Pecos out of the "new" opportunity went far beyond just the Reeves County Property, and had begun months before. In a transaction unrelated to the purchase of the Reeves County Property, Ballengee Interests granted a promissory note to TCB dated January 6, 2015 for a line of credit in the amount of $750,000. Unbeknownst to Marrocco and Albanese, in order to secure the Ballengee Interests line of credit, Calce executed a deed of trust to the First Parcel, purportedly on behalf of Centurion Pecos as its manager – this was at a time when Calce was no longer a manager of Centurion Pecos. The January 6, 2015 deed of trust also contained a cross-collateralization clause pledging the First Parcel as collateral for all obligations of Ballengee Interests to TCB, even obligations not involving Centurion Pecos. The proceeds of the line of credit were not used for any purpose related to the business of Centurion Pecos. Rather, Calce, Ballengee and Ramsey used the proceeds from the unauthorized loan and deed of trust to fund other projects, including the Brownsville terminal. That is, the $750,000 was either spent directly on other projects, or allowed Defendants to divert other resources to those projects. Centurion Logistics was unaware of the January 6, 2015 deed of trust, and only discovered it during a record search of Reeves County conducted in May 2016.

39. On October 30, 2015, after Calce had openly expressed the desire to remove Albanese from Centurion Logistics, and shortly after Centurion Midstream was formed, Ballengee Interests extended the term of the First Parcel note to TCB, and filed an extension of the deed of trust on the First Parcel to secure that note. Again, that extension was surreptitiously signed by Calce, as "manager of Centurion Pecos," although he was not a manager of Centurion

MR.879

Pecos at the time, and had no other authority to act on behalf of Centurion Pecos. Again, Marrocco, Albanese, Centurion Logistics and Centurion Pecos were not aware of the extension of the deed of trust on the First Parcel, and only discovered it during a record search of Reeves County conducted in May 2016. Ballengee's and Calce's purpose in extending the deed of trust was to support their grand scheme and their fraudulent efforts to preserve the Ballengee Interests note as a means of removing the First Parcel from Centurion Pecos.

40.     In April 2016, without authority to act for Centurion Pecos, Stampede[1] and Calce forged documents that purported to obligate Centurion Pecos to assume Ballengee Interests' obligations under the notes Ballengee Interests owed TCB (which had been used to obtain the funds contributed to purchase the Reeves County Property), and to grant Ballengee Interests a deed of trust to secure the assumption. Marrocco, Albanese, Centurion Logistics and Centurion Pecos were unaware of these documents or the unauthorized assumption until Centurion Pecos received a "notice of default" dated April 28, 2016 from Ballengee Interests for its purported failure to make interest payments under the assumption agreement. Neither Centurion Pecos, Centurion Logistics, Marrocco nor Albanese were provided with copies of the purported assumption agreement and deed of trust until after the *Original Petition* was filed in this matter.

41.     In addition, Calce and Ramsey created a note, dated on or about November 15, 2015, purporting to obligate Centurion Pecos to make payments to Centurion Terminals, which was controlled by Calce and Ramsey. Centurion Pecos first learned of this note in a demand letter dated May 27, 2016. No note of this description was ever authorized by Centurion Pecos, and to date, neither Centurion Pecos, Centurion Logistics, Marrocco nor Albanese have ever seen this purported note.

---

[1] By this time, Stampede Louisiana had become Stampede, as detailed in Section F, below.

PLAINTIFFS' SECOND AMENDED PETITION                                    Page 14

MR.880

42. Ballengee Interests and Calce also created fraudulent notes ostensibly by Centurion Pecos to Ballengee Interests, dated September 16, 2014 and August 17, 2015. Centurion Pecos first learned of these notes in demand letters dated May 25, 2016. Again, neither Centurion Pecos, Centurion Logistics, Marrocco nor Albanese had ever seen these purported notes until after the filing of the *Original Petition.* When Centurion Logistics originally agreed to providing the Reeves County Property as collateral for the Ballengee Loans, it did not realize that such could be parlayed into circumstances that would obligate Centurion Pecos (as opposed to Ballengee) to repay the purchase price.

43. In furtherance of their grand scheme and their fraudulent plans, Defendants threatened to use the unauthorized, forged and fraudulent documents to foreclose on the Reeves County Property. Centurion Pecos received letters from Ballengee Interests and Centurion Terminals demanding payment of purported obligations that Centurion Pecos never, in fact, agreed to assume.

**D.** **The Grand Scheme Begins to Come Together: Calce "Transfers" the Reeves County Property to Ballengee Interests**

44. On May 26, 2016, Calce signed Special Warranty Deeds purporting to transfer both parcels of the Reeves County Property to Ballengee Interests. However, those purported transfers were legally invalid, as they were done without the authorization of Centurion Pecos. According to documents executed by Calce and Ballengee, the purported transfer of the Reeves County Property was made because Centurion Pecos was unable to make payments under the unauthorized financial obligations fraudulently entered into by Calce and Ballengee. The transfer of the Reeves County Property was an invalid and illegitimate transaction, fraudulently made as a part of the grand scheme of cutting Marrocco and Albanese out of the Pecos terminal project, and excluding them from additional opportunities (as explained below).

MR.881

**E.** **Calce, Ballengee and Ramsey Expand the Grand Scheme Using Centurion Pecos Funds and Property**

45.     As set forth above, Calce fraudulently granted a deed of trust in Centurion Pecos' name to TCB to procure a $750,000 loan to Ballengee Interests – a transaction made without any authorization from Centurion Pecos. Calce, Ballengee and Ramsey, together with their related entity Defendants, used this $750,000 as seed capital to fund and expand their grand scheme by constructing other projects in Reeves County, Texas and in Brownsville, Texas. The $750,000 was either spent directly on these projects or the influx of the $750,000 allowed Defendants to use other resources on these projects.

46.     For example, Centurion Midstream and Centurion Terminals used these funds to begin constructing their own railway terminal next door to the site of the original proposed Centurion Pecos terminal. Calce, Ballengee and Ramsey also used the funds as seed capital to begin construction of the related railway terminal and refinery in Brownsville, Texas. Eventually, the grand scheme involved every aspect from West Texas to the Gulf Coast, gathering and transporting crude oil from the Delaware Basin, through the Pecos Terminal, and then on to Brownsville, where it would be stored, processed, and blended, and subsequently be sold or exported.

47.     In a further attempt to conceal their fraudulent scheme, Defendants created JupiterMLP (with Tom Ramsey as CEO, in addition to his CEO duties for Centurion Midstream and Centurion Terminals), and transferred some or all of these projects to that entity. JupiterMLP continues pursuit of this grand scheme to this day.

48.     While Defendants used the wrongfully-obtained funds to commence and pursue these projects, Centurion Logistics and Centurion Pecos have not only been defrauded of their assets and excluded from participation in the original project, but have also been deprived of the

MR.882

lucrative business opportunity to participate in the broader Brownsville terminal, storage, and refining project and the profits flowing therefrom – even though it was Centurion Logistics and Centurion Pecos' own assets that helped fund and construct these additional projects. In other words the Defendants formulated and executed this fraudulent method of financing the broader project for a huge payoff, using Centurion Logistics and Centurion Pecos as the source of financing and funds since they had the only hard asset, the Reeves County Property), all the while cutting them off from any participation or profits therefrom.

## F. Stampede Violates the Company Agreement

49.     Section 10 of the First Amended and Restated Company Agreement of Centurion Pecos Terminal LLC ("Company Agreement") sets forth the conditions under which a member may transfer its membership interest.  Section 10.4 states that a transfer shall not be permitted unless:

> [t]he transferor and transferee have delivered to the Company [Centurion Pecos] any documents that the Board of Managers request to confirm that the transfer satisfies the requirements of this Agreement to give effect to the transfer, and to confirm the transferee's agreement to be bound by this Agreement as Assignee.

50.     Pursuant to Section 10.1(a) of the Company Agreement, "transfer" includes "a transfer by merger or other business combination."  Stampede Louisiana (a Louisiana limited liability company) was a member of Centurion Pecos at the time that the Company Agreement was adopted, and was bound thereby.  On January 20, 2016, Stampede Louisiana was converted to Stampede. Stampede then engaged in a series of mergers, first with Centurion Brownsville Terminal, LLC, a Texas limited liability company, on February 4, 2016, and then with Stampede Energy, LLC, a Delaware limited liability company on March 2, 2016.

51.     On April 30, 2016 and again on May 4, 2016, Centurion Logistics expressly requested that Stampede and Centurion Brownsville provide the information required by Section

MR.883

10.4 of the Company Agreement. Stampede, at Mott's direction, and Centurion Brownsville failed and refused to provide the information required by the Company Agreement.

**G.**      **Centurion Pecos Expels Stampede as Member and Manager**

52.      In response to Stampede's blatant violations of the Company Agreement, Centurion Logistics, on behalf of Centurion Pecos, on May 31, 2016, called a meeting of managers and members of Centurion Pecos, which was held on June 13, 2016. At the meeting, Centurion Logistics moved to remove Stampede as a member of Centurion Pecos based on Stampede's prohibited transfers of its membership interest and refusal to provide related and required information. Because the motion involved removing Stampede as a member, Stampede was an interested manager and not eligible to vote. Centurion Logistics, the only manager eligible to vote on the motion, voted to remove Stampede as a member. This left Centurion Logistics as the sole member of Centurion Pecos.

53.      Subsequently, the remaining member of Centurion Pecos called a meeting to determine whether Stampede should be removed as a manager because it had transferred its membership interest in a prohibited transfer and engaged in other wrongful conduct that materially affected the business of Centurion Pecos and its members, and had also engaged in conduct that had made it not reasonably practicable to carry on the company business with Stampede. Centurion Logistics, the only remaining member, voted to remove Stampede as a manager of Centurion Pecos. This left Centurion Logistics as the sole manager of Centurion Pecos.

**V.**
**THE CENTURION PECOS COMPANY AGREEMENT**

54.      Article X of the Company Agreement for Centurion Pecos provides for removal of a Member under certain conditions, including when a Member makes a "Prohibited Transfer"

MR.884

of all or any part of its Membership Interest. Article I of the Company Agreement provides that the Board of Managers is comprised of Centurion Logistics and "Stampede", and further defines "Stampede" as "Stampede Energy, LLC, a Louisiana limited liability company." Although the Company Agreement does not specify what Managers are eligible to vote on removal of a Member that violates the Company Agreement, allowing a designated Manager to be a voting member of the Board for purposes of determining whether it should be removed as a Member for violations of the Company Agreement would lead to an absurd result, and render large portions of the Company Agreement superfluous and meaningless, specifically including all of Article X, all references to a "Permitted Transfer" or a "Prohibited Transfer", and the provisions of Article 12 regarding removal of a Member.

55.     Article V of the Company Agreement provides for removal of a Manager under certain conditions, including when the Manager has (1) engaged in wrongful conduct described in Section 6.3(a) that adversely and materially affected the Company business of the Members, and (2) engaged in conduct relating to Company business that has made it not reasonably practicable to carry on the Company business with the Manager. Although the Company Agreement does not specify whether a Manager which is subject to removal pursuant the terms of the Company Agreement has a right to vote concerning its own removal, allowing a designated Manager to be a voting member of the Board for purposes of determining whether it should be removed as a Manager for engaging in such wrongful conduct (including any act or omission that involves gross negligence, intentional misconduct or knowing violation of law, transfer or attempted transfer of all or a portion of a Membership Interest in a Prohibited Transfer, of a willful or reckless breach of the Company Agreement) would lead to an absurd

MR.885

result, and render large portions of the Company Agreement superfluous and meaningless, specifically including, but not limited to, all of Section 5.2(b), 5.5 and 5.9(a).

56.     To the extent that the Company Agreement does not specifically provide for the ineligibility of a Manager to vote on removal of a Member, the Company Agreement is vague and ambiguous. Moreover, a fair reading of the Company Agreement demonstrates that the real intention of the parties thereto was to actually have an effective method to remove Members and the only way to effectuate such an intention is to imply a covenant that a Member is ineligible to participate as a Manager for purposes of voting as to whether to remove itself as a Member.

57.     To the extent that the Company Agreement does not specifically provide for the ineligibility of a Manager to vote on his own removal for cause, the Company Agreement is vague and ambiguous. Moreover, a fair reading of the Company Agreement demonstrates that the real intention of the parties thereto was to actually have an effective method to remove Managers and the only way to effectuate such an intention is to imply a covenant that a Manager is ineligible to participate as a Manager for purposes of voting as to whether to remove itself as a Manager.

## VI.
## CAUSES OF ACTION

A.     **First Cause of Action:  <u>Breach of Fiduciary Duty as to Calce</u>**

58.     Plaintiffs hereby restate and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

59.     As a manager of Centurion Logistics, Calce had a duty of loyalty to the company. The duty of loyalty requires Calce to act in good faith and not allow personal interests to take precedence over the interests of Centurion Logistics.

MR.886

60.     Calce also had a duty to disclose all important information concerning any transaction, including any matters that might influence him to act in a manner prejudicial to Centurion Logistics.

61.     In violation of his fiduciary duties, Calce colluded with the other Defendants to engage in a series of fraudulent transactions which were contrary to the interests of Centurion Logistics and Centurion Pecos. This pattern of misconduct is intended to further Defendants' grand scheme, namely, to remove the Reeves County Property from Centurion Pecos and pursue a competing development as well as use the resources of Centurion Pecos and Centurion Logistics to deprive Centurion Logistics of its share of any profits from the Pecos terminal project and other projects funded through Centurion Pecos assets. The entire scheme is an egregious breach of Calce's duty of loyalty and full disclosure.

62.     By secretly encumbering Centurion Pecos' assets and misusing the company's assets, Calce has damaged the ability of Centurion Logistics to conduct business and impaired the value of those assets.

63.     Calce's breaches of fiduciary duty proximately caused Centurion Logistics (and Marrocco and Albanese) to suffer damage and Calce has obtained benefits, which Calce should be required to forfeit. The benefits Calce should be required to forfeit also include any remuneration he has received from Defendants Centurion Midstream, Centurion Terminals, Centurion Brownsville and JupiterMLP.

64.     Calce's breaches of fiduciary duty were intentional and, accordingly, Centurion Logistics, Marrocco and Albanese seek, and should recover, exemplary damages against Calce.

MR.887

**B.    Second Cause of Action:  Breach of Fiduciary Duty as to Stampede**

65.    Plaintiffs hereby restate and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

66.    As a manager of Centurion Pecos, Stampede owed Centurion Pecos a duty of loyalty.  Further, Stampede owed Centurion Pecos a duty of candor, including a duty to disclose information concerning its role in any transaction that would prejudice the interests of Centurion Pecos.

67.    Stampede violated its fiduciary duty by covertly engaging in a pattern of transactions designed to deprive Centurion Pecos of the Reeves County Property, as well as Centurion Pecos' interest in the terminal project.  Stampede has also breached its fiduciary duty by using Centurion Pecos' resources and assets, without authorization, to develop other projects, while excluding Centurion Pecos from any share in the profits of those projects.

68.    By secretly encumbering Centurion Pecos' assets and misusing Centurion Pecos' assets, Stampede has damaged the ability of Centurion Pecos to conduct business, impaired the value of those assets, and deprived the company of returns which should rightfully belong to the company.

69.    Stampede's breaches of fiduciary duty have proximately caused Centurion Pecos to suffer damage and Stampede has obtained benefits which Stampede should be required to forfeit.

70.    Stampede's breaches of fiduciary duty were intentional and, accordingly, Centurion Pecos seeks, and should recover, exemplary damages against Stampede.

**C.    Third Cause of Action:  Aiding and Abetting Breach of Fiduciary Duty**

MR.888

71.    Plaintiffs hereby restate and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

72.    Ballengee, Ballengee Interests, Mott, Hock, Jilla, Ramsey, Centurion Midstream, Centurion Terminals, Centurion Brownsville, and Jupiter MLP assisted with, encouraged and participated in breaches of fiduciary duty by Calce and Stampede.  As set forth above, Calce and Stampede had fiduciary duties of loyalty to Centurion Logistics and to Centurion Pecos and fiduciary duties to disclose any transactions that would be prejudicial to the chief objectives of Centurion Logistics and Centurion Pecos.

73.    Ballengee, Ballengee Interests, Mott, Hock and Jilla assisted Calce and Stampede to breach their fiduciary duties by participating in the creation of false debt, attempting to strip Centurion Pecos of its chief asset, the Reeves County Property, and using Centurion Pecos' assets to procure funds for other projects in Reeves County and Brownsville.

74.    Centurion Logistics and Centurion Pecos were created chiefly to purchase the Reeves County Property and to develop a railway terminal in order to transport petroleum and petroleum products.  Rather than pursue these objectives with loyalty fiduciaries owe, Calce, with Ramsey, assisted in the creation of Centurion Midstream, Centurion Terminals, Centurion Brownsville, and JupiterMLP to thwart the efforts of Centurion Logistics and Centurion Pecos and to compete with Centurion Logistics and Centurion Pecos.

75.    Based on the content of the Centurion Midstream and JupiterMLP websites, Centurion Midstream and JupiterMLP covertly assisted Calce in his plan to take over the Reeves County Property, and to build a railway terminal and other projects for his own benefit and for the benefit of Centurion Midstream and JupiterMLP.

MR.889

76. Based on its affiliation with Calce, Centurion Terminals was aware that Calce was not authorized to undertake any obligation to Centurion Terminals on behalf of Centurion Pecos. Nonetheless, Centurion Terminals entered into the note and threatened to enforce it.

77. Centurion Brownsville accepted the ill-gotten proceeds of Calce's breach and has used the $750,000 to construct a railway terminal and refinery in Brownsville, Texas without the participation of Centurion Logistics or Centurion Pecos.

78. The breaches of fiduciary duty of Calce and Stampede, committed with the assistance of Ballengee, Ballengee Interests, Mott, Hock, Jilla, Ramsey, Centurion Midstream, Centurion Terminals, Centurion Brownsville, and JupiterMLP, proximately caused Plaintiffs to suffer actual damages in an amount exceeding the minimum jurisdiction of the Court.

79. As Defendants' participation in the breaches of fiduciary duty were intentional and exemplary damages are recoverable for the breaches of fiduciary duty, Plaintiffs pray for exemplary damages against Ballengee, Ballengee Interests, Mott, Hock, Jilla, Ramsey, Centurion Midstream, Centurion Terminals, Centurion Brownsville and JupiterMLP.

**D.     Fourth Cause of Action: Money Had and Received (<u>Unjust Enrichment</u>)**

80. Plaintiffs hereby restate and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

81. A claim for money had and received arises when the defendant obtains money or a benefit that in equity and good conscience belongs to the plaintiff. It is an equitable doctrine applied to prevent unjust enrichment. A cause of action for money had and received is not based on wrongdoing but, instead, looks only to the justice of the case and inquires whether the defendant has received money that rightfully belongs to another. A claim for money had and received is based upon the doctrine of unjust enrichment.

MR.890

82. Further, where a defendant obtains a benefit from the plaintiff by fraud, duress, or taking undue advantage, the plaintiff may recover money or property under the theory of unjust enrichment.

83. Ballengee and Ballengee Interests colluded with Calce to encumber property of Centurion Pecos to secure debts of Ballengee Interests, including the notes to purchase the Reeves County Property and the $750,000 line of credit. These proceeds have been used by Centurion Midstream, JupiterMLP and Centurion Brownsville to develop a competing railway terminal in Reeves County, Texas, as well as a terminal and refinery in Brownsville, Texas.

84. Ballengee and Ballengee Interests have, therefore, been unjustly enriched by pledges of property to secure Ballengee Interests' debt, including the $750,000 line of credit, and unauthorized assumption of the Ballengee Interests' obligations to TCB. Indeed, pursuant to the cross-collateralization clauses, the deeds of trust pledged the Reeves County Property to secure all Ballengee Interests' debts to TCB, not merely those related to Centurion Pecos. Defendants Ballengee and Ballengee Interests should be required to disgorge and to turn over to Centurion Pecos any benefits obtained through these transactions.

85. Centurion Midstream, JupiterMLP and Centurion Brownsville have been unjustly enriched through the use of the proceeds of the unauthorized loan obtained by Calce and Ballengee. These entities should be required to disgorge the $750,000 as well as a share of the profits from the projects that the funds were used to develop.

86. On information and belief, Calce and Ramsey have received a salary and other benefits from Centurion Midstream, Centurion Terminals, Centurion Brownsville, and JupiterMLP, in exchange for effectuating Calce's and Ballengee's plan, namely, to fraudulently

MR.891

obtain ownership of the Reeves County Property and use the assets of Centurion Pecos to fund projects for the benefit of Defendants. This remuneration constitutes unjust enrichment.

87. In obtaining these benefits, Defendants have acted with fraud and malice. Accordingly, Plaintiffs pray that these Defendants be found liable for exemplary damages.

**E. Fifth Cause of Action: <u>Fraud/Fraudulent Inducement</u>**

88. Plaintiffs hereby restate and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

89. Ballengee and Ballengee Interests represented to Centurion Pecos that they would make a capital contribution by purchasing the Reeves County Property on behalf of Centurion Pecos. At the 11th hour, Ballengee and Ballengee Interests demanded that Centurion Pecos agree to deeds of trust on the Reeves County Property to secure large loans to Ballengee and Ballengee Interests. Ballengee and Ballengee Interests did not disclose that the purpose of this demand was to eventually surreptitiously shift the payment obligations on those loans to Centurion Pecos and cause a default on the loans so as to ultimately transfer of the Reeves County Property from Centurion Pecos to Ballengee Interests, and to use the Reeves County Property to fund other projects in Reeves County and Brownsville, including development of a competing railway terminal in Reeves County, Texas, and a terminal and refinery in Brownsville, Texas.

90. Centurion Pecos justifiably relied on Ballengee's and Ballengee Interests' professions that their purpose was to invest in, and to promote, the Centurion Pecos Terminal project.

91. Ballengee's and Ballengee Interests' actions have injured Centurion Logistics (and Marrocco and Albanese) and Centurion Pecos, in that Defendants used the TCB loans and

MR.892

deeds of trust, as well as unauthorized and fraudulently executed documents, to complete their grand scheme to obtain the Reeves County Property for a competing entity, Centurion Midstream and/or JupiterMLP, and to use the equity in the property to fund other projects from which Centurion Logistics and Centurion Pecos were excluded.

92. The wrongful fraudulent acts and omissions have proximately caused Plaintiffs to suffer damages. Because Defendants' wrongful fraudulent acts and omissions were conducted with intent, Plaintiffs seek both actual and exemplary damages.

**F. Sixth Cause of Action: <u>Aiding and Abetting Fraud/Fraudulent Inducement</u>**

93. Plaintiffs hereby restate and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

94. Defendants Calce, Ramsey, Mott, Hock, Jilla, Stampede, Centurion Midstream, Centurion Terminals, Centurion Brownsville, and JupiterMLP provided knowing and intentional assistance to the fraud committed by Ballengee and Ballengee Interests. Calce and Stampede, including its managing member, Mott, its President, Hock, and its designated representative Jilla, were aware of the fraudulent scheme and Stampede allowed itself to be used as a conduit through which Ballengee Interests made its payments for the Reeves County Property. As fiduciaries, Calce and Stampede, including Mott, had a heightened duty to disclose Ballengee's true intent, but they remained silent. Indeed, they actively furthered the scheme through their participation in the creation of false and unauthorized transactions and the creation of fraudulent documents.

95. Calce's and Stampede's assistance and encouragement constituted a substantial factor in causing the fraud. Without their participation, it is unlikely that Ballengee and Ballengee Interests could have attempted the scheme, given the limitations imposed on

MR.893

Ballengee by the non-compete agreement. Moreover, these Defendants furthered the plan through a series of threatening communications.

96. Centurion Midstream, Centurion Terminals, Centurion Brownsville, and JupiterMLP were aware of the fraud and provided knowing assistance by accepting funds that were the product of the fraud, using them to construct other projects in Reeves County and Brownsville from which Centurion Logistics and Centurion Pecos were excluded.

97. These other Defendants' participation in the fraudulent scheme has proximately caused Plaintiffs to suffer damages. Because these Defendants' participation in the wrongful fraudulent scheme was conducted with knowledge and intent, Plaintiffs seek both actual and exemplary damages.

## G. Seventh Cause of Acton: Texas Theft Liability Act, Tex. Civ. Prac. &Rem. Code §§134.001-134.005

98. Plaintiffs hereby restate and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

99. Defendants Calce, Ballengee, and Ballengee Interests have unlawfully appropriated the Reeves County Property through the unauthorized transfer of the property from Centurion Pecos to Ballengee Interests.

100. Centurion Pecos has suffered actual damages from Defendants' appropriation, which not only deprived Centurion Pecos of the Reeves County Property, but prevented Centurion Pecos from developing a railway terminal on that property.

101. In addition, Ballengee and Ballengee Interests stole and appropriated the $750,000 obtained from the loan made possible by the unauthorized use of the Reeves County Property as collateral. These funds rightfully belonged to Centurion Pecos.

MR.894

102. Plaintiffs seek, and should recover, actual damages, including lost profits, as well as exemplary damages for Defendants' violations of the Texas Theft Liability Act.

**H.      Eighth Cause of Action:  <u>Tortious Interference with Contract</u>**

103. Plaintiffs hereby restate and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

104. Pursuant to the company agreement of Centurion Pecos, Centurion Logistics had a valid and enforceable contract with Stampede.  With knowledge of this contract, Defendants, other than Stampede, willfully and intentionally interfered with the performance of the contract.

105. Pursuant to the company agreement of Centurion Logistics, Centurion Logistics was comprised of a valid and enforceable agreement between Marrocco, Albanese and TXC Energy.  With knowledge of this contract, Defendants willfully and intentionally interfered with the performance of the contract.

106. The purpose of Centurion Pecos and Centurion Logistics was to purchase the Reeves County Property and build the Centurion Pecos railway terminal on the property.  By interfering with the performance of the company agreements of Centurion Pecos and Centurion Logistics, Defendants prevented the development of the railway terminal.

107. Plaintiffs seek, and should recover, actual damages, including lost profits, as well as exemplary damages for Defendants' tortious interference with contract.

**I.      Ninth Cause of Action:  <u>Fraudulent Inducement</u>**

108. Plaintiffs hereby restate and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

109. Calce, Ballengee and Ballengee Interests represented to Centurion Pecos that they would cooperate with Centurion Pecos to develop the Centurion Pecos terminal.  Calce,

MR.895

Ballengee and Ballengee Interests further represented to Centurion Pecos that Ballengee Interests would provide funds to purchase the Reeves County Property free and clear of any liens or encumbrances. Centurion Pecos relied on these representations when it negotiated to purchase the Reeves County Property and entered into the contract to purchase the Reeves County Property.

110. Calce, Ballengee and Ballengee Interests were aware that the representations made to Centurion Pecos were false.

111. Based on the false representations by Calce, Ballengee and Ballengee Interests, Centurion Pecos was also induced to grant TCB deeds of trust on the Reeves County Property. Calce, Ballengee and Ballengee Interests also falsely represented that Centurion Pecos would receive remuneration from projects developed through the deeds of trust placed on the Reeves County Property. Moreover, neither Centurion Pecos, Centurion Logistics, Marrocco nor Albanese were aware that Centurion Pecos was ultimately going to be responsible to pay the Ballengee loans secured by the Reeves County Property, since it was represented that the property was only collateral for Ballengee's obligation to pay the loans.

112. Centurion Pecos has been damaged by the fraudulent inducement because Defendants have used the loans and deeds of trust to interfere with Centurion Pecos' ownership of the Reeves County Property and prevent the development of the Centurion Pecos terminal. Centurion Pecos has also been damaged because it has been denied its share of profits from the projects developed through loans secured by deeds of trust on the Reeves County Property.

113. Defendants' fraudulent inducement has proximately caused Plaintiffs to suffer actual damages. Furthermore, Plaintiffs seek, and should recover, exemplary damages.

MR.896

## J.    Tenth Cause of Action:  Promissory Estoppel

114.    Plaintiffs hereby restate and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

115.    Calce, Ballengee and Ballengee Interests promised Centurion Pecos that they intended to cooperate with Centurion Pecos to develop the Centurion Pecos terminal.  Centurion Pecos reasonably, foreseeably, substantially and detrimentally relied on Defendants promises when they purchased the Reeves County Property and agreed to place deeds of trust on the Reeves County Property.

116.    Calce, Ballengee and Ballengee Interests also promised Centurion Pecos that they would share with Centurion Pecos the profits from any projects that were developed through proceeds obtained by placing deeds of trust on the Reeves County Property, including, but not limited to, the Centurion Pecos terminal.  Centurion Pecos reasonably, foreseeably, substantially and detrimentally relied on Defendants' promises when it agreed to place deeds of trust on the Reeves County Property.

117.    To avoid injustice, Defendants should be required to fulfill the promises upon which Centurion Pecos relied and restore Centurion Pecos to the position it was in before it altered its position in reliance on Defendants' promises.

## K.    Eleventh Cause of Action:  Declaratory Judgment

118.    Plaintiffs hereby restate and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

119.    A justiciable controversy exists between Centurion Pecos and Stampede regarding the status, rights, obligations and legal relations between Centurion Pecos and Stampede in

MR.897

connection with the Company Agreement. The justiciable controversy concerns the right of members and managers of Centurion Pecos to expel Stampede as a member and manager.

120. Pursuant to the terms of the Company Agreement, transfer of membership interests is prohibited unless certain conditions were met. Among the conditions is the obligation of the transferor and transferee to provide information to assure that the transfer comported with the Company Agreement and the transferee agreed to be bound by the Company Agreement. Transfer of a membership interest includes any transfer by merger or business combination.

121. Stampede or its predecessor transferred its membership interest within the definitions of the Company Agreement through one or more of three business transactions. First, Stampede Energy, LLC, a Louisiana limited liability company, converted to Stampede. Second, Stampede merged with Stampede Energy, LLC, a Delaware limited liability company. Third, Stampede divided into two entities, Stampede and Centurion Brownsville.

122. Subsequently, both the transferor and transferee companies expressly refused to provide information about the transactions, as required by the Company Agreement, for any transfer of a membership interest to be permitted. Centurion Pecos duly called a meeting of the managers and members of Centurion Pecos in order to discuss Stampede's violations and its removal as a member and manager.

123. At the June 13, 2016 meeting, Centurion Logistics, as manager of Centurion Pecos, voted to remove Stampede as a member of Centurion Pecos. As the party whose removal was at issue, Stampede was an interested manager excluded from voting. Accordingly, Stampede was removed as a member of Centurion Pecos.

MR.898

124.     Following the June 13, 2016 managers meeting, a meeting of members was held to determine whether Stampede should be removed as a manager of Centurion Pecos for cause. Centurion Logistics, the only remaining member, voted to expel Stampede, based on its prohibited transfer of membership interest, as well as its other misconduct, as set forth in this Petition.

125.     In accordance with Tex. Civ. Prac. & Rem. Code § 37.001, et seq., Plaintiffs seeks a declaratory judgment against Defendant Stampede, wherein the Court declares that following:

(a)     The June 13, 2016 meeting was a valid meeting under the Company Agreement;

(b)     The removal of Stampede as a member of Centurion Pecos was a valid, binding and enforceable action of the managers of Centurion Pecos;

(c)     The removal of Stampede as a manager of Centurion Pecos was a valid, binding and enforceable action of the members of Centurion Pecos.

126.     In addition, there is a real and justiciable controversy between Centurion Pecos, on the one hand, and Ballengee, Ballengee Interests, and Centurion Terminals, on the other hand, concerning the enforceability of certain financial obligations that Defendants purport were entered into on behalf of Centurion Pecos.  As set forth above, Calce, without authority to act for Centurion Pecos, and in violation of his fiduciary duties, created documents purporting to obligate Centurion Pecos to pay the notes that Ballengee Interests entered into with TCB and to make other payments to Ballengee Interests.  Similarly, Calce, again without the authority to act for Centurion Pecos, and in violation of his fiduciary duties, apparently created a promissory note in favor of Centurion Terminals, purportedly obligating Centurion Pecos to make certain payments to Centurion Terminals.

MR.899

127.    In accordance with Tex. Civ. Prac. & Rem. Code § 37.001, et seq., Plaintiffs seek a declaratory judgment against Defendants Ballengee, Ballengee Interests, and Centurion Terminals, wherein the Court declares the following:

(a)    Any assumption agreement purported to exist between Ballengee Interests and Centurion Pecos is invalid, void and unenforceable;

(b)    Any agreement that purports to create a financial obligation of Centurion Pecos to Ballengee Interests is invalid, void and unenforceable; and

(c)    Any promissory note purported to create financial obligations between Centurion Pecos and Centurion Terminals is invalid, void and unenforceable.

128.    In addition and cumulative of other relief sought herein, Plaintiffs are entitled to declaratory judgment concerning the status of Stampede under the Company Agreement and the enforceability of certain financial obligations that Calce, without authority, and in violation of his fiduciary duties, purported to create on behalf of Centurion Pecos.

L.    **Twelfth Cause of Action:  Fraudulent Transfer**

129.    Plaintiffs hereby restate and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

130.    Defendants made transfers of assets, property or business interests that were once held by Centurion Midstream and Centurion Terminals.

131.    The transfers were made to an insider, subsidiary or affiliate of Centurion Midstream and Centurion Terminals, including, but not limited to JupiterMLP.

132.    The individuals and/or entities that were/are in control of Centurion Midstream and Centurion Terminals retained control over the assets, property or business interests that were transferred from Centurion Midstream and Centurion Terminals to the insiders/affiliates (including JupiterMLP), and concealed the transfers.

MR.900

133. Prior to the transfers, Centurion Midstream and Centurion Terminals were already involved in litigation with the Plaintiffs, who were seeking significant damages from Centurion Midstream and Centurion Terminals. Prior to the transfers, Centurion Midstream and Centurion Terminals had significant assets that could have been used to satisfy any judgments against them. However, as a result of the transfers, and on information and belief, Centurion Midstream and Centurion Terminals no longer have sufficient assets to satisfy any judgments rendered against them.

134. While this litigation was pending, the individuals and/or entities that were/are in control of Centurion Midstream and Centurion Terminals undertook a pattern and course of conduct to divest Centurion Midstream and Centurion Terminals of their assets, property and business interests so as to make any judgment against them uncollectible. Based upon information and belief, the transfers were completed with inadequate consideration.

135. The transfers were completed with either actual or constructive intent to hinder, delay or defraud any judgment creditors of Centurion Midstream and Centurion Terminals.

136. Hence, this Court should deem the transfers fraudulent. Because Defendants' participation in the fraudulent transfer scheme was conducted with knowledge, intent and malice, the transfers should be set aside, and Plaintiffs be awarded both actual and exemplary damages.

## VII.
## ATTORNEYS' FEES AND COSTS

137. Plaintiffs hereby restate and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

138. As a result of Defendants' actions, Plaintiffs were forced to retain the legal counsel of Shamoun & Norman, LLP ("S&N") to bring this lawsuit. Plaintiffs retained the services of S&N to prosecute these claims and agreed to pay S&N its usual, customary and

MR.901

reasonable attorneys' fees. Such action and payment is necessary for the enforcement of Plaintiffs' rights.

139. Plaintiffs seek the recovery of attorneys' fees and costs that they incur in prosecuting the above-stated claims pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code, or any other applicable law.

## VIII.
## CONDITIONS PRECEDENT

140. All conditions precedent to Plaintiffs' right to obtain the relief requested herein has been performed or has occurred.

## IX.
## PRAYER

WHEREFORE, Plaintiffs Centurion Logistics LLC, individually and on behalf of Centurion Pecos Terminal LLC, and Marc Marrocco and Antonio Albanese, individually and derivatively on behalf of Centurion Logistics, respectfully request that upon final trial of this cause the Court enter judgment against James Ballengee, Ballengee Interests, LLC, John Calce, Chris A. Mott, Stampede TX Energy, LLC, Tom Ramsey, Centurion Midstream Group, LLC, Centurion Terminals, LLC, Centurion Brownsville, LLC, and JupiterMLP, LLC as follows:

A. Against all Defendants and in favor of Plaintiffs for the amount of actual damages sustained by Plaintiffs;

B. Against all Defendants and in favor of Plaintiffs for the disgorgement of unjust enrichment and money had and received;

C. Against all Defendants and in favor of Plaintiffs for exemplary damages;

D. Entering a declaratory judgment concerning the status of Stampede under the Company Agreement and the enforceability of certain financial obligations that Calce, without

MR.902

authority, and in violation of his fiduciary duties, purported to enter into on behalf of Centurion Pecos;

E.   Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.   Granting such other and further relief as the Court deems just and proper, at law or in equity.

Respectfully submitted,

**SAYLES WERBNER, P.C.**

/s/ *Mark E. Torian*_____
Mark E. Torian
State Bar No. 24028051
mtorian@swtriallaw.com
Darren P. Nicholson
State Bar No. 24032789
dnicholson@swtriallaw.com
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
Telephone:  (214) 939-8700
Facsimile:  (214) 939-8787

**ATTORNEYS FOR PLAINTIFF CENTURION LOGISTICS LLC INDIVIDUALLY AND DERIVATIVELY ON BEHALF OF CENTURION PECOS TERMINAL LLC**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing document has been served upon the counsel of record on May 2, 2018 in accordance with the *Texas Rules of Civil Procedure*.

/s/  *Mark E. Torian*_____
Mark E. Torian

MR.903

| | | |
|---|---|---|
| CENTURION LOGISTICS LLC, | § | IN THE DISTRICT COURT OF |
| individually and derivatively on behalf of | § | |
| CENTURION PECOS TERMINAL LLC, | § | |
| a Texas limited liability company, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | DALLAS COUNTY, TEXAS |
| | § | |
| JAMES BALLENGEE, BÁLLENGEE | § | |
| INTERESTS, LLC; JOHN CALCE; | § | |
| CHRIS A. MOTT; TOM RAMSEY; | § | |
| STAMPEDE TX ENERGY, LLC, | § | |
| CENTURION MIDSTREAM GROUP LLC; | § | |
| CENTURION TERMINALS, LLC; | § | |
| CENTURION BROWNSVILLE | § | |
| TERMINAL, LLC; JAMES HOCK; | § | |
| JUPITERMLP, LLC | § | |
| | § | |
| Defendants, | § | |
| | § | B-44th JUDICIAL DISTRICT |
| and CENTURION PECOS TERMINAL | § | |
| LLC, a Texas limited liability company | § | |
| | § | |
| Nominal Defendant. | § | |

### ORDER DENYING JOHN CALCE'S AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING COUNTERCLAIM AGAINST CENTURION LOGISTICS LLC

Before the Court is *John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC* (the "Amended Motion") filed by Defendant John Calce, ("Defendant") to which Plaintiff Centurion Logistics, LLC ("Centurion Logistics") filed *Plaintiff's Response to John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC* (the "Response") in response thereto. Having considered the Amended Motion, the Response, and arguments of counsel, the Court finds that the Amended Motion should be DENIED.

MR.904

IT IS THEREFORE ORDERED that *John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC* is hereby DENIED.

SIGNED this 21st day of May, 2018.

_____
HON. BONNIE LEE GOLDSTEIN

*Order Denying John Calce's Amended Motion for Partial Summary Judgment*
*Regarding Counterclaim Against Centurion Logistics LLC*                    Page 2

MR.905